1
2
3
4
5    IN THE UNITED STATES DISTRICT COURT
6    FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    BOSTON SCIENTIFIC CORPORATION, et al.,        No. C 02-00790 SI
9              Plaintiffs,                         **ORDER RE: CORDIS'S MOTIONS FOR**
                                                   **SUMMARY JUDGMENT**
10      v.
11   JOHNSON & JOHNSON, et al.,
12             Defendants.
                                            /
13
14
15        On August 21, 2007, the Court heard argument on a series of motions for summary judgment

16   filed by defendants Johnson & Johnson and Cordis Corporation (collectively "Cordis"). Having

17   considered the papers on file and the arguments of counsel, the Court orders as set out below.

18

19                                      **BACKGROUND**

20        In 2002, plaintiffs Boston Scientific Corp., Boston Scientific Scimed, Inc., Scimed Life Systems,

21   Inc. and Schneider (Europe) GmbH (collectively "BSC") brought suit against defendants Johnson &

22   Johnson and Cordis Corporation (collectively "Cordis") for infringement of six patents. The first four

23   patents were invented at Schneider (Europe) by Gerhard Kastenhofer and are directed to a bilayered

24   catheter tube design for balloon angioplasty catheters.

25        Catheters generally consist of a hollow tube with a wire ("guide wire") running through the

26   hollow interior (or "lumen") of the tube. The insertion (or "distal") end of the catheter shaft is

27   encapsulated in a tubular balloon. The guide wire fits closely inside the tube, so that the inner surface

28   of the tube contacts and slides over the guide wire. These tubular catheters are inserted into and through

arteries to reach constricted and clogged sites. The guide wire is inserted first, and acts to guide the catheter tube into position within the artery.

Catheters having this basic structure were already in existence prior to the filing of the Kastenhofer patents. However, no tube material that was stiff enough to be pushed though the twists of arteries was also slippery enough to slide easily over the guide wire without often getting stuck. Gerhard Kastenhofer, a scientist at Schneider (Europe), invented an improved bilayered catheter design that addressed this problem, which was claimed in the Kastenhofer patents.[1]

The Kastenhofer catheter design involves a multilayered tube having an outer layer of stiff material to keep the tube firm enough to be pushed up an artery, and an inner layer of soft slippery material to allow the tube to slide easily over the guide wire. The Kastenhofer patents disclose that the bilayered tube is made by a process called coextrusion, in which the molten materials of the inner and outer layers are pushed out together through tubular dies so that the materials merge to form the required tubular structure. In Kastenhofer's preferred embodiment, the outside layer is made of a polyamide (nylon), and the inner layer is made of high density polyethylene ("HDPE").

The other patent at issue here – the Forman U.S. Patent 5,501,759 ("the '759 patent") – claims methods of forming a fusion bond between a catheter and a balloon with a laser, where the catheter and the balloon have high absorptivity. In its preferred embodiment, the catheter body is made from Hytrel polyester, the balloon is made from polyethylene terephthalate (PET), and the laser is a $CO_2$ laser. Forman filed the patent application for the '759 patent on November 29, 1991.

**LEGAL STANDARD**

**1.     Summary judgment**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a

---

[1]  Specifically, U.S. Patent Nos. 5,843,032 ("the '032 patent"); 5,961,765 ("the '765 patent"); 6,027,477 ("the '477 patent") and 6,471,673 ("the '673 patent") (Kastenhofer patents I to IV respectively).

1  matter of law."  Fed. R. Civ. P. 56(c).

2        The party requesting summary judgment has the initial burden to show that there are no genuine

3  issues of material fact.  *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 632

4  (9th Cir. 1987).  The party moving for summary judgment may satisfy its burden of production by

5  submitting affirmative evidence that negates an essential element of the nonmoving party's claim or by

6  demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential

7  element of the nonmoving party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).  If the

8  moving party meets its initial burden, then the burden shifts to the nonmoving party to point to portions

9  of pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits,

10  which "designate 'specific facts showing that there is a genuine issue for trial.'"  *See Bhan v. NME*

11  *Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991) (citing *Celotex*, 477 U.S. at 323).

12        In judging evidence at the summary judgment stage, the Court does not make credibility

13  determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the

14  nonmoving party.  *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v.*

15  *Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

16  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(e).  A summary judgment

17  motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.

18  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Hearsay statements found in affidavits are

19  inadmissible.  *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir. 1980).

20

21  **2.      Summary judgment of invalidity**

22        "Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine

23  issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Nike Inc.*

24  *v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994) (citations omitted).  A party seeking

25  to invalidate a patent must overcome a presumption that the patent is valid.  35 U.S.C. § 282; *United*

26  *States Gypsum Co. v. National Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996); *Hibritech Inc. v.*

27  *Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986).  This presumption places the burden

28  on the challenging party to prove the patent's invalidity by clear and convincing evidence.  *United States*

**United States District Court**
For the Northern District of California

*Gypsum Co.*, 74 F.3d at 1212. The challenging party's burden also includes overcoming deference to the PTO's findings and decisions in prosecuting the patent application. Deference to the PTO is due "[w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker." *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir.), *cert. denied*, 469 U.S. 821 (1984).

### 3.    Summary judgment of non-infringement

Summary judgment can be used to determine both infringement and noninfringement. *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988). The moving party bears the burden of proving infringement or noninfringement by a preponderance of the evidence. *Mannesmann Demag Corp. v. Engineered Metal Products, Inc.*, 793 F.2d 1279, 1282 (Fed Cir. 1986).

To establish infringement, every limitation in a claim as construed by the Court must be in the accused product, either exactly or by substantial equivalent. *Carroll Touch, Inc. v. Electro Mechanical Systems*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). A claim is literally infringed if the accused product is exactly the same as each element of the asserted claim. *Hi-Life Products, Inc. v. American National Water-Mattress Corp.*, 842 F.2d 323, 325 (Fed. Cir. 1986). Even if a product does not literally infringe it may infringe under the doctrine of equivalents. *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21 (1997). "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." *Sage Prods., Inc. v. Devon Indus. Inc*., 126 F.3d 1420, 1423 (Fed. Cir. 1997).

Although the determination of patent infringement is a fact-intensive process, "comparison of a properly interpreted claim with a stipulated or uncontested description of an accused device or process would reflect such an absence of material fact issue as to warrant summary judgment of infringement or noninfringement." *D.M.I. Inc. v. Deere & Co.*, 755 F.2d 1570, 1573 (Fed. Cir. 1985).

///

United States District Court
For the Northern District of California

**DISCUSSION**

1.      **MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE KASTENHOFER PATENTS ARE INVALID FOR FAILURE TO SATISFY THE WRITTEN DESCRIPTION REQUIREMENTS**

Cordis argues that the Kastenhofer patents are invalid for failure to meet the written description requirements of title 35 U.S.C. section 112.  For the following reasons, the Court finds that Cordis has not met its burden of showing entitlement to summary judgment on this issue.

The first paragraph of § 112 states:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"Whether a specification complies with the written description requirement of § 112, ¶ 1, is a question of fact . . . ."  *Regents of the Univ. of Cal. v. Eli Lilly Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997), *cert. denied*, 118 S. Ct. 1548 (1998) (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1985)).  To comply with the written description requirement, "the patent specification 'must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (alteration in original) (quoting *In re Gosteli*, 872 F.2d 1008, 1012 (Fed. Cir. 1989)); *see also Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1575 (Fed. Cir. 1985) ("[T]he test . . . is whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.").

The Kastenhofer patents cover catheters utilizing either mechanical or chemical bonds between the catheter tube layers.  Cordis argues that the patents fail to satisfy the written description requirement because at the time of application they did not allow a person of ordinary skill in the art to recognize that the inventors had possession of catheters with chemical bonds.  The specifications of the patents, Cordis argues, make no mention of chemical bonds.  If they had possession of catheters with chemical bonds, Cordis contends, they would have described chemically-bonded tubes in the specifications, because it was commonly known that chemical bonds were superior to mechanical bonds.  Therefore,

according to Cordis, the fact that the specifications do not specifically describe chemical bonds would have indicated to one skilled in the art that the inventors did not possess chemically-bonded catheters. *See* Robinson Decl. ¶¶ 6-14.

In opposition, BSC presents the declaration of Professor Robert Cohen, which states that a person of ordinary skill in the art, reading the specifications of the Kastenhofer patents, would have understood that the inventors possessed catheters with chemical bonds. *See* Cohen Decl. ¶ 36. The specifications all state that the two layers of the catheter tubes are "secured in relation to one another." In reading the word "secured," a person of ordinary skill in the art at the time, Cohen states, "would recognize that the inventors had possession of an invention that encompassed any method of securing the two layers together, including chemical bonding." Cohen Decl. ¶ 40.

Cohen's declaration is consistent with this Court's claim construction, which held that "those of skill in the art would not have limited 'secured' to mechanical forms of attachment." *See* May 11, 2004 Order at 12:22-24. Though the order interpreted "secured" in the context of the claims, there is no reason to apply a wholly different analysis to the use of "secured" in the specifications.

Accordingly, BSC has raised a triable issue as to whether the specifications would have conveyed that the inventors had possession of chemically-bonded catheter tubes. The Court therefore DENIES Cordis' motion for summary judgment of invalidity for failure to satisfy the written description requirement.

**2.    CORDIS' MOTION FOR SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE KASTENHOFER PATENTS ARE INVALID FOR OBVIOUSNESS**

A patent can be invalidated through the doctrines of anticipation or obviousness. *See* 35 U.S.C. §§ 102, 103. Section 103 states in relevant part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103(a) (West 2007). A determination of obviousness under 103 is a question of law based on underlying findings of fact. *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1339 (Fed. Cir.

United States District Court
For the Northern District of California

2003).  Obviousness is based on whether a "hypothetical person having ordinary skill in the art" with all prior art references would regard the subject matter of the invention as obvious.  *Standard Oil Co. v. American Cyanamid*, 774 F.2d 448, 453-54 (Fed. Cir. 1985).

In *KSR International Co. v. Teleflex, Inc.*, --- U.S. ---, 127 S. Ct. 1727 (2007), the Supreme Court rejected the Federal Circuit's rigid application of the "teaching, suggestion, motivation" test for obviousness.  Instead, the Court set forth several initial factors for performing an objective analysis of obviousness:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.  Against this background the obviousness or nonobviousness of the subject matter is determined.  Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 1734 (quoting *Graham v. John Deer Co. of Kansas City*, 383 U.S. 1 (1966)).  In addition to the *Graham* factors, the Court in *KSR* stated that an obviousness analysis must consider:

> interrelated teachings of multiple patents; the effect of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 1740-41.  The Court went on to affirm that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 1741.  Nevertheless, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  *Id.* at 1739.  Ultimately, the Court "set forth an expansive and flexible approach," *id.* at 1739, that takes into account "common sense," *id.* at 1742.

In this case, Cordis argues that the catheters described in the Kastenhofer patents were obvious combinations of prior art described in the following four patents:

- The "Pinchuk" patent, U.S. Patent Number 4,906,244, which describes a nylon catheter balloon, welded to a guidewire tube.  *See* Donahey Decl., Ex. 8, Col. 4:29-44.

- The "Shaffer" patent, U.S. Patent Number 5,049,132, which describes the desirability of attaching nylon catheter tubing to a nylon balloon.  *See* Donahey Decl., Ex. 6, Col. 4-5.

- The "Arney" patent, U.S. Patent Number 5,047,045, which discloses that high density

United States District Court
For the Northern District of California

polyethylene ("HDPE") would provide a low friction inner surface for free guide wire movement in a catheter. *See* Donahey Decl., Ex. 7, Col. 5, lns. 17-19.

•   The "Quackenbush" patent, U.S. Patent Number 4,840,623, which describes the use of coextrusion to make a bilayered tube. Donahey Decl., Ex. 8 at Col. 2:38-39.

With knowledge of this prior art, faced with the desire to build a catheter utilizing a nylon balloon, but with a low friction inner surface, Cordis contends that the Kastenhofer inventions would have been obvious to one skilled in the art.

The Court finds that Cordis has not met its burden on summary judgment of establishing obviousness by clear and convincing evidence. BSC has raised a triable issue as to whether the prior art taught the use of coextrusion to create a bilayered catheter comprised of HDPE and nylon. According to BSC's evidence, it was known that HDPE did not bond easily with other materials, including nylon. *See* Cohen Decl. ¶¶ 17-20; *see also* Selwyn Decl., Ex. 11 at 26:15-16 (report of Cordis' expert Janine Robinson, opining that "Polyethylene generally (and [HDPE] in particular) is chemically incompatible with a polyamid"). Accordingly, the Court DENIES Cordis' motion for summary judgment of invalidity of the Kastenhofer patents for obviousness.

**3.   CORDIS' MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE '759 FORMAN PATENT ARE INVALID FOR OBVIOUSNESS**

As discussed above, the Forman U.S. Patent 5,501,759 ("the '759 patent") claims methods of forming a fusion bond between a catheter and a balloon with a laser, where the catheter and the balloon have high absorptivity. In its preferred embodiment, the catheter body is made from Hytrel polyester, the balloon is made from polyethylene terephthalate (PET), and the laser is a $CO_2$ laser. Forman filed the patent application for the '759 patent on November 29, 1991.

Cordis sold Atlas catheters beginning in 1989 that comprised a Hytrel catheter body attached to a PET balloon. Furthermore, prior to 1991, U.S. Patent 4,958,634 ("the '634 patent") to Jang, and an article by Rüffler and Gürs entitled "Cutting and Welding Using a $CO_2$ laser" taught laser bonding with a $CO_2$ laser. Cordis argues that the Atlas catheter, the '634 patent, and the article by Rüffler and Gürs constitute prior art that collectively render the claims of the '759 patent invalid for obviousness. BSC responds by arguing that the Atlas catheter preferably bonds the catheter body and the balloon

using hot jaws, that the '634 patent fails to identify the advantages of laser bonding, and that the article by Rüffler and Gürs fails to teach laser bonding for a catheter and balloon; only the uncombined components of the '759 patent were independently known.

### A.    Claim 1 of the '759 patent

At issue is claim 1 of the '759 patent, which reads:

A process for forming a fluid tight seal between a polymeric body and a polymeric dilation member surrounding the body, comprising the steps of:

positioning a dilation member of polymeric material along and in surrounding relation to a body of polymeric material, with the dilation member and body aligned to place a first surface portion of the dilation member and a second surface portion of the body in a contiguous and confronting relation, wherein the polymeric materials forming the body and the dilation member have non-uniform energy absorption spectra that include high absorptivity wavelength bands, and wherein at least one of the high absorptivity wavelength bands of the polymeric material forming the body and at least one of the high absorptivity wavelength bands of the polymeric material forming the dilation member overlap one another in at least one range of overlapping wavelengths;

selecting a monochromatic energy wavelength that is contained within at least one of the overlapping wavelength ranges;

generating substantially monochromatic energy at said selected monochromatic energy wavelength;

controllably directing the monochromatic energy onto the body and the dilation member to concentrate the monochromatic energy in a narrow bond site circumscribing the body and running along the interface of the first and second surface portions, thus to melt the polymeric materials along said bond site and the immediate region thereof; and

allowing the previously melted polymeric material to cool and solidify to form a fusion bond between the body and dilation member.

'759 patent, Col. 9, ln. 39-Col. 10, ln. 5.

### B.    The Atlas Catheter

The parties agree that the Atlas catheter was made from Hytrel tubing and PET balloons, and sold as early as the late 1980s. However, BSC has put forth evidence that the Atlas balloons were bonded to the catheter body using hot jaws and solvents, according to Cordis's own experts and a Cordis patent issued in 1987. *See* Trotta Decl., ¶¶ 6-7; Selwyn Decl., Ex. 14.

9

**United States District Court**
For the Northern District of California

### C.    The '634 Patent

The parties agree that the Jang '634 patent specification mentions laser bonding as one among eight possible techniques for attaching a catheter body to a balloon.  Cordis argues that since laser bonding was one viable solution among a handful of possibilities, this renders the '759 patent obvious because the application of a known method will "yield predictable results."  *See KSR*, 127 S. Ct. at 1742.  However, as BSC explains, the '634 patent fails to identify a reason to try laser bonding.  *See* Cohen Decl. ¶ 42.  Furthermore, the PTO already considered the '634 patent during the prosecution process of the Forman patent, and deference is therefore due the PTO's decision to award the patent.  *See American Hoist*, 725 F.2d at 1359.  While the scope and content of the '634 patent closely parallels the '759 patent, it is unclear whether laser bonding presented such a viable solution so as to "yield predictable results."  A passing reference to laser bonding as a possible method for joining the balloon to the catheter body does not necessarily imply that it is a viable solution.  It is unclear from the record what the technological state of laser bonding in attaching plastics, such as in attaching PET balloons to a Hytrel catheter body, was at the time.  Consequently, there is a triable issue of material fact as to whether the Jang '634 patent disclosed laser bonding as a viable solution for bonding catheter tubes to balloons.

### D.    The Rüffler and Gürs' Article

Cordis supplements its argument that laser bonding was a viable solution at the time of the '634 patent by highlighting the Rüffler and Gürs' article, "Cutting and Welding using a CO2 Laser," published in 1972.  *See* Fogel Decl., Ex. 4.  The article had a section entitled "Welding of Plastics," which stated, in pertinent part:  "The use of a laser also has the advantage over the conventional method that the lossless focusing of the laser beam on the welding site . . . reduces the operating cost significantly."  *Id.* at 268.  The Court has reviewed the article and finds that it  would have provided little, if any, suggestion that CO2 lasers were a good alternative for catheter-balloon bonding.  *See id.*  The article does not identify the "conventional method" to which laser bonding was being compared, and does not otherwise teach or suggest the use of lasers in the technology at issue here.

**United States District Court**
For the Northern District of California

### E.     The Lemelson '363 Patent, and the Lentz '522 Patent

In opposition, BSC highlights the U.S. Patent 4,237,363 to Lemelson ("the '363 patent") and the U.S. Patent 4,769,522 to Lentz ("the '522 patent"). The '363 patent discloses a method for laser welding two sheets, specifically plastic sheets, and the '522 patent discusses that "an attendant disadvantage of this method [of Lemelson] is that the surface of one of the sheet elements is marred by the electron or laser beam." *See* Selwyn Decl., Ex. 17. In light of this prior art, BSC argues that one skilled in the art would not have considered lasers to be an attractive alternative for balloon-catheter bonding. There is thus a triable issue as to whether the relevant prior art "taught away" from the use of laser bonding.

### F.     Secondary Considerations

BSC argues that the invention's commercial success, the failure of others to achieve the invention, the movement of skilled artisans in a different direction prior to the discovery, and the skepticism of skilled artisans reinforce the fact that the '759 patent was not obvious at the time of the invention. As discussed above, *KSR* affirmed the decision in *Graham*, which mandated exploration of secondary considerations such as commercial success, long felt but unsolved needs, and failure of others to achieve the invention. *See Graham*, 383 U.S. at 17. In addition, the courts have included skepticism of the invention's advantages, copying, praise, unexpected results, and industry acceptance as further secondary considerations. *See, e.g., Environmental Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 697-98 (Fed. Cir. 1983); *Allen Archery, Inc., v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed. Cir. 1987).

In its reply brief, Cordis concedes that "[f]or purposes of this motion, the Court can accept that evidence of secondary considerations is present." Reply at 8:6-7. These secondary considerations, briefly discussed below, support the Court's denial of Cordis' motion.

BSC presents evidence that laser bonding of balloons to catheters has been recognized as a superior method, that Cordis has recognized laser bonding as a strength in BSC's products, and that Cordis has sought to compete with BSC to steal its market share. *See* Selwyn Decl., Exs. 9, 10, 11, and

11

12. BSC also provides evidence that Cordis attempted to develop a laser bonding process in the 1993 time frame, but failed to achieve commercial implementation. *See* Selwyn Decl., Ex. 13. Under *Graham*, the failure of others to achieve the invention is objective evidence of nonobviousness. *See* 383 U.S. at 17. BSC also provides evidence that prior to the '759 patent, the bonding of balloons to catheter bodies proceeded in the direction of hot jaw bonding and adhesives. As mentioned, a Cordis patent and a Cordis expert disclosed that the use of hot jaws and solvents as the preferred methods for bonding PET balloons to Hytrel catheter bodies. *See* Trotta Decl., ¶¶ 6-7; Selwyn Decl., Ex. 14. Furthermore, BSC presents evidence of skepticism from Schneider and Cordis's own experts. In a deposition, one of Cordis's own experts expressed skepticism of Forman actually achieving the advantages claimed in his invention, particularly with respect to matching high absorption bandwidths and obtaining low crystallinity. *See* Selwyn Decl., Ex. 20. Moreover, Forman testified, "It was an uphill battle to get the project funded, and to get people to understand that it was valuable. So it wasn't obvious to people that this was something valuable." *See* Selwyn Decl., Ex. 4.

## G. Conclusion

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiffs' motion for partial summary judgment that the asserted claims of the Forman '759 patent are invalid for obviousness.

## 4. CORDIS' MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE ASSERTED CLAIMS OF THE FORMAN '759 PATENT ARE NOT INFRINGED

Cordis argues that the asserted claims of the Forman '759 patent are not infringed because the patent requires the formation of fusion bonds substantially free from crystallization, and the bonding process used by Cordis results in significant crystallization. Cordis argues that the specifications and prosecution history of the '759 patent make clear that the claims require fusion bonds with regions "substantially free from crystallization." In opposition, BSC argues that this motion is untimely, because it seeks to impose structural limitations on the '759 patent that should have been resolved in the *Markman* proceedings three years ago. Furthermore, BSC argues that the '759 patent does not

require the formation of fusion bonds substantially free from crystallization. The Court agrees with BSC.

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). The Court retains discretion to hear belated claim construction arguments. *Cf. Hewlett-Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314, 1321 (Fed. Cir. 2003) (holding that new and more detailed interpretation of the claim language is too late at JMOL stage). In *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1292 (Fed. Cir. 2005), the Federal Circuit upheld the district court's refusal to entertain untimely claim construction arguments made "after relevant cut-off dates under the Northern District's Patent Local Rules and the trial court's scheduling order."

In this case, the claims of the '759 patent all require "allowing the previously melted polymeric material to cool and solidify to form a fusion bond between the body and dilation member." *See, e.g.*, '759 patent at claim 1 (Spanbauer Decl., Ex. A). Cordis now seeks to add a restriction to this claim: that the "fusion bond" formed by the method be "substantially free from crystallization."[2]

Cordis did not seek such a construction during the *Markman* proceedings, over three years ago, and the May 11, 2004 Claim Construction Order did not ascribe such a limitation. The issue of whether the '759 patent requires a lack of crystallization was first raised by Cordis in a memorandum filed on August 9, 2004. *See* Defendants' Memorandum of Points and Authorities Regarding Construction of Forman U.S. Patent No. 5,501,759 (Selwyn Decl., Ex. 3). The Court refused to rule on the issue because no formal motion was filed with the memorandum. Cordis did not re-raise the issue until now – three years later.

Cordis provides no justification for its delay, and the Court finds that Cordis' claim construction argument is untimely. As a result, the asserted claims of the '759 patent do not require a limitation of having fusion bonds with regions near the bond sites being "substantially free of crystallization."

Moreover, having considered the merits of Cordis' tardy claim construction argument, the Court finds that the '759 patent does not require the production of fusion bonds "substantially free of

---

[2] The "substantially free from crystallization" language is found in the claims of the '959 patent, which has since been dismissed from this lawsuit; the language appears nowhere in the claims of the '759 patent.

13

United States District Court
For the Northern District of California

crystallization." Cordis presents evidence that its device resulted in the same amount of crystallization whether using hot jaw bonding and laser bonding. Consequently, Cordis argues, its method did not result in a device "substantially free of crystallization," and the method therefore does not infringe the '759 patent. The Court disagrees. Cordis is correct that one of the explicit goals of the '759 patent inventors was to create a method for manufacturing catheters "substantially free of crystallization." *See* '759 patent, col. 3, lines 57-62; col. 7, lines 57-62; col. 9, lines 26-32. None of the patent claims, however, contain such a limitation, and Cordis cites no authority for the proposition that the goals of a method should be imported as claim limitations. If a product is created through a method identical to that claimed in a valid patent, but the product fails to meet one of the goals highlighted in the specifications or description of the patent, it still infringes. The cases cited by Cordis do not hold to the contrary. If Cordis device was created pursuant to the method described in the claims of the '759 patent, then it infringed that patent, regardless of whether the device meets all of the goals the '759 inventors sought to achieve.

Accordingly, the Court DENIES plaintiffs' motion for partial summary judgment that the asserted claims of the Forman '759 patent are not infringed.

## 5.   CORDIS' MOTION FOR SUMMARY JUDGMENT LIMITING BSC'S DAMAGE CLAIMS

Cordis moves the Court to limit the damages available to BSC based on the "full compensation" and "patent exhaustion" doctrines. Cordis also moves for summary judgment on BSC's indirect infringement claims with respect to the "rapid exchange" products. The Court rules as follows.

### A.   Full compensation

Cordis argues that BSC has already fully recovered for allegedly infringing "rapid exchange" products that were manufactured by Guidant and Abbott for Cordis.

In *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 512 (1964), the Supreme Court stated:

> we think that after a patentee has collected from or on behalf of a direct infringer damages sufficient to put him in the position he would have occupied had there been no

United States District Court
For the Northern District of California

> infringement, he cannot thereafter collect actual damages from a person liable only for contributing to the same infringement. This principle is but an application of the rule that full satisfaction received from one tort-feasor prevents further recovery against another.

The Court continued: "Where a private release of past infringement which does not purport to release others is involved, the adequacy of the compensation must always be a question of fact." *Id.* at 513.

Here, Cordis argues that BSC was fully compensated for the allegedly infringing "rapid exchange" products when BSC settled with Guidant in 2004, and when Abbott bought Guidant's vascular division from BSC in 2006[3]. As part of the settlement agreement, Cordis contends, BSC received billions of dollars worth of licenses from Guidant. "This compensation," Cordis contends, "was more than enough to compensate BSC for the $[figure under seal] in damages allegedly caused by the products that []Cordis bought from Guidant/Abbott." Reply at 2:16-18.

In opposition, BSC argues only that whether it has received full compensation is a question of fact that cannot be resolved on summary judgment. The Court agrees with BSC that this is a question of fact. However, as with any issue of fact, this issue can be resolved at summary judgment if the moving party presents uncontroverted evidence of the fact. Because BSC has not presented any evidence on the issue of full compensation, the Court must examine Cordis' factual showing to determine if it definitively establishes that BSC has been fully compensated.

Cordis has presented evidence that the total value of BSC's settlement with Guidant, along with Abbott's acquisition of Guidant's vascular division, is much greater than the maximum damages owed BSC by Cordis for the "rapid exchange" products. BSC's settlement with Guidant, however, dealt with numerous claims that fall outside the scope of this lawsuit, and resulted in complex licensing and other cooperative arrangements. It is thus difficult, if not impossible, for the Court to determine, on this record, what compensation BSC received from Guidant in consideration for settling the infringement claims related to the "rapid exchange" products. Similarly, it is unclear what fraction of the $3.8 billion paid by Abbott for the vascular division reflected consideration for the covenant not to sue granted by

---

[3]BSC acquired Guidant on April 21, 2006. As part of the merger approval, the FTC required BSC to divest the vascular division of Guidant, which made the "rapid exchange" products. BSC divested to Abbott, which paid over $3.8 billion for the division. With the divestment, the FTC required BSC to covenant not to sue Abbott for infringing any of BSC's patents covering products made by the vascular division.

15

United States District Court
For the Northern District of California

BSC.  Citing California law, Cordis argues that because the allocations are not clear, BSC should have the burden of establishing that it did not receive full compensation under the settlement agreement with Guidant.  The Court disagrees with Cordis.  The "full compensation" doctrine is an affirmative defense, which Cordis has the burden of proving.  Absent any federal authority so mandating, the Court will not shift the burden onto BSC, forcing it to disprove full compensation.

At this stage, therefore, Cordis has the burden of establishing that there is no triable issue as to whether BSC received full compensation for the "rapid exchange" products.  Given the complexity of BSC's settlement and resulting relationship with Guidant, Cordis has failed to meet this burden, at this stage.[4]

**B.      Patent exhaustion**

Cordis next argues that the "patent exhaustion doctrine" precludes BSC from recovering for infringement by the "rapid exchange" products.  The Federal Circuit recently addressed the patent exhaustion doctrine, in *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364 (Fed. Cir. 2006). The court summarized the doctrine as follows:

> [T]he patent exhaustion doctrine, commonly referred to as the first sale doctrine, is triggered by an unconditional sale.  "[A]n unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter. The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods.  This exhaustion doctrine, however, does not apply to an expressly conditional sale or license.  In such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee."

*Id.* at 1369-70 (citations omitted).  The facts of *LG Electronics*, summarized by the Federal Circuit as follows, were somewhat analogous to the facts faced here:

> Defendants purchase microprocessors and chipsets from Intel or its authorized distributors and install them in computers.  Intel is authorized to sell these products to defendants under an agreement with [plaintiff] LGE. However, pursuant to this agreement, Intel notified defendants that, although it was licensed to sell the products to them, they were not authorized under that agreement to combine the products with non-Intel products. LGE brought suit against defendants, asserting that the combination of microprocessors or chipsets with other computer components infringes LGE's patents

---

[4]Other district courts have reached similar conclusions in factually analogous cases.  *See Omniglow Corp. v. Unique Indus., Inc.*, 184 F. Supp. 2d 105 (D. Mass. 2002); *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*, 2007 WL 1793770 (N.D. Cal. June 19, 2007).

United States District Court
For the Northern District of California

1  covering those combinations.  LGE did not assert patent rights in the microprocessors
2  or chipsets themselves.

3  *Id.* at 1368.

4  The Federal Circuit ultimately reversed the district court's finding that the patent exhaustion

   doctrine applied, stating:

6  > The LGE-Intel license expressly disclaims granting a license allowing computer system
   > manufacturers to combine Intel's licensed parts with other non-Intel components.
   > Moreover, this conditional agreement required Intel to notify its customers of the limited
7  > scope of the license, which it did.  Although Intel was free to sell its microprocessors and
   > chipsets, those sales were conditional, and Intel's customers were expressly prohibited
8  > from infringing LGE's combination patents.  The "exhaustion doctrine . . . does not apply
   > to an expressly conditional sale or license," so LGE's rights in asserting infringement of
9  > its system claims were not exhausted.

10 *Id.* at 1370 (citations omitted).

11 Here, BSC has covenanted not to sue Guidant and Abbot for their manufacture and sale of the

12 "rapid exchange" products.  Cordis argues that the covenants-not-to-sue are equivalent to unconditional

13 licenses, and BSC therefore exhausted its patent claims by settling with Guidant and Abbot.  The Court

14 disagrees.  Even assuming a covenant-not-to-sue should be treated the same as a license, the covenants

15 here were not unconditional, and under *LG Electronics*, the exhaustion doctrine does not apply.

16 The BSC-Guidant settlement agreement contains the following language:

17 > These covenants not to sue are personal to the Guidant Companies and the BSC
   > Companies, and do not extend for the benefit of any other entity nor grant any license
18 > . . . .  Prior to any manufacture for or by or sale to any Listed Company where the
   > manufacture or sale would be licensed under Section 1.1 or Section 1.2 if made by, made
19 > for, or sold to an entity other than a Listed Company, the Guidant Companies or BSC
   > Companies, as the case may be, shall notify the Listed Company that the Guidant
20 > Companies or BSC Companies, as the case may be, do not have a license right or
   > covenant not to sue . . . from the other Party that extends to the Listed Company for such
21 > activities.  Within two weeks of the Effective Date of this Agreement, the Guidant
   > Companies will notify Johnson & Johnson that they do not receive a license right or
22 > covenant not to sue pursuant to this Agreement.

23 Oppo., App. A (quoting Selwyn Decl., Ex. 1 § 1.3).

24 The BSC-Abbott transaction agreement also contains a covenant not to sue, which is expressly

25 limited as follows:  "The covenant not to sue contained in this Section 5.08(e) shall extend only to

26 suppliers, licensees, distributors and customers of Abbott and its Affiliates that are not Restricted

27 Persons."  Oppo., App. A (quoting Selwyn Decl., Ex. 5 § 5.08(e)).  Johnson & Johnson is a "Restricted

28 Person."  *See* Selwyn Decl., Ex. 5, Schedule 1.01.

17

Thus, as in *LG Electronics*, Guidant and Abbott were "authorized to sell these products to defendants under an agreement with" BSC. 453 F.3d at 1368. Also as in *LG Electronics*, the covenants here explicitly excluded Guidant's and Abbott's subsequent sales to defendants. Guidant, in fact, was required to notify defendants that they were not covered by the covenant not to sue. Accordingly, the rights granted Guidant and Abbott under their agreements with BSC were not equivalent to unconditional licenses. The Court must therefore GRANT summary judgment in BSC's favor on Cordis' patent exhaustion defense.[5]

### C.      Indirect infringement

#### 1.      § 271(b):  inducement

Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and knowingly aid[ed] and abett[ed] another's direct infringement." However, "knowledge of the acts alleged to constitute infringement" is not enough. The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (citations omitted).

[T]he intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. In the words of a recent decision, inducement requires "'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'" Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.

*Id.* at 1306 (citations omitted). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Id.* (quoting case).

Here, according to Cordis, it "did not tell Guidant/Abbott how to make the 'rapid exchange' products, it simply selected an existing, off-the-shelf 'rapid exchange' product and asked Guidant/Abbott to replace the balloon on that product with a standard J&J/Cordis balloon." Reply at 11:9-11.

---

[5]Cordis asserted at hearing that there are no facts in dispute on this issue, and that the Court could and should rule one way or another on the patent exhaustion issue.

United States District Court
For the Northern District of California

In opposition, with respect to alleged infringement of the Forman patents, BSC presents evidence "that Cordis knew that ACS[6] [Advanced Cardiovascular Systems] was laser bonding the balloons to the catheters," and "that Cordis was aware of BSC's laser bonded products, desired laser bonded catheters, and hoped to 'steal' market share from BSC." Oppo. at 19:15-19. From this evidence, BSC argues a reasonable jury could conclude that Cordis induced infringement. The Court disagrees. As discussed above, inducement requires more than knowledge. BSC has provided evidence only of knowledge that laser bonding was being used. Similarly, with respect to the Kastenhofer patents, BSC presents evidence only that Cordis knew that the tubes used by ACS were multi-layer catheters, with the outer layer made of nylon. *See* Oppo. at 20:10-22; Selwyn Decl., Ex. 8 (Lorenzo Depo. at 69:9-15). BSC presents no evidence that Cordis intended ACS to manufacture multi-layer catheters that infringed the Kastenhofer patents.

BSC argues that intent can be inferred under the Supreme Court's ruling in *Metro-Goldwyn-Mayer Studios, Inv. v. Grokster, Ltd.*, 545 U.S. 913 (2005). In *Grokster*, the Court found that a jury could infer intent to induce infringement based on three pieces of evidence: "First, each [defendant] showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users." *Id.* at 939. Second, "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software." *Id.* Third, "the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing." *Id.* Cordis' position, BSC argues, is analogous to that of the defendants in *Grokster*, because Cordis "made no attempt to develop mechanisms to diminish known infringing uses, and benefitted financially from acts of direct infringement." Opp. at 20:1-2. Specifically, "Cordis made no effort during the next five years [after BSC filed suit] to change from laser bonding to heat jaws, even though it could have contractually required ACS to make such a change." Oppo. at 20:3-5. *Grokster*, however, is distinguishable. The product at issue in *Grokster* was designed specifically to allow people to violate copyrights by sharing music files and other protected material. The purchase of finished products, or the direction of a manufacturing process, is fundamentally different from the design and maintenance

---

[6]ACS apparently was a division or affiliate of Guidant.

**United States District Court**
For the Northern District of California

1   of a software platform that is designed to allow consumers to infringe intellectual property. *Grokster*

2   is therefore of little help to plaintiff here.

3       BSC's argument would require a rule that if a defendant knows a third-party is possibly

4   infringing, and does nothing to discourage such actions, intent can be inferred.   BSC provides no

5   authority for such a rule, and such a rule would essentially render meaningless the emphasis placed by

6   the Federal Circuit in *DSU* on the fact that inducement requires more than knowledge.  The Court

7   therefore GRANTS Cordis' motion for partial summary judgment on BSC's claims for inducement with

8   respect to the "rapid exchange" products.

9

10                          **2.     § 271(c)**

11      Section 271(c) establishes contributory infringement liability, for those who sell components

12  they know will be used in an infringing products.  Here, BSC seeks to hold Cordis liable for selling

13  Number 12 nylon balloons to Guidant and Abbott for use in infringing catheters.

14      Cordis argues that BSC cannot show the requisite intent.  Under section 271(c), "[o]ne who

15  makes and sells articles which are only adapted to be used in a patented combination will be presumed

16  to intend the natural consequences of his acts; he will be presumed to intend that they shall be used in

17  the combination of the patent." *Grokster*, 545 U.S. at 932.  Cordis presents evidence that the Number

18  12 nylon balloons are used in many types of catheters, many of which are made "using heated metallic

19  elements, not laser bonding, to attach the balloon to the catheter shaft.  This has been true for over 10

20  years." Trotta Decl. ¶ 6; *see also id.* ¶¶ 7-10.  Similarly, Cordis presents evidence that the Number 12

21  balloons can be attached to single-layer guidwire tubes.  *See id.* ¶ 12.  In particular, "Cordis sold a

22  product called the Predator for many years that had a Nylon 12 balloon heat bonded to a guidewire tube

23  made from a single layer of nylon." *Id.*

24      In the face of this evidence of non-infringing uses, BSC presents two pieces of evidence which

25  it argues demonstrate that the nylon balloons sold by Cordis "are only adapted to be used" in the

26  infringing "rapid exchange" catheters.  *See* Selwyn Decl., Ex. 8 (Lorenzo Dep.) at 59; Selwyn Decl.,

27  Ex. 15.  The portion of the Lorenzo deposition cited by BSC, however, only establishes that the balloons

28  could not "be used *by ACS* for any purpose other than manufacturing" infringing catheters.  Selwyn

1  Decl., Ex. 8 at 59:3-5 (emphasis added).  The fact that ACS could only use the balloons for one purpose

2  does not indicate that the balloons were not used by other manufacturers in non-infringing products.

3  The second piece of evidence – minutes from joint development meetings between Cordis and ACS –

4  similarly lacks probative value.  *See* Selwyn Decl., Ex. 15.  BSC asserts that the minutes "show that

5  Cordis spent considerable time and effort in 2000 to adapt the balloons so that they would be especially

6  suitable for ACS's processes."  Oppo. at 21:20-24.  The Court has reviewed the minutes, and does not

7  see any obvious evidence of efforts by Cordis to customize the balloons.  BSC has thus failed to present

8  any evidence to contradict Cordis' evidence that the Number 12 nylon balloons were used in products

9  that infringed neither the Forman nor the Kastenhofer patents.

10  Accordingly, the Court GRANTS Cordis' motion for summary judgment on BSC's contributory

11  infringement claims, with respect to both the Forman and Kastenhofer patents.

12

### 3.   § 271(g)

14  Finally, Cordis argues that section 271(g) does not apply to products manufactured inside the

15  United States.  Section 271(g) reads, in pertinent part:

16  Whoever without authority imports into the United States or offers to sell, sells, or uses
   within the United States a product which is made by a process patented in the United
17  States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the
   product occurs during the term of such process patent.
18

19  Cordis argues that despite its plain language, this subsection was intended by Congress only to address

20  importation of goods created through infringing processes conducted outside of the United States.  In

21  support of this argument, Cordis cites *Hughes Aircraft Co. v. Nat'l Semiconductor Corp.*, 857 F. Supp.

22  691 (N.D. Cal. 1994), in which Judge Williams of this Court held:

23  Based on legislative history, it appears that [section 271(g)] was designed to provide a
   remedy within the United States for United States process patent holders whose
   processes were being used in other countries to manufacture goods for importation into
24  the United States.  It does not appear to have been designed to provide a basis for
   holding a domestic, downstream seller of goods . . . liable for infringement merely
25  because it has incorporated an allegedly infringing good produced by a domestic,
   upstream manufacturer . . . into its finished product.
26

27  *Id.* at 698-99.

   In opposition, BSC cites only one case – an unpublished decision from the Eastern District of
28

21

New York – in which a court has applied section 271(g) to activities taking place entirely in the United

States. Absent any controlling authority, this Court finds the analysis of Judge Williams persuasive, and

therefore GRANTS Cordis' motion for summary judgment on BSC's section 271(g) claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Cordis' motion for summary judgment on BSC's

section 271(b), (c) and (g) claims with respect to the "rapid exchange" products; DENIES the remainder

of Cordis' motions for summary judgment; and GRANTS summary judgment in BSC's favor on Cordis'

patent exhaustion defense.  [Docket Nos. 548, 554, 558, 562, 570, 574]

**IT IS SO ORDERED.**

Dated: August 21 , 2007

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California