1
2
3
4
5             IN THE UNITED STATES DISTRICT COURT

6             FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   BOSTON SCIENTIFIC CORPORATION, et al.,        No. C 02-00790 SI

9              Plaintiffs,              **ORDER RE: VARIOUS POST-TRIAL**
                                        **MOTIONS**
10     v.

11   JOHNSON & JOHNSON, et al.,

12             Defendants.
    _____/

13

14       On February 15, 2008, the Court heard oral argument on plaintiffs' and defendants' motions for

15  renewed judgment as a matter of law, plaintiffs' motions for a new trial, and defendants' motion for

16  damages and equitable relief.  Having considered the arguments of counsel and the papers submitted,

17  the Court hereby DENIES all of plaintiffs' motions.  In addition, the Court DENIES defendants'

18  renewed motion for judgment as a matter of law and DENIES defendants' motion for retrospective

19  damages.  The Court reserves judgment on defendants' motion for equitable relief.

20

21                            **BACKGROUND**

22       In 2002, plaintiffs Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life

23  Systems, Inc., and Schneider (Europe) GmbH (collectively "BSC") brought suit against defendants

24  Johnson & Johnson and Cordis Corporation (collectively "Cordis") for infringement of six patents.  The

25  first four patents were invented at Schneider (Europe) by Gerhard Kastenhofer and are directed to a

26  bilayered catheter tube design for balloon angioplasty catheters.

27       Catheters generally consist of a hollow tube with a wire ("guide wire") running through the

28  hollow interior (or "lumen") of the tube.  The insertion (or "distal") end of the catheter shaft is

1   encapsulated in a tubular balloon.  The guide wire fits closely inside the tube, so that the inner surface

2   of the tube contacts and slides over the guide wire.  These tubular catheters are inserted into and through

3   arteries to reach constricted and clogged sites.  The guide wire is inserted first, and acts to guide the

4   catheter tube into position within the artery.

5       Catheters having this basic structure were already in existence prior to the filing of the

6   Kastenhofer patents.  However, no tube material that was stiff enough to be pushed though the twists

7   of arteries was also slippery enough to slide easily over the guide wire without often getting stuck.

8   Gerhard Kastenhofer, a scientist at Schneider (Europe), invented an improved bilayered catheter design

9   that addressed this problem, which was claimed in the Kastenhofer patents.[1]

10      The Kastenhofer catheter design involves a multilayered tube having an outer layer of stiff

11  material to keep the tube firm enough to be pushed up an artery, and an inner layer of soft slippery

12  material to allow the tube to slide easily over the guide wire.  The Kastenhofer patents disclose that the

13  bilayered tube is made by a process called coextrusion, in which the molten materials of the inner and

14  outer layers are pushed out together through tubular dies so that the materials merge to form the required

15  tubular structure.  In Kastenhofer's preferred embodiment, the outside layer is made of a polyamide

16  (nylon), and the inner layer is made of high density polyethylene ("HDPE").

17      Also at issue in this case is BSC's infringement of Cordis' patents.  Defendants counterclaimed

18  that plaintiffs are infringing three Cordis-owned U.S. patents invented by Carlos Fontirroche and Jason

19  Querns (collectively, the "Fontirroche patents").[2]  As with the Kastenhofer patents, the Fontirroche

20  patents are directed to a bilayered catheter tube design for balloon angioplasty catheters.

21      A jury trial was held from October 9, 2007 to October 31, 2007.  BSC's argument that Cordis

22  infringed the claims of the Kastenhofer patents, as well as Cordis' argument that BSC infringed Claim

23  7 of the Fontirroche patent, were submitted to the jury.  Also submitted to the jury were preliminary

24  factual questions relating to the obviousness of the Kastenhofer patents.  The jury found for Cordis on

25

26      [1] Specifically, U.S. Patent Nos. 5,843,032 ("the '032 patent"); 5,961,765 ("the '765 patent");
    6,027,477 ("the '477 patent") and 6,471,673 ("the '673 patent") (Kastenhofer patents I to IV
27  respectively).

28      [2] The Fontirroche patents bear U.S. Patent Nos. 5,538,510 ("the '510 patent"), 5,820,594 ("the
    '594 patent"), and 5,824,173 ("the '173 patent").

2

its invalidity contention that BSC did not reduce the invention of the Kastenhofer patents to practice in January 1992 and that Christine Byam was not correctly named as a joint inventor of the Kastenhofer patents. The jury also found that BSC infringed Claim 7 of the Fontirroche patent under the doctrine of equivalents. The question of damages for BSC's infringement of the Fontirroche patent was not submitted to the jury because Cordis inexplicably chose not to call its damages expert and therefore failed to put on evidence regarding a reasonable royalty rate.

Now before the Court are: (1) BSC's renewed motion for judgment as a matter of law and motion for a new trial as to the validity of the Kastenhofer patents; (2) BSC's renewed motion for judgment as a matter of law and motion for a new trial as to the jury's finding of infringement of the Fontirroche patent; (3) Cordis' renewed motion for judgment as a matter of law as to the jury's findings on both patents; and (4) Cordis' motion for damages and equitable relief stemming from BSC's infringement of the Fontirroche patent.

## LEGAL STANDARD

### I. Renewed motion for judgment as a matter of law: Rule 50(b)

Federal Rule of Civil Procedure 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

The party moving for judgment as a matter of law bears a heavy burden. Granting a renewed motion for judgment as a matter of law is proper when the evidence construed in the light most favorable to the non-moving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's verdict. *See Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181 (9th Cir. 1989).

The question in a motion for judgment as a matter of law is whether there is substantial evidence to support the jury finding for the non-moving party. *See Johnson v. Paradise Valley Unified Sch. Dist.*,

251 F.3d 1222, 1227 (9th Cir. 2001); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 909 (9th Cir. 1978). In ruling on such a motion, the trial court may not weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists to support the verdict. *See Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984). Substantial evidence is more than a scintilla of evidence. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Chisholm Bris. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1140 (9th Cir. 1974). Rather, it is defined as such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *See Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).

## II. Motion for new trial: Rule 59(a)

Rule 59 of the Federal Rules of Civil Procedure provides that "[t]he court may, on motion, grant a new trial . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Rule 59 gives the trial judge the power to prevent a miscarriage of justice. *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246 (9th Cir. 1957). A new trial may be ordered to correct manifest errors of law or fact, but "the burden of showing harmful error rests on the party seeking the new trial." *Malhiot v. S. Cal. Retail Clerks Union*, 735 F.2d 1133 (9th Cir. 1984). A motion for new trial may invoke the court's discretion insofar as it is based on claims that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Where a movant claims that a verdict is against the clear weight of the evidence, a new trial should be granted where, after giving full respect to the jury's findings, the judge "is left with the definite and firm conviction that a mistake has been committed" by the jury. *Landes Const. Co.*, 833 F.2d at 1371-72.

The authority to grant a new trial under Rule 59 "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon*, 449 U.S. 33, 36 (1980) (per curiam); *see Vickery v. Fisher Governor Co.*, 417 F.2d 466, 470 (9th Cir. 1969) (trial court has "wide

judicial discretion" in considering new trial motion).  A trial court may grant a motion for a new trial

if the verdict is "contrary to the clear weight of the evidence, or is based upon evidence which is false,

or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Roy v. Volkswagen of*

*Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quoting *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359

(9th Cir. 1976)).  A court may grant a motion for a new trial where the jury instructions were erroneous

or inadequate, so long as the moving party demonstrates that it made a request for alternative

instructions that could have corrected the "fatal flaws" in the instructions that were given. *Chiron Corp.*

*v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004).

## DISCUSSION

### I.    Invalidity of the Kastenhofer patents

The first issue raised by the parties, in competing motions, is whether the Court should find that

the Kastenhofer patents are invalid.  The jury found that Cordis proved, by clear and convincing

evidence, that (1) BSC did not have a reduction to practice of the invention the Kastenhofer patents

in January 1992, and (2) Christine Byam was not correctly named as a joint inventor of the Kastenhofer

patents.  Although the ultimate question regarding the obviousness of the Kastenhofer patents is a

decision for the Court, the jury also answered preliminary factual questions having to do with secondary

considerations of the obviousness of the Kastenhofer patents.  BSC now moves for a new trial as to

whether the Kastenhofer patents were reduced to practice in January 1992.  BSC also moves for

judgment as a matter of law or, in the alternative, for a new trial, as to whether Byam was properly

named as a joint inventor of the Kastenhofer patents.  Cordis now renews its motion for judgment as a

matter of law as to whether the Kastenhofer patents are invalid for obviousness.  The Court will address

each issue in turn.

### A.    Reduction to practice of the Kastenhofer patents

BSC argues that the Court should order a new trial on the issue of whether BSC reduced to

practice the claimed invention of the Kastenhofer patents in January 1992 because the jury instructions

regarding the "intended purpose" of the Kastenhofer patents were erroneous and because the jury's

1   verdict was against the great weight of the evidence.  Cordis argues in response that the instructions'
2   description of the "intended purpose" was correct and that the jury's verdict is supported by the
3   evidence presented at trial.

4       "A reduction to practice does not occur until an inventor, or perhaps his agent, knows that the
5   invention will work for its intended purpose."  *Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 593
6   (Fed. Cir. 1997); *see also Manning v. Paradis*, 296 F.3d 1098, 1102 (Fed. Cir. 2002).  Reduction to
7   practice does not require the invention, when tested, to "be in a commercially satisfactory stage of
8   development."  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 838 (Fed.
9   Cir. 1984) (internal quotation marks omitted).

10      BSC argues the Court erroneously identified the intended purpose of the claimed invention of
11  the Kastenhofer patents when it stated, in both the preliminary and final jury instructions, that the
12  intended purpose was "to present an interventional low profile balloon catheter that can be moved into
13  tortuous vessels with a guidewire inside the catheter *without the risk of the guidewire being captured*
14  *or clogging in the catheter.*"  Selwyn Decl. at ex. 1, Tr. 97-98 (emphasis added).  BSC takes issue with
15  the last phrase of this instruction, arguing that the Kastenhofer claims do not require that the guide wire
16  not be captured or clogged in the catheter.  Instead, BSC argues the Court should have adopted its
17  definition of the intended purpose as "a catheter with a low-friction inner tube that was capable of being
18  bonded to a catheter balloon."  *See* BSC Renewed Motion for JMOL at 5.  The Court disagrees.  The
19  specification of the '032 patent states that "[t]he *purpose* of the present invention is to present an
20  interventional low profile balloon catheter that can be moved into tortuous vessels with a guidewire
21  inside the catheter *without the risk of the guidewire being captured or clogging in the catheter.*"  PTX
22  1, col. 3, lns. 3-7 (emphasis added).  In addition, the abstract states that "[t]he inner layer is comprised
23  of a low friction nonkinkable material to avoid risk of clogging of a guide wire in the longitudinal
24  lumen," PTX 1, Abstract, while the background section states that "[a] problem with these catheters is
25  that the guide wire may clog into the longitudinal lumen of the catheter. . . ," PTX 1, col. 1, lns. 21-23.
26  Thus, as a matter of common sense, the intended purpose of the Kastenhofer patents was to create a
27  catheter whose guide wire did not clog.  BSC's proposed intended purpose, on the other hand, appears
28  to be nothing more than a recitation of the structural requirements of the invention, not its purpose.

In addition, the Court did not err, as a legal matter, in relying on the patent's specification to define the intended purpose of the invention. The Federal Circuit has relied on a preamble when it "gives meaning and purpose" to the claimed invention. *Manning*, 296 F.3d at 1104 ("Just as the preamble of a count may define a limitation of the count, so too it may define the intended purpose of the invention."). BSC points to the recent case of *Z4 Technologies, Incorporated v. Microsoft Corporation*, 507 F.3d 1340 (Fed. Cir. 2007), for the proposition that a court may look only to the language of the claims in defining the intended purpose of an invention. BSC reads too much into *Z4*, however. There, the Federal Circuit held that the intended purpose of the invention was not to "stop" piracy but to "reduce" it, because "the claim language indicates that the purpose of the invention is merely the *reduction*, rather than the elimination, of such piracy." *Id.* at 1352. The court did not state that it would be improper to look beyond the claim language to determine the intended purpose of an invention, but rather that in that particular case, the claim language did not support the intended purpose found by the district court because the district court appears to have invented out of whole cloth the purpose of "stopping" piracy. *Id.* The patents at issue in that case contain no language whatsoever suggesting that the purpose was to "stop piracy," *see* U.S. Patents No. 6,044,471 & 6,785,825, such that the Federal Circuit was merely looking at the purpose reflected in the patents themselves, not as enlarged by the district court. In short, *Z4* does not prevent this Court from examining the specification of the '032 patent in determining the intended purpose of the Kastenhofer patents. Therefore, the jury instructions regarding intended purpose were not erroneous, and BSC's motion for a new trial on those grounds is DENIED.

Next, BSC argues that the preliminary jury instructions were erroneous and incomplete because they may have led the jury to believe that reduction to practice required a showing that BSC's invention was entirely successful and that there was no possibility of failure, i.e. a showing of perfection. The Court takes no position on whether the preliminary jury instructions were incomplete. Assuming, for the sake of argument, that they were incomplete, any error was remedied by the instructions given to the jury at the end of trial, to which BSC does not object. *See Guam v. Ignacio*, 852 F.2d 459, 461 (9th Cir. 1988) ("Because the trial judge used the correct instruction at the end of trial, and because the correct instruction was the only instruction given to the jury to take with them to the jury room, it is

presumed that the jury followed the correct instruction."); *see also Petrocelli v. Angelone*, 248 F.3d 877, 888-89 (9th Cir. 2001) (same). Here, the Court's final instructions correctly informed the jury that reduction to practice does not require "that the catheter must have absolutely no risk of the guidewire being captured or clogging in the catheter. . . . Testing must show that there is a probability that the invention can be used for its intended purpose. . . . Reduction to practice do [sic] not require that the invention, when tested, be a commercial product." Cordis' Opposition to BSC's Renewed Motion for JMOL at ex. B, Tr. 2005-06. The strong wording of the final instructions was sufficient to correct any incorrect impressions the jury might have had about BSC's need to achieve perfection when testing its catheter. The Court DENIES BSC's motion for a new trial as to any incomplete preliminary jury instructions.

BSC's final argument is that the jury's verdict must be set aside because the clear weight of the evidence demonstrates that BSC's prototype catheters worked for the intended purpose identified by the Court "beyond a probability of failure." *Scott v. Finney*, 34 F.3d 1058, 1062 (Fed. Cir. 1994) ("Testing need not show utility beyond a possibility of failure, but only utility beyond a probability of failure."). The Court disagrees. The evidence presented at trial was sufficient to support the jury's verdict regarding reduction to practice, and the Court is not "left with the definite and firm conviction that a mistake has been committed" by the jury. *Landes Const.*, 833 F.2d at 1371-72. For example, the jury could have found that there was not a probability that the invention could be used for its intended purpose based on contemporaneous evidence that in one of fifteen "crush tests," the guide wire clogged in the tube. The jury heard testimony from an engineer that this single incident would have been "of significant concern" because "a piece of free plastic in somebody's coronary vasculature is . . . it's just game over. That's not okay. . . . As a designer you just wouldn't accept that." Cordis' Opposition to BSC's Renewed Motion for JMOL at ex. B, Tr. 833. The jury also heard evidence that in either ten or twelve of the fifteen tests, the catheters delaminated, *see*, *e.g.*, *id.* at Tr. 824 ("there was evidence of those layers coming apart or peeling apart consistently"), and that such delamination created a risk of the guide wire becoming clogged, *id.* at Tr. 825; DX 4019 at 120-21. In addition, the jury also could have found that employees working on BSC's prototype catheters themselves recognized that delamination and the risk of clogging created serious problems, such that the project could not go

forward, *see* Cordis' Opposition to BSC's Renewed Motion for JMOL at 14, for safety reasons, *id.* at ex. B, Tr. 1407-08. For any of these reasons, the jury could have found that there was not a probability that the catheter could be used for its intended purpose. The Court DENIES BSC's motion for a new trial on these grounds. Accordingly, the jury's verdict that Cordis proved that the invention of the Kastenhofer patents was not reduced to practice in January 1992 stands, and the Court deems the Kastenhofer patents invalid under 35 U.S.C. § 102(g)(2).

### B. Joint inventorship of the Kastenhofer patents

The jury found that Cordis proved, by clear and convincing evidence, that Christine Byam was not correctly named as a joint inventor of the Kastenhofer patents. BSC moves for judgment as a matter of law that Byam is a joint inventor of the patents and moves, in the alternative, for a new trial on the issue of joint inventorship. Cordis opposes the motion, arguing that the jury's verdict was supported by sufficient evidence.

The right to a patent may be lost if a person "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). Joint inventors "may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent." 35 U.S.C. § 116. The parties here agree that the Court correctly instructed the jury regarding joint inventorship when it stated that (1) each inventor must have made a contribution to the conception of at least one claim of the patent and (2) that the inventors must have collaborated in some fashion. *See* BSC's Renewed Motion for JMOL at 13; Cordis' Opposition to BSC's Renewed Motion for JMOL at 2.

The Court agrees with Cordis that substantial evidence supports the jury's verdict regarding joint inventorship. The jury could have found either that Byam did not make a contribution to any claims of the patents or that Byam did not collaborate with Kastenhofer, or both, based on Kastenhofer's testimony that he alone came up with the idea to use HDPE as the inner layer of a co-extruded guidewire tube. Kastenhofer's testimony was inconsistent, but at various points he testified that: (1) it was his idea to use HDPE, DX 4018 at 98; (2) it was not Rich Goodin's idea – and by extension not Byam's idea –

to use a two-layer catheter with an inner layer of HDPE and an outer layer of nylon, *id.* at 99; (3) he could not think of anything Byam contributed to the invention of the Kastenhofer patents, *id.* at 903-04; and (4) at the time he talked with Goodin – and by extension by the time Goodin would have relayed any of Byams' ideas – he already had the idea to use an inner layer of HDPE and an outer layer of nylon, DX 4021 at 97. The jury's role was to weigh this testimony against conflicting testimony by Kastenhofer, and the jury could have found the above statements more believable than other statements to the contrary. The Court therefore DENIES BSC's motion for judgment as a matter of law and BSC's motion for a new trial on the question of joint inventorship.

Because the jury found that Cordis proved by clear and convincing evidence that Byam was improperly named as a joint inventor of the Kastenhofer patents, the Court holds that, as a legal matter, the Kastenhofer patents are invalid under 35 U.S.C. § 102(f). *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998) (explaining that § 102(f) "mandates that a patent accurately list the correct inventors of a claimed invention"). Without ruling on the merits of such a motion, the Court notes that BSC could have invoked 35 U.S.C. § 256 to correct the inventorship of the Kastenhofer patents, *see id.* at 1350; *see also* 35 U.S.C. § 116, but has not done so. For this reason, the Court holds that the patent is invalid for failure to comply with § 102(f). *Pannu*, 155 F.3d at 1350-51 ("[I]f the patentee does not claim relief under the statute and a party asserting invalidity proves incorrect inventorship, the court should hold the patent invalid for failure to comply with section 102(f).").

### C.    Obviousness of the Kastenhofer patents

As discussed above, the jury has already found, and the Court has affirmed, that the Kastenhofer patents are invalid on two independent grounds: BSC's failure to reduce to practice prior to Cordis' invention in the United States and the misjoinder of Byam as an inventor of the patents. Notwithstanding these conclusions, Cordis asks the Court to also find the Kastenhofer patents invalid for obviousness. The Court declines.

A patent can be invalidated through a showing that the subject matter of the patent was obvious. 35 U.S.C. § 103. Section 103 states in relevant part:

A patent may not be obtained though the invention is not identically disclosed or

10

described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

*Id.* § 103(a). A determination of obviousness under § 103 is a question of law based on underlying findings of fact. *Oakley, Inc. v. Sunglass Hut Intern.*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). Obviousness is based on whether a "hypothetical person having ordinary skill in the art" with all prior art references would regard the subject matter of the invention as obvious. *Standard Oil Co. v. Am. Cyanamid*, 774 F.2d 448, 453-54 (Fed. Cir. 1985).

In *KSR International Co. v. Teleflex, Inc.*, --- U.S. ---, 127 S. Ct. 1727 (2007), the Supreme Court rejected the Federal Circuit's rigid application of the "teaching, suggestion, motivation" test for obviousness. Instead, the Court set forth several initial factors for performing an objective analysis of obviousness:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."

*Id.* at 1734 (quoting *Graham v. John Deer Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). In addition to the *Graham* factors, the Court in *KSR* stated that an obviousness analysis must consider:

interrelated teachings of multiple patents; the effect of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 1740-41. The Court went on to affirm that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 1741. Nevertheless, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 1739. Ultimately, the Court "set forth an expansive and flexible approach," *id.* at 1739, that takes into account "common sense," *id.* at 1742.

In this case, Cordis argues that the catheters described in the Kastenhofer patents were obvious

combinations of prior art described in the following four patents:

- The "Pinchuk" patent, U.S. Patent Number 4,906,244, which describes a nylon catheter balloon, welded to a guidewire tube. *See* DX 177.

- The "Shaffer" patent, U.S. Patent Number 5,049,132, which describes the desirability of heat bonding nylon catheter tubing to a nylon balloon. *See* DX 951.

- The "Arney" patent, U.S. Patent Number 5,047,045, which discloses that HDPE would provide a low friction inner surface for free guidewire movement in a catheter. *See* DX 71.

- The "Pande" patent, U.S. Patent Number 4,753,765, which describes the use of coextrusion to make a bilayered tube with HDPE as the inner layer. *See* DX 868.

With knowledge of this prior art, faced with the desire to build a catheter utilizing a nylon balloon, but with a low friction inner surface, Cordis contends that the Kastenhofer inventions would have been obvious to one skilled in the art.

The Court finds that Cordis has not met its burden of establishing obviousness by clear and convincing evidence. Because they were patented, the Kastenhofer inventions enjoy "a strong presumption of validity." *Robotic Vision Sys., Inc. v. View Eng'g*, 189 F.3d 1370, 1377 (Fed. Cir. 1999). In addition, three of the four prior art references – all except for the Shaffer patent – were before the six patent examiners who previously found that the Kastenhofer patents were not obvious. Although Cordis' burden may be somewhat reduced because not all of the prior art was before the patent examiners, the Federal Circuit has explained that the burden "is especially difficult where the prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990).

Cordis' primary argument is that a person of ordinary skill in the art would have easily combined the various teachings of the prior art to arrive at the Kastenhofer inventions. The Court finds significant evidence in the record to dispute Cordis' contention, which appears to rely too heavily on hindsight. BSC has demonstrated, to the Court's satisfaction, that its inventors, when faced with multiple paths that could have been taken, took the correct paths to arrive at the Kastenhofer catheters. Contrary to Cordis' arguments that any number of multiple paths would have led to an obvious invention, a common sense approach suggests that there were multiple opportunities for BSC's inventors to take wrong turns, and that it was not obvious or predictable what combination of elements would achieve the desired result.

For instance, there was evidence presented that coatings, rather than a separate lubricious material, were often used to make the inside of the tube slippery, Massa Decl. at ex. 1, Tr. 1057, that many skilled in the art were not using nylon balloons at the time, *id.* at Tr. 1267 (Byam used polyester balloons); DX 4016 at 10, 13 (Wilkins used polyethylene balloons and considered using polyester), and that it may have been more common to choose methods other than co-extrusion to create an inner liner made of HDPE, such as pulling and shrinking the outer layer over the inner tubing, Massa Decl. at ex. 1, Tr. 1685.

The non-obviousness of which precise routes would lead to the desired result is also supported by BSC's expert witness, Dr. Cohen, who testified that it "definitely" would not have been obvious to a person of ordinary skill in the art to combine elements of the prior art to arrive at the Kastenhofer patents. Cordis' Motion for JMOL at ex. B, Tr. 1875. Dr. Cohen testified that "[n]obody, at that time, would have taken the snippets of information from these references and cobbled them together to come up with the Kastenhofer invention," in part because "there are more than a few places where they might have been directed away." *Id.* For instance, Dr. Cohen testified that "there was no expectation of success in co-extruding" HDPE, "which is central to what Kastenhofer did," *id.*, and that it was widely thought that compatibility with HDPE was necessary for co-extrusion, *id.* at 1876. In fact, other engineers such as Byam and Wilkins had failed to co-extrude HDPE with Hytrel, *id.* at 832-33, 1876; DX 4016 at 16, and there is no evidence that Wilkins ever tried to co-extrude HDPE with nylon, detracting somewhat from Cordis' argument that this was obvious, *see* DX 4016.

Finally, there is evidence that Cordis itself did not, until recently, view the Kastenhofer inventions as obvious. In its marketing documents, Cordis described similar technology – co-extruded shaft design with a guide wire – as "revolutionary" and "unique" because it "provides the benefits of a high strength nylon outer shaft with a lubricious polyethylene inner shaft for an optimal combination of exceptional pushability and enhanced trackability over the guidewire." Massa Decl. at ex. 6, CS10; *see also id.* at ex. 1, Tr. 411. The Court also notes that once Cordis began using nylon balloons, it still took the company roughly four years to reduce to practice a nylon-balloon catheter featuring a co-extruded guide wire tube with an inner layer of HDPE and an outer layer of nylon. *See id.* at ex. 1, Tr. 1136. In short, common sense informs the Court that the Kastenhofer patents would not have been

obvious to a person with ordinary skill in the art.

The secondary considerations found by the jury support this conclusion. The jury found that the Kastenhofer inventions enjoyed commercial success and that there had been unsuccessful attempts by others to find the solution provided by the inventions. On the other hand, the jury also found that others had independently arrived at the invention around the same time, and that the evidence did not establish a long felt need for the solution provided by the invention or that the invention had been licensed. The Court will not disturb these findings, as they are supported by substantial evidence. The fact that others had tried unsuccessfully to find the solution provided by the Kastenhofer patents strongly supports the Court's conclusion that the inventions were not obvious. In addition, the commercial success of these patents and the fact that almost every balloon catheter and stent delivery system on the market today uses the Kastenhofer technology weigh heavily in favor of a finding of non-obviousness. *See id.* at ex. 1, Tr. 404-06. Although the Kastenhofer technology is only one feature of these products, *see Cont'l Can Co. U.S.A. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("It is not necessary, however, that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence, along with other pertinent factors."), the ubiquitousness of the technology strongly suggests that it has been extremely successful. This, in turn, calls into question why, despite its assertions of obviousness, it took Cordis more than a few years to independently arrive at the invention. For all of these reasons, the Court DENIES Cordis' motion for judgment as a matter of law on the jury's verdict regarding secondary considerations of obviousness, and also DENIES Cordis' motion to declare the Kastenhofer patents invalid for obviousness.

## II.     BSC's infringement of the Fontirroche patent

As to Cordis' counterclaim against BSC for infringement of the Fontirroche patent, the jury found that Cordis did not prove, by a preponderance of the evidence, that the BSC's Maverick family of products literally infringe claim 7 of the Fontirroche patent. Instead, the jury found that Cordis proved, by a preponderance of the evidence, that BSC's products have an equivalent structure to every requirement of claim 7 of the Fontirroche patent, and therefore infringe Cordis' patent under the doctrine of equivalents. Both parties now move to set aside the jury's verdict.

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002). The doctrine asks "whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation," *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)), such that "[a] claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device," *Sage Prods., Inc. v. Devon Indus. Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). "[T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

BSC asks the Court to grant its motion for judgment as a matter of law as to the jury's finding of infringement under the doctrine of equivalents. In the alternative, BSC also asks for a new trial on this issue. BSC is undoubtedly correct that different conclusions could be drawn from the evidence presented at trial as to infringement under the doctrine of equivalents. The parties, however, chose to try this case before a jury, and the jury's verdict is supported by substantial evidence and is not contrary to the clear weight of the evidence. Cordis contends that it presented a theory at trial that all of the limitations of Claim 7 of the Fontirroche patent were literally infringed by BSC, and that a single limitation – requiring the inner and outer guide wire tube layers to be chemically bonded to each other – could also be found to have been infringed under the doctrine of equivalents. As to that limitation, the jury could have found that the inner and outer layers of BSC's Maverick products were bound together in an equivalent manner to that claimed in the Fontirroche patent. The jury heard evidence that BSC's products featured a chemical bond between the tie layer and the Pebax outer layer, *see*, *e.g.*, Cordis' Opposition to BSC's Motion for JMOL at ex. B, Tr. 610-12; *see also id.* at ex. B., Tr. 625, and that the entanglement bond between the tie layer and the HDPE inner layer was substantially similar to a chemical bond, *see id.* at ex. B, Tr. 628-29. While there are obviously some differences between a

single chemical bond and a chemical bond combined with an entanglement bond, the jury reasonably

could have found that these differences were insubstantial under the doctrine of equivalents.[3]

The Court also rejects BSC's arguments that Cordis could not benefit from the doctrine of

equivalents. BSC argues that the doctrine of equivalents, as applied here, reads out of the Fontirroche

patent the requirement of a chemical bond, but evidence put forth at trial clearly supports the finding

that there was a chemical bond in BSC's products. In addition, the Court does not agree that, in

distinguishing the Fontirroche patent from other patents featuring no chemical bonds, Cordis is estopped

from arguing the equivalency of an invention featuring a chemical bond. The Court agrees with Cordis

that language in Claim 7 of the Fontirroche patent discussing the use of Plexar as either a tie layer or

a layer itself merely states a preferred and nonpreferred embodiment of the claim, *see* DX 1, col. 3, lns.

6-12; *see also* Cordis' Opposition to BSC's Motion for JMOL at ex. B, Tr. 624 (testimony of Cordis'

witness Lisa Pruitt regarding the language in question), and that BSC's Maverick family of products

would fall squarely into the nonpreferred embodiment. Accordingly, the Court also finds that Cordis

did not dedicate the Maverick tie layer design to the public.

As to the other limitations, which Cordis contends were literally, not equivalently, infringed, the

Court finds that the jury's verdict should not be disturbed. BSC argues that the use of HDPE without

reactive groups cannot infringe the Fontirroche patent because the specification states that "[h]igh

density polyethylene is generally understood by those skilled in the art to have a density of at least about

0.94 g/cc. For purposes of this invention a polyethylene containing reactive groups and being of this

density or greater is defined to be 'high density polyethylene.'" DX 1, col. 7, lns. 11-13. The plain

import of this language is not, as BSC contends, that the patent's definition of HDPE is limited only to

HDPE containing reactive groups. Rather, the Court agrees with Cordis that this statement merely

clarifies that HDPE with reactive groups will be included in the definition of HDPE, a reading that is

supported by mention of HDPE elsewhere in the specification. *See id.* at col. 2, lns. 21-23; Cordis'

Opposition to BSC's Motion for JMOL at 6. The jury, therefore, could have found the material used

---

[3]Even if insubstantial, these differences were certainly adequate to justify the jury's finding that BSC's products did not literally infringe Claim 7 of the Fontirroche patent. The Court therefore DENIES Cordis' motion for judgment as a matter of law on the question of literal infringement.

1    in BSC's products to literally infringe the Fontirroche patent. *See* Cordis' Opposition to BSC's Motion

2    for JMOL at ex. B, Tr. 630.

3        BSC also argues that the jury could not have found that BSC's products infringe Claim 7 because

4    the inner and outer layers of the guide wire tube do not physically touch. Claim 7 requires only that the

5    two layers be different and be "bonded to each other," not that they be in direct contact. DX 1, col.8,

6    ln. 49. There was substantial evidence upon which the jury could have relied to find that the two layers

7    were bonded to each other without touching, via the tie layer. *See*, *e.g.*, Cordis' Opposition to BSC's

8    Motion for JMOL at ex. B, Tr. 621-22, 624.

9        Finally, BSC argues that the jury could not have found that BSC's products infringe Claim 7

10   because the requirement that the inner layer be more flexible than the outer layer was not met. The

11   parties debate whether this flexibility requirement refers to the inherent flexibility of the materials, i.e.

12   the flexural modulus of the polymers, or the flexibility of the materials as used, which would take into

13   account the thickness of the layers. The parties agree that (1) the polymer used in the inner layer of

14   BSC's products has a higher flexural modulus than the polymer used in the outer layer and (2) the

15   materials as actually used in the infringing products, i.e. at the given thicknesses, consisted of a more

16   flexible inner layer and a stiffer outer layer. Both pieces of evidence were presented to the jury. The

17   jury therefore must have found that the flexibility of the materials should be measured in the context of

18   their use, and that BSC's products literally infringed the Fontirroche patent under this common-sense

19   approach to flexibility. Substantial evidence supports this finding. *See id.* at ex. B, Tr. 630-31.

20   Accordingly, BSC's renewed motion for judgment as a matter of law on Cordis' counterclaim for

21   infringement, as well as BSC's alternative motion for a new trial on this issue, are DENIED.

22

23   **III.    Cordis' damages for infringement of the Fontirroche patent**

24       Because the jury found that BSC had infringed Cordis' Fontirroche patent, Cordis now seeks a

25   judgment granting Cordis retrospective damages at a 2% royalty rate, plus interest, and prospective

26   damages at a 4% royalty rate. The Court previously ruled, from the bench, that Cordis was precluded

27   from asking the jury to award damages because Cordis submitted no evidence regarding a reasonable

28   royalty rate for infringement of the Fontirroche patent. BSC opposes the current motion for a 2%

17

royalty rate, arguing that BSC made a tactical decision not to produce any damage evidence to the jury and, under such circumstances an award of damages by the Court would violated BSC's Seventh Amendment right to a jury trial.

The Seventh Amendment to the United States Constitution guarantees that "[i]n suits at common law . . . the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." Though the right to a jury trial may be waived, "[b]ecause the right to a jury trial is a fundamental right guaranteed to our citizenry by the Constitution, courts should indulge every reasonable presumption against waiver." *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981).

The statute governing damages for patent infringement provides that "[u]pon finding for the claimant the court *shall award* the claimant damages adequate to compensate for the infringement, but *in no event less than a reasonable royalty* for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (emphasis added). The statute has been interpreted as creating a "presumption of damages when infringement is proven," *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003), because "[t]he statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty," *id.* at 1381; *see also Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990) ("In patent law, the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated."); *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (same).

Despite this presumption, the patentee must put on evidence supporting its assertion of a reasonable royalty rate. *See Lindemann*, 895 F.2d at 1406 ("The patentee must then prove the amount of damage."). The reasonably royalty analysis involves an approximation of the market as it would have hypothetically developed, and this, "in turn, requires *sound economic and factual predicates*." *Riles*, 298 F.3d at 1311 (emphasis added). The Federal Circuit has explained that where a patentee fails to put on sufficient evidence of a reasonable royalty rate, the patentee will face an uphill battle overcoming the presumption that the amount of awarded was reasonable: "the district court's obligation to award some amount of damages does not mean that a patentee who puts on little or no satisfactory evidence

of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284." *Dow Chem.*, 341 F.3d at 1382 (internal quotation marks omitted). Where little or no satisfactory evidence of a reasonable royalty is presented, the court should "award such reasonable royalties as the record evidence will support." *Id.* Where the record lacks any evidence of a reasonable royalty rate, the Federal Circuit has approved of awarding "zero damages" because "'[t]he statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute.'" *Lindemann*, 895 F.2d at 1407 (quoting *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981)) (alteration in original).

Despite a great deal of discussion at trial regarding the need for the patentee to present evidence of the amount of damages, Cordis decided not to call its damages expert, who was prepared to testify about a reasonable royalty rate as it relates to the Fontirroche patent. Instead, Cordis chose to rely on testimony about reasonable rates for other, similar patents, despite the fact that Cordis' own witness had testified that every license negotiation is distinct. *See* Massa Decl. at ex. 1, Tr. 1208 ("Q: Is there a formula or recipe for how Cordis would weigh these various factors if they – in considering whether to grant or take a license? A: No, no. As I said – I think I said, you have to kind of weigh each deal on its own merits. So depending on what the deal is, that would be where you would weigh it."). For this reason, the Court ruled that Cordis could not present the damages question to the jury. *See id.* at Tr. 1303-04 ("[T]here is no evidence in this record upon which a jury could make any intelligent royalty assessment as to Cordis. . . . I don't see how I can possibly ask the jury to make a finding on that."); *see also id.* at Tr. 1313 ("I'm not going to allow the jury to award damages, because it would be sheer speculation. And this is the choice you've made.").[4] Instead, the Court explained that after trial, "if [Cordis wants] to make a motion to me for damages, I will consider whether there is evidence in the

---

[4]The degree of speculation required is exacerbated by the substantial dollar amount of sales to which the royalty rate would be applied. Based on having previously paid, or received, royalties as low as .5% and as high as 12% on unrelated patents, Cordis now argues (with no discernible basis that the Court can see) for a 2% royalty rate. Depending on which arbitrary figure is chosen, and using the stipulated sales amount of $1.8 billion, these figures would produce royalty figures of $9 million, or $36 million, or $218 million.

1  record from which given argument and any other matters you want to address with respect to how the

2  *Georgia-Pacific* factor[s] should be applied, I will consider that." *Id.* at Tr. 1314.

3  　　　Cordis now contends that if the Court does not grant it a 2% royalty rate for infringement of the

4  Fontirroche patent, Cordis' right to a jury trial will be violated unless the Court holds a new trial on

5  damages. The Court strongly disagrees. Cordis waived its Seventh Amendment right during trial when

6  it decided not to put on evidence in support of its contention that 2% would be a reasonable royalty rate.

7  The Court made clear to Cordis that it could not ask the jury to decide the damages question unless

8  Cordis put on damages evidence specific to the Fontirroche patent, *see id.* at Tr. 1314 ("[T]he Seventh

9  Amendment gives you a right to a jury, and the jury needs to have evidence. And you have chosen not

10  to put evidence on. That's the problem."), but Cordis decided that it would forego its jury trial rights

11  by refusing to put forth any evidence of a reasonable royalty rate specific to the Fontirroche patent. The

12  Court asked Cordis to confirm that not putting on its witness was "a choice you're making. Correct?"

13  and Cordis responded "I want to be honest with you. Sure, it was a choice we made." *Id.* at Tr. 1315.

14  Although Cordis did not go so far as to state explicitly that it was waiving its right to a jury trial on the

15  issue of damages, it knew that it would forego a jury trial if it chose not to put on evidence. The Court

16  finds that this is sufficient to constitute waiver, and that any subsequent jury trial on the issue of

17  damages would unfairly provide Cordis with a second opportunity to present evidence that Cordis has

18  already chosen not to present.

19  　　　Having established that Cordis' Seventh Amendment rights will not be violated if the Court were

20  to award a reasonable royalty rate, the question remains whether this course of action would violate

21  BSC's right to a jury trial. Cordis argues that BSC waived its right to a jury trial when it did not object,

22  at trial, to the Court's suggestion that Cordis could submit a motion for damages after trial. Although

23  the Court finds that Cordis waived its jury trial right when it was given a clear choice between putting

24  on evidence and foregoing its Seventh Amendment right, the Court does not agree that BSC also waived

25  its rights merely by remaining silent when the Court made a single statement about the possibility of a

26  post-trial damages award. *See Pradier*, 641 F.2d at 811 ("Because the right to a jury trial is a

27  fundamental right guaranteed to our citizenry by the Constitution, courts should indulge every

28  reasonable presumption against waiver."). This situation is far different from the cases cited by Cordis

in which parties have waived their right to jury trials by participating in full bench trials on specific questions. *See, e.g.*, *Thompson v. Mahre*, 110 F.3d 716, 721 (9th Cir. 1997). The Court therefore agrees with BSC that it could not award damages to Cordis without violating BSC's Seventh Amendment right.

This leaves the Court in the somewhat difficult position of awarding Cordis no damages for BSC's past infringement of the Fontirroche patent. While 35 U.S.C. § 284 does create a "presumption of damages when infringement is proven," *Dow Chem.*, 341 F.3d at 1382, the Federal Circuit has indicated that this presumption may be rebutted when the patentee fails to put on "'any evidence from which a court may derive a reasonable royalty,'" *Lindemann*, 895 F.2d at 1407 (quoting *Devex*, 667 F.2d at 363). Because Cordis chose to rely entirely on evidence of a reasonable royalty rate in the context of BSC's patents, the Court finds, as it did at trial, that there is no evidence on which to base an award of damages for infringement of the Fontirroche patent. Even if there were evidence sufficient for the Court, as opposed to the jury, to determine a reasonable royalty, doing so at this point would violate BSC's Seventh Amendment rights, and the statutory language cannot override the requirements of the Constitution. *Gray v. Mississippi*, 481 U.S. 648, 663 (1987) (noting that "where a constitutional right comes into conflict with a statutory right, the former prevails").

That said, the Court may award Cordis equitable relief in the form of an injunction or an ongoing royalty for future infringement of its patent without infringing BSC's jury trial rights. *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315-16 (Fed. Cir. 2007). Before ordering that BSC is permanently enjoined from infringing the Fontirroche patent, the Court must be satisfied that the four-factor test for permanent injunctions is met. This test applies "with equal force to disputes arising under the Patent Act," and looks at (1) whether the plaintiff has suffered an irreparable injury, (2) whether legal remedies such as monetary damages are inadequate to compensate the plaintiff for the injury, (3) whether the balance of hardships justifies an equitable remedy, and (4) whether the public interest would be served by the injunction. *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, —, 126 S. Ct. 1837, 1839 (2006). On the other hand, before ordering that BSC must pay Cordis a reasonable royalty going forward, the Court must receive evidence in order to justify the award of a particular royalty rate. *See, e.g.*, *Paice*, 504 F.3d at 1315 ("[T]he district court's order provides no reasoning to support the selection of $25 per infringing vehicle as the royalty rate. Thus, this court is unable to determine whether the

district court abused its discretion in setting the ongoing royalty rate.").

The Court does not, at this time, reach any conclusion as to whether a permanent injunction or an ongoing royalty is the preferable course of action. The Court notes only that one of these equitable remedies will be necessary to remedy BSC's infringement, going forward. Before taking any action, the Court will allow the parties 60 days from the date of this order to negotiate a license or to permit BSC to cease its infringement of the Fontirroche patent. *See Paice*, 504 F.3d at 1315 ("In most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement."). If, at the end of the 60-day period, BSC continues to infringe Cordis' patent, and if the parties cannot negotiate a license agreement, the parties shall submit evidence of what a reasonable royalty rate would be; in the alternative, the parties may also brief the issue of how the Court should apply the four-factor test for a permanent injunction. Accordingly, Cordis' motion for damages is DENIED with regard to past damages. The Court reserves judgment with regard to prospective remedies.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiffs' renewed motions for judgment as a matter of law and for a new trial [Docket Nos. 815, 817], DENIES defendants' renewed motion for judgment as a matter of law [Docket No. 814], and DENIES defendants' motion for past damages [Docket No. 821].

Dated: February 19, 2008

SUSAN ILLSTON
United States District Judge