1  Robert B. Morrill, <rmorrill@sidley.com> (SBN 035488)
   Teague I. Donahey, <tdonahey@sidley.com> (SBN 197531)
2  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
3  San Francisco, California  94104
   Telephone:    (415) 772-1200
4  Facsimile:    (415) 772-7400

5  David T. Pritikin, <dpritikin@sidley.com> (*pro hac vice*)
   William H. Baumgartner, Jr., <wbaumgartner@sidley.com> (*pro hac vice*)
6  SIDLEY AUSTIN LLP
   One South Dearborn Street
7  Chicago, Illinois  60603
   Telephone:    (312) 853-7000
8  Facsimile:    (312) 853-7036

9  *Attorneys for Counterclaim-Plaintiff*
   *Cordis Corporation*

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13
14  BOSTON SCIENTIFIC CORPORATION,        ) No. C 02-790 SI (filed Feb. 14, 2002)
    BOSTON SCIENTIFIC SCIMED, INC.,       )
15  SCIMED LIFE SYSTEMS, INC., and        ) **DECLARATION OF LAWRENCE WU,**
    SCHNEIDER (EUROPE) GmbH,              ) **Ph.D.**
16                                        )
            Plaintiffs,                   )
17                                        )
        vs.                               )
18                                        )
    JOHNSON & JOHNSON                     )
19  and CORDIS CORPORATION,               )
                                          )
20          Defendants.                   )
                                          )
21                                        )
    CORDIS CORPORATION,                   )
22                                        )
            Counterclaim-Plaintiff,       )
23                                        )
        vs.                               )
24                                        )
    BOSTON SCIENTIFIC CORPORATION,        )
25  BOSTON SCIENTIFIC SCIMED, INC.,       )
    SCIMED LIFE SYSTEMS, INC., and        )
26  SCHNEIDER (EUROPE) GmbH,              )
                                          )
27          Counterclaim-Defendants.      )
                                          )
28

Lawrence Wu declares:

### Qualifications and Experience

1.      I am an economist and Senior Vice President at National Economic Research Associates, Inc. ("NERA").  NERA is a firm of consulting economists that provides research and analysis in the economics of competition, regulation, and finance.  Prior to joining NERA, I was a staff economist in the Bureau of Economics at the Federal Trade Commission.  I received my B.A. from Stanford University and my Ph.D. from the University of Chicago, Graduate School of Business.

2.      My areas of specialization include health economics, as well as the economics of antitrust and competition policy.  In the area of intellectual property, I have written and consulted on issues involving patent pools and reasonable royalties.  I also have experience in assessing competition in a variety of health care markets, including health insurance, hospital services, physician services, and medical devices.  My research in health economics and health care antitrust includes several published articles and my Ph.D. dissertation at the Graduate School of Business at the University of Chicago.  In the spring of 1997, I also taught a graduate course in health economics at the Wagner School of Public Service at New York University.

3.      I have provided written and oral expert testimony on numerous occasions, which include testimony in U.S. district courts and presentations before the U.S. Federal Trade Commission ("FTC") and the U.S. Department of Justice ("DOJ").  My research has appeared in the *Antitrust Bulletin*, *Antitrust Report*, *European Competition Law Review*, *Journal of Business Venturing*, and *Medical Care*, and I am the editor of two books that have been published on the economics of antitrust.  My recent speeches in the area of healthcare include presentations at the 2005 American Bar Association ("ABA") Health Law Section conference on Emerging Issues in Healthcare Law and the 2005 Antitrust in Healthcare conference sponsored by the ABA Antitrust Law and Health Law Sections and the American Health Lawyers Association.  I also testified at the FTC and DOJ Hearings on Health Care and Competition Law and Policy in 2003.  My publications,

prior testimony, and selected consulting assignments are listed in my curriculum vitae, which is appended to this report as Exhibit 1.

### Assignment

4.    On October 31, 2007, a jury returned a verdict finding that Boston Scientific Corporation ("BSC") infringed Claim 7 of U.S. Patent No. 5,820,594 issued to Fontirroche et al. ("the '594 patent"). In its *Order Re: Various Post-Trial Motions* filed February 19, 2008 (the "*Order*"), the Court denied the motions of both parties to set aside the jury's verdict.[1] In its *Order*, the Court noted that either a permanent injunction or an ongoing royalty "will be necessary to remedy BSC's infringement, going forward."[2] I understand that, to date, the parties have not been able to agree upon a license to the '594 patent.

5.    I have been asked by counsel for Cordis Corporation ("Cordis") to determine a reasonable ongoing, post-verdict royalty for the '594 patent. As described in more detail below, my conclusion is that (a) a hypothetical negotiation between Cordis and BSC on October 31, 2007, would have yielded a bargaining range of reasonable royalty rates of 5.4 percent to 15.0 percent of the catheter portion of BSC's projected infringing sales, and (b) 6 percent is a reasonable ongoing royalty for licensing the '594 patent to BSC. This conclusion is based on my analysis of the maximum royalty that BSC would be willing to pay for a license, the minimum royalty that Cordis would be willing to accept, and the pertinent *Georgia-Pacific* factors that would affect the determination of a reasonable royalty.

6.    The opinions in this report are based on my professional training and experience, as well as my review of (a) relevant portions of the testimony that was given at trial in this matter, relevant trial exhibits and relevant expert reports (as well as some of the documents referred to in expert reports), (b) publicly available information, such as stock analyst reports, and (c) interviews with Cordis personnel. A complete list of the primary materials and information that I relied upon to prepare this declaration is attached as Exhibit 2.

---

[1] See *Order* at 14-17.

[2] See *Order* at 22.

1    7.    My research and analysis are continuing, and my opinions may be supplemented or

2    updated to reflect any subsequent consideration of documents, testimony, or additional information.

3    I also intend to review any additional information that may be submitted by Cordis and BSC, as well

4    as any reports or testimony that may be given by BSC's experts or other witnesses that relate to a

5    reasonable ongoing royalty.  If necessary and if asked, I may submit additional reports.

### Overview of the Analysis

7    8.    My analysis begins with an analysis of the range of ongoing royalty rates that would

8    have been considered in a hypothetical negotiation between Cordis and BSC on October 31, 2007,

9    which is the day on which the jury returned its verdict against BSC.  A reasonable royalty rate would

10   be a negotiated outcome that would fall within this range, which is constructed using (a) the

11   maximum royalty rate that the licensee (i.e., BSC) would be willing to pay and (b) the minimum

12   royalty rate that the licensor (i.e., Cordis) would be willing to accept.  My analysis is informed by

13   the *Georgia-Pacific* factors, which I discuss below.  I then add perspective by discussing the reasons

14   why a hypothetical negotiation between BSC and Cordis on October 31, 2007, would have led to a

15   royalty that is different from the royalty that would have resulted from a hypothetical negotiation in

16   1998, when BSC's infringement of the '594 patent began.

### Reasonable Royalty Analysis

**A.  Introduction**

19   9.    The following sections present my opinions regarding the range of reasonable

20   ongoing, post-verdict royalty rates to be paid by BSC on the catheter portion of the company's sales

21   of its infringing products.  I have considered the fifteen factors described in the *Georgia-Pacific*

22   case.[3]

23   10.   *Georgia-Pacific* Factor 15—which incorporates aspects considered in many of the

24   other *Georgia-Pacific* factors—provides a useful starting point for determining a range of reasonable

25   royalty rates.  The analysis that is called for by *Georgia-Pacific* Factor 15 is a reconstruction of a

---

[3] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

DECLARATION OF LAWRENCE WU, Ph.D. — No. C 02-790 SI

hypothetical arm's-length negotiation between a licensor (i.e., the patent holder, which would be Cordis in this case) and a licensee (i.e., the infringer, which would be BSC in this case) for the patent-in-suit (i.e., the '594 patent).

11. From the licensee's standpoint, an important consideration in the hypothetical negotiation would be the additional profits that the licensee could earn with a license, as compared to its situation without a license. Within the *Georgia-Pacific* framework, this relates to a number of other *Georgia-Pacific* factors, including Factor 2 (the royalty rates paid for the use of other patents comparable to the patents in suit), Factor 8 (the established profitability of the product made under the patent), Factor 9 (the marginal utility of the patented invention), Factor 10 (the nature of the patented invention and the benefits to those who have used the invention), Factor 11 (the extent to which the licensee has made use of the invention), and Factor 13 (the portion of the realizable profit that should be credited to the invention). Because a licensee would not be willing to pay a royalty that exceeds the additional profits that it could earn with a license, as compared to its situation without a license, the amount of the additional profit that would be earned with a license creates an upper bound on a reasonable royalty.

12. From the licensor's standpoint, an important consideration in the hypothetical negotiation is the profits from the sales of its own products that the licensor would lose if a license were granted, as compared to a situation without a license. Within the *Georgia-Pacific* framework, this relates to a number of other *Georgia-Pacific* factors, including Factor 5 (the commercial relationship between Cordis and BSC, such as whether they are competitors in the same territory in the same line of business) and Factor 12 (the portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions). Because the licensor would not be willing to accept a royalty that did not compensate it sufficiently for the profits that it would lose by granting the license, the amount of the lost profit creates a lower bound on a reasonable royalty.

13. If the licensee's maximum willingness to pay is greater than the licensor's minimum willingness to accept, then the two parties can reasonably be expected to negotiate and agree upon a rate that would be mutually beneficial for both parties.

14.     After the range of reasonable royalties is established, the *Georgia-Pacific* factors are evaluated to help identify the point within the range where the ultimate bargain would be struck. Where within the range the final agreed-upon royalty is likely to fall depends on the relative bargaining strength of Cordis and BSC.  The midpoint of the bargaining range is often a useful starting point for considering the effect of the *Georgia-Pacific* factors that may affect the relative bargaining strength of the two parties and, therefore, the ultimate royalty that would have been negotiated.

15.     In my analysis, I assume that the hypothetical negotiation would have taken place on October 31, 2007.  This is the date on which the jury returned a verdict finding that BSC infringed the '594 patent.  I have assumed that the term of the license resulting from the hypothetical negotiation between BSC and Cordis would be until January 31, 2014, which is the date that the '594 patent expires.  Furthermore, I have also assumed that BSC would be negotiating a license for the right to make, use, offer for sale, or sell its infringing products in the United States or to import the products into the United States.[4]

**B.  The Hypothetical Negotiation – *Georgia-Pacific* Factor 15**

16.     In thinking about the hypothetical negotiation that would have occurred on October 31, 2007, I have compared two possible scenarios: (1) a successful negotiation and (2) a failed negotiation.  In a successful negotiation, the parties are able to reach an agreement, with BSC obtaining a non-exclusive license to practice the '594 patent for the remainder of the patent's life. This hypothetical scenario is similar to the market as we know it in that BSC would be free, from November 1, 2007 forward, to continue to sell the catheters and stent delivery systems that it currently sells.  There are, however, some unresolved issues.  BSC is seeking FDA approval for a new drug-eluting stent called the Promus stent.  Whether the catheter on which the Promus stent is mounted infringes the '594 patent is an issue that has not yet been resolved.  I therefore consider

---

[4]  I understand that BSC has sold, to foreign customers, U.S.-manufactured products that incorporate the '594 technology.  These transactions, therefore, represent sales of infringing products.  However, due to the lack of data from BSC on the amount of U.S.-manufactured products sold abroad, I have not been able to account for these foreign infringing sales in my analysis.

1  both possibilities: (1) a scenario in which the Promus stent delivery system does infringe the '594

2  patent, and (2) a scenario in which the Promus stent is not an infringing product.

3       17.    In a failed negotiation, the parties cannot agree on a reasonable royalty, in which case

4  BSC would not obtain a license and thus would no longer be able to make, use, or sell products that

5  infringe the '594 patent.  This hypothetical scenario is different from the market as we know it in

6  that BSC would have stopped selling its infringing catheters and stent delivery systems on

7  November 1, 2007.  In addition, BSC would have had to (a) design and develop a non-infringing

8  product, (b) obtain FDA approval, and (c) re-enter the market with the non-infringing products.

9  These three aspects of this hypothetical scenario are discussed below.

10       18.    First, after a failed negotiation, BSC would have to seek FDA approval to sell

11  products that employ a non-infringing design.  I have not seen any evidence at trial indicating that

12  BSC would be able to sell any of its rapid exchange ("RX") cardiac catheters, bare metal stent

13  delivery systems, and Taxus drug-eluting stent delivery systems before such approval were obtained.

14  However, I understand that BSC does have FDA approval to sell over-the-wire ("OTW") cardiac

15  catheters that do not infringe the '594 patent.  These non-infringing catheters, which have been sold

16  in the U.S., include the Schneider Asuka catheter and the Ranger catheter.  I conservatively assume

17  that BSC is able immediately to resume production of the non-infringing OTW Ranger catheter.

18       19.    Second, I understand that it could take 6 to 17 months for BSC to test and obtain the

19  approval needed to re-enter the market with an acceptable, FDA-approved, non-infringing catheter

20  and stent delivery system.  As explained in the declaration of Marlene Valenti, Cordis's World Wide

21  Vice President of Regulatory Affairs ("Valenti Declaration"), it would take at least 5 months for

22  BSC to design and test a non-infringing product and another 6 months to file an FDA application

23  and obtain approval.  If that application were not successful and BSC had to submit a second FDA

24  application, the approval process would take another 6 months.  Thus, the best case scenario for BSC

25  would be FDA approval by April 30, 2008 (i.e., 6 months).  This would be the case if BSC had

26  completed the design and testing of a non-infringing product before the jury verdict and BSC was

27  able to secure FDA approval for the new design in 6 months.  The anticipated "worst case" scenario

28  would be FDA approval in 17 months, which assumes that BSC would have started the design and

testing of a non-infringing product on the day of the verdict, with an application to the FDA five months later and approval one year after that.  Given that design, testing, and FDA approval could take anywhere from 6 months to 17 months, I have assumed that it would take BSC 12 months—the midpoint of this time period—to design and test a non-infringing product, gain FDA approval, and bring the product to market.  In other words, I assume that BSC would be able to obtain FDA approval by November 1, 2008, after which BSC could begin to sell its redesigned, FDA-approved, non-infringing RX cardiac catheters, bare metal stent delivery systems, and Taxus drug eluting stent delivery systems.

20.     Third, upon BSC's re-entry into the market in November 2008 with a non-infringing product, I have assumed that the company's expected revenues and profits from sales of its non-infringing product line would be the same as the forecasted sales and profits of its current line of infringing catheters and stent delivery systems—in other words, BSC would immediately achieve the sales levels it would have realized if it had never stopped selling its infringing products.  This assumption is conservative.  BSC's sales upon re-entry in November 2008 could be lower than current forecasts of BSC's sales in November 2008 because (a) BSC's redesigned and non-infringing product(s) may or may not be as good as the products that BSC currently sells using the patented '594 technology, and (b) it may take time for BSC to win back customers and to regain its forecasted level of sales if it is out of the market for 12 months.  As a result, actual sales and profits of the redesigned, non-infringing catheter and stent products from November 2008 forward would likely be less than the projected sales and profits of BSC's current infringing catheter and stent products (for the reasons that caused BSC to choose to sell the infringing catheters in the first instance).  Rather than model these effects specifically in my calculation of BSC's maximum willingness to pay, I will address these issues in my application of the *Georgia-Pacific* factors (i.e., *Georgia-Pacific* Factor 5).

21.     I assess the maximum royalty rate that BSC would be willing to pay for a license to the '594 technology by comparing BSC's expected profitability in each of these scenarios (i.e., a successful negotiation and a failed negotiation).  Exhibits 3A-B present my calculations under the assumption that Promus is not an infringing product.  Exhibits 4A-B present my calculations under

the assumption that Promus is an infringing product. Similarly, I assess the minimum royalty rate that Cordis would be willing to accept by assessing and comparing Cordis's profitability in each of these scenarios (i.e., a successful negotiation in which BSC obtains a license and a failed negotiation in which BSC does not obtain a license). Exhibits 5A-B present my calculations under the assumption that Promus is not an infringing product. Exhibits 6A-B present my calculations under the assumption that Promus is an infringing product. The sections that follow discuss my calculations in further detail.

### 1. The Maximum Royalty that BSC Would Be Willing to Pay

22.     The maximum royalty that BSC would be willing to pay for the right to practice the technology covered by the '594 patent is driven by the expected profitability to BSC from using the patented technology (assuming a successful negotiation) compared to the expected profitability resulting from using the next-best alternative (assuming a failed negotiation). In other words, BSC would be unwilling to pay more for the right to utilize the '594 patent than the incremental profit that it would lose if it were forced to develop and switch to another technology. Thus, the maximum royalty that BSC would be willing to pay (at the time of the hypothetical negotiation) is the difference between (a) the expected profitability to BSC from using the patented technology and (b) the expected profitability to BSC (including applicable design-around costs) from selling a commercially acceptable, non-infringing product, to the extent that such a product would have been available to BSC. The maximum royalty rate that BSC would be willing to pay is this difference in profits, expressed as a percentage of the royalty base. I assumed that the royalty base would be the catheter portion of BSC's projected infringing sales from November 1, 2007 to the patent's expiration date. This royalty rate is the most that BSC would be willing to pay for a license, forming an upper bound for the license negotiation. If the royalty rate were higher than this upper bound, BSC would lose money by taking a license, and so it would never agree to do so. However, if the royalty rate were lower than this upper bound, BSC would make money by taking a license, compared to the failed negotiation scenario.

### a. **BSC's Expected Profitability from Using the Patented Technology**

23.    With a license to the '594 patent, BSC would be able to use the patented technology and to continue selling its infringing products, which include all of the company's balloon catheter products, bare metal stents, and drug-eluting stents (including the Taxus stent).  The expected profitability of these infringing products can be calculated using forecasts of BSC's infringing revenues and profit margins throughout the term of the hypothetical license (i.e., the remaining life of the '594 patent).

24.    I obtained forecasts of the revenues of BSC's infringing products in the United States from two investment analyst reports: (a) an April 16, 2008 report on Johnson & Johnson by Citi Investment Research, and (b) an April 22, 2008 report on BSC by Morgan Stanley.[5]  These forecasts are useful and realistic because they account for two important events that would have been expected to and actually have had an effect on BSC's forecasted revenues and market shares:  (a) the entry of Medtronic's Endeavor drug-eluting stent in February 2008, and (b) the anticipated entry of Abbott's Xience and BSC's Promus drug-eluting stents in mid-2008.[6]

25.    I estimated BSC's profits in this hypothetical scenario by multiplying BSC's forecasted revenues by its expected profit margin.  I have assumed that BSC will earn a profit margin of 30 percent of revenue on sales of its infringing balloon catheters, bare metal stents, and Taxus drug-eluting stents.[7]  I have also assumed that BSC will earn a profit margin of 18 percent of revenue on sales of its Promus drug-eluting stent.[8]

---

[5] The April 16, 2008 report by Citi Investment Research provides forecasted quarterly revenues and market shares for BSC's infringing bare metal stents and drug-eluting stents.  The April 22, 2008 report by Morgan Stanley provides forecasted revenues for BSC's infringing balloon catheters. Copies of these reports can be found in Appendix A.

[6] For example, see BSC's Form 10-K, for the fiscal year ended December 31, 2007, p. 25 ("In February 2008, Medtronic received FDA approval for its Endeavor drug-eluting stent system.  We expect our share of the drug-eluting stent market, as well as unit prices, to continue to be adversely affected as additional significant competitors enter the drug-eluting stent market, including Abbott's anticipated launch of the XIENCE V everolimus-eluting stent system in the first half of 2008.").

[7] The 30 percent expected profit margin is based on the testimony of BSC's damages expert, Paul Meyer (See PDX D009 and the trial transcript at 445:24-446:3 (Meyer)).

[8] BSC has agreed to pay Abbott  40 percent of its profits made on sales of the company's Promus drug-eluting stent.  As a result, BSC's expected profit margin on sales of these infringing products is equal to approximately $(0.30) * (1 - 0.40) = 18$ percent. See "Transaction Agreement Between

*(Footnote continued)*

---

**b.  BSC's Expected Profitability from Selling a Non-Infringing Product**

26.     As described above, if BSC does not obtain a license from Cordis for the '594 patent, BSC would not be able to sell its existing line of bare metal stents and drug-eluting stents, including the Taxus stent, which uses the patented '594 technology.[9]  As noted above, I have assumed that it would take BSC approximately 12 months to gain FDA approval to make and sell an acceptable, non-infringing product. Thus, BSC's sales of these products would be zero in the last two months of 2007 and for the first 10 months of 2008.[10]

27.     However, I understand that the OTW Ranger balloon catheter is an available, non-infringing alternative to the infringing Maverick balloon catheters.  Thus, my assumption is that on November 1, 2007, had the hypothetical negotiation not resulted in a license, BSC could have immediately started to make and sell its non-infringing, OTW Ranger catheter as a stand-alone catheter (i.e., without a stent).  Historically, BSC's OTW catheters have accounted for 26 percent of the company's total stand-alone catheter revenues, and I have assumed that sales of these non-infringing OTW catheters would continue in the same proportion and at forecasted growth rates.[11]

28.     One possible redesign that would enable BSC to bring a non-infringing stent delivery system to market would be to mount the stent on the non-infringing OTW Ranger balloon catheter. Similarly, the Ranger guidewire tube design could be used to build a non-infringing RX cardiac catheter.  My understanding is that the Ranger did not exist in an RX version and that the Ranger was not and has not been approved by the FDA for delivering the stents that BSC currently sells, including the Taxus drug-eluting stent.  Thus, BSC would have to seek FDA approval for an RX version of the Ranger catheter.  BSC could also have to seek FDA approval to use any version of the Ranger (the OTW version or an RX version if BSC were to develop one) in a stent delivery system.

---

Boston Scientific Corporation and Abbott Laboratories," January 8, 2006, p. 14.  The agreement can be found in Appendix B.

[9] These products use the Maverick balloon catheter, which is an infringing product.

[10] See Exhibit 3-B.

[11] In 2006, BSC's OTW catheters accounted for 26 percent of the company's total stand-alone catheter revenues. See Exhibit 7 for details.

DECLARATION OF LAWRENCE WU, Ph.D. — No. C 02-790 SI

29.     There are likely to be design-around costs.  However, I do not have specific data on the costs that BSC would incur to design, test, and gain FDA approval for a non-infringing alternative.[12]  As such, I have assumed that BSC's design-around costs are zero.  This is a conservative assumption in that any incremental design-around costs would increase the royalty rate that BSC would be willing to pay by reducing the expected profitability from selling a non-infringing product.  Without design-around costs, I estimate the profits that BSC would earn without a license to the '594 technology by multiplying BSC's expected revenues in this scenario by BSC's expected profit margin (i.e., 30 percent).

### c.   Calculation of BSC's Maximum Willingness to Pay

30.     To compute the maximum royalty rate that BSC would pay, I calculated the difference in profit between the two scenarios:  BSC's profits with a license and BSC's profits without a license.  BSC's maximum willingness to pay is equal to the net present value ("NPV") of the difference between the company's expected profits on sales of its licensed products and its expected profits on sales of non-infringing alternative products.[13]

31.     Under the assumption that Promus is not an infringing alternative, the difference in profits between the two scenarios amounts to $63 million in 2007 and $253 million in 2008.  Using the conservative assumptions stated above, there would not be any difference in profits from 2009 through the remaining life of the patent.  (See Exhibits 3A-B.)  Under the assumption that Promus is an infringing alternative, the difference in profits between the two scenarios amounts to $63 million in 2007 and $264 million in 2008.  (See Exhibits 4A-B.)

32.     I can express BSC's maximum willingness to pay, as of October 31, 2007, as a percentage of BSC's infringing revenues by dividing this difference in expected profitability by the applicable royalty base, which I understand is the net present value of the future sales (through January 31, 2014) of the catheter portion of BSC's infringing products.  The royalty base would

---

[12] See *Boston Scientific's Responses to J&J/Cordis's Ninth Request for the Production of Documents*, May 18, 2007.

[13] The present value is calculated to convert future expected profits and revenues into current year amounts.

DECLARATION OF LAWRENCE WU, Ph.D. — No. C 02-790 SI

include sales of BSC's infringing catheters.  In addition, the royalty base would include BSC's

catheter-related revenues resulting from sales of the company's infringing bare metal and drug-

eluting stents.  Sales of the Promus stent were either included or excluded in the calculation

depending on whether Promus was assumed to infringe or not.  The key assumptions and

calculations of my analysis are described below:

- From the April 16, 2008 Citi Investment Research report, I obtained the average selling price ("ASP") for bare metal stents and drug-eluting stents.  Based on the testimony of Samuel Liang, Cordis's Vice President of Worldwide Commercial Operations, I have assumed that the ASP for balloon catheters in 2007 was $200.[14]  I also have assumed that the ASP of balloon catheters will decline at the same rate as the forecasted decline in the ASP of drug-eluting stents.

- To estimate BSC's unit sales of bare metal stents and drug-eluting stents, I divided these products' forecasted revenues by the appropriate ASP.  I have assumed that each unit sale of a bare metal stent or drug-eluting stent implies the sale of one infringing catheter.

- To estimate BSC's catheter-related infringing revenues resulting from sales of its bare metal stents and drug-eluting stents, I multiplied BSC's forecasted unit sales of catheters that are sold together with a stent by the ASP of a catheter.

33.     The maximum royalty rate that BSC would pay is derived by (a) calculating the NPV

of the difference in profits from taking a license and not taking a license, (b) calculating the NPV of

the royalty base, and (c) expressing the NPV of the difference in profits as a percentage of the NPV

of the royalty base. [15]  My calculations show that under the assumption that Promus does not infringe

the '594 patent, the maximum royalty rate that BSC would pay is 14.99 percent.  (See Exhibit 3A.)

Under the assumption that Promus infringes the '594 patent, the maximum royalty rate that BSC

would pay is 15.06 percent.  (See Exhibit 4A.)

## 2.   The Minimum Royalty that Cordis Would Be Willing to Accept

34.     The minimum royalty that Cordis would be willing to accept is based on the lost

profits that the company would incur by granting a license to BSC.  These include the profits that

---

[14] See trial transcript at 532:22-:24 (Liang).

[15] The discount rate that I used to calculate the present value of BSC's expected profits and revenues is BSC's weighted average cost of capital ("WACC").  This figure is consistent with the large composite WACC for the surgical and medical instruments and apparatus industry (SIC Code 3841).  See *Cost of Capital 2007 Handbook*, Morningstar, Inc., p. 3-67.  The source documents for this calculation can be found in Appendix C.

1   Cordis would have expected to lose if BSC was able to sell a competing, licensed product.  Thus, the

2   minimum royalty rate that Cordis would be willing to accept will depend on the difference between

3   (a) the expected profitability of products that Cordis would expect to sell if BSC did not have a

4   license to the '594 patent and (b) the expected profitability of products that Cordis would expect to

5   sell if it licensed the '594 patent to BSC.  In other words, I estimate the additional profit that Cordis

6   would earn if BSC were forced temporarily to stop selling its RX catheters, bare metal stent delivery

7   systems, and the Taxus (and perhaps the Promus) drug-eluting stent delivery system.  This amount

8   reflects the minimum amount that Cordis would have to obtain in royalties for it to agree to license

9   the '594 patent, because Cordis would need to be compensated for all of the additional profits that it

10  would otherwise earn in the absence of a license.  I can calculate the minimum royalty rate that

11  Cordis would accept by expressing the NPV of Cordis's lost profits as a percentage of the NPV of

12  the appropriate royalty base (i.e., the NPV of the projected BSC sales on which royalties would be

13  paid).  This royalty rate is the minimum that Cordis would agree to, and it establishes a lower bound

14  on the reasonable royalty.

### a.  Cordis's Expected Profitability if BSC Does Have a License

15

16  35.    I begin with forecasts of industry revenues for drug-eluting stents and Cordis's share

17  of drug-eluting stent sales.[16]  To obtain an estimate of Cordis's drug-eluting stent revenues, I

18  multiplied Cordis's share of drug-eluting stent sales by total industry drug-eluting stent sales.

19  36.    To obtain an estimate of Cordis's profits from selling its drug-eluting stents, I

20  multiply Cordis's drug-eluting stent revenues by an estimate of Cordis's profit margin.  I have

21  assumed that Cordis earns an operating profit margin of 30 percent of revenue.[17]  Based on these

22  assumptions regarding Cordis's forecasted revenues and profit margins, I calculate the profits that

23  Cordis would have expected to earn, at the time of the hypothetical negotiation, on sales of its

24  covered drug-eluting stents throughout the term of the hypothetical license.

25  [16] Data were obtained from the April 16, 2008 Citi Investment Research report.

26  [17] The 30 percent profit margin is based on the testimony of BSC's damages expert, Paul Meyer
    (PDX D009; also see trial transcript at 445:24-446:3 (Meyer)).  The operating profit margin earned

27  by Cordis's Cardiology business unit (excluding NOGA) in 2006 is comparable to this figure. (See
    COR 00355147.)

28

DECLARATION OF LAWRENCE WU, Ph.D. — No. C 02-790 SI

**b.  Cordis's Expected Profitability if BSC Does Not Have a License**

37.     Using the same forecasts of Cordis's revenues and profit margins that I used to calculate Cordis's expected profitability if BSC did take a license to the '594 patent, I recalculated Cordis's expected profitability under the assumption that BSC did not have a license.[18]  The key difference is that given BSC's assumed absence from the market with its infringing products, Cordis would expect to earn additional revenues and profits above and beyond that which is forecasted in the April 16, 2008 Citi Investment Research report.  This is because if BSC were no longer able to sell its infringing line of catheters and stent delivery systems, Cordis would have expected that its share of catheters and drug-eluting stent sales would increase.  I have assumed that Cordis's increase in sales would be limited to its Cypher drug-eluting stent, which comprises the large majority of Cordis's sales.[19]

38.     As described above, under the assumption that it takes BSC 12 months to design, test, and bring to market an FDA-approved, non-infringing product, Cordis would have expected to see an increase in revenues and profits from the additional sales of its drug-eluting stent products from November 1, 2007 through October 31, 2008, which is the period during which BSC would be out of the market.

39.     To calculate the expected sales of Cordis's drug-eluting stents in the scenario in which BSC did not have a license to the '594 patent, I started with the forecasted sales of Cordis's drug-eluting stents (as it appears in the April 16, 2008 Citi Investment Research report).  To determine the portion of BSC's sales that Cordis would have been able to capture, I assumed that if Cordis could manufacture enough units, it would have made a fraction of BSC's sales of infringing products, where that fraction is equal to Cordis's share of drug-eluting stent sales, not including BSC's sales.[20]

---

[18] I have assumed that Cordis's profit margin is the same, whether BSC obtains a license or not. This is a conservative assumption.

[19] Cordis's share of balloon catheters is very small, so I would not expect to see a material increase in revenue from Cordis's sales of these products even if BSC were out of the market for a 12 month period.

[20] This principle was used by the court in *State Industries, Inc. v. Mor-Flo Industries, Inc.* 883 F.2d 1573, 1578 (Fed. Cir. 1989).  Under this approach, if an infringer's share of the market is *x* and

*(Footnote continued)*

40.     However, it does not appear that Cordis would be able to make enough units during the entire period.  According to Scott Oberman, Cordis's Director of World Wide Cardiology Supply Chain, it would have taken Cordis approximately two months to ramp up its production of Cypher stent delivery systems to twice the current levels.[21]  If this effort began on November 1, 2007, Cordis could be able to double its output (i.e., go from 30,000 units per month to 60,000 units per month) by January 2008.  I accounted for this ramp-up time in my projections of Cordis's profit.  (See Exhibits 5B and 6B.)

### c.  Calculation of Cordis's Minimum Willingness to Accept

41.     To compute the minimum royalty rate that Cordis would be willing to accept, I calculated the difference in profit between the two scenarios:  Cordis's profits with a license and Cordis's profits without a license.  Cordis's minimum willingness to accept is equal to the NPV of the difference between the company's expected profits if BSC did not have a license to the '594 patent and the NPV of its expected profits if it had licensed the patent to BSC.  In other words, the minimum royalty rate that Cordis would accept is derived by (a) calculating the NPV of the difference in profits to Cordis from licensing BSC and not licensing BSC, (b) calculating the NPV of the royalty base, and (c) expressing the NPV of the difference in profits as a percentage of the NPV of the royalty base.[22]

42.     Under the assumption that Promus is not an infringing alternative, my analysis shows that had the negotiation with BSC failed, Cordis would have gained $109 million in profit in 2008, all from January through October.  (See Exhibits 5A-B.)  There would not be any increase in profits from 2009 through the remaining life of the patent.  Under the assumption that Promus is an

---

the patentee's share of the market is $y$, the patentee would get a fraction of the infringing sales equal to $y/(1-x)$.

[21] Interview with Scott Oberman, Cordis Director of World Wide Cardiology Supply Chain, May 9, 2008.

[22] The discount rate that I used to calculate the present value of Cordis's expected profits is the WACC for Johnson & Johnson.  See Exhibit 9 for details.  The source documents for this calculation can be found in Appendix C.

DECLARATION OF LAWRENCE WU, Ph.D. — No. C 02-790 SI

infringing alternative, the analysis shows that had the negotiation with BSC failed, Cordis would have gained $120 million in profit in the first 10 months of 2008.  (See Exhibits 6A-B.)

43.     I can express the minimum that Cordis would have been willing to accept, as of October 31, 2007, as a percentage of the royalty base.  To do so, I divide the NPV of the difference in expected Cordis profitability by the applicable royalty base (i.e., the NPV of BSC's catheter-related infringing revenues for stent and catheter sales).  Under the assumption that Promus is not an infringing product, the minimum royalty that Cordis would have been willing to accept from BSC is 5.19 percent.  Assuming BSC's Promus stent delivery system also infringes the '594 patent, the minimum royalty that Cordis would have been willing to accept from BSC is 5.53 percent.

### 3.   Conclusions Regarding the Hypothetical Bargaining Range of Reasonable Royalties

44.     In conclusion, the maximum royalty that BSC would have been willing to pay ranges from 14.99 to 15.06 percent, depending on whether the Promus stent delivery system infringes the '594 patent.  The average of these two maximum royalties is 15.0 percent, and I have adopted this average as the maximum royalty to reflect the uncertainty that would have existed regarding the Promus stent delivery system and whether it infringes the '594 patent.

45.     The minimum royalty that Cordis would have been willing to accept ranges from 5.19 to 5.53 percent.  The average of these two minimum royalties is 5.4 percent, and I have adopted this average as the minimum royalty that Cordis would accept to reflect the uncertainty that would have existed regarding the Promus stent delivery system and whether it infringes the '594 patent.  Thus, based on my analysis of the hypothetical negotiation that would have taken place between Cordis and BSC on October 31, 2007, a reasonable royalty would fall in the hypothetical bargaining range of 5.4 percent to 15.0 percent.

### C.   Analysis of the *Georgia-Pacific* Factors

46.     For the reasons discussed above, a hypothetical negotiation between Cordis and BSC on October 31, 2007, would have yielded a hypothetical bargaining range of potential reasonable royalty rates of 5.4 percent to 15.0 percent.  The specific value of a reasonable royalty would depend on the parties' relative bargaining strengths and weaknesses.  A convenient place to start is to

1   assume that Cordis and BSC had roughly equivalent bargaining positions, in which case the

2   negotiated royalty rate would likely be close to the mid-point of this range, which is 10.2 percent.  I

3   begin my analysis of the remaining *Georgia-Pacific* factors by assessing how each factor may affect

4   the parties' negotiating position and whether the effect, if any, is to increase the royalty above or

5   below the midpoint described above.

6       47.   ***Factor 1.  The royalties received by Cordis for the licensing of the patent in suit,***

7   ***proving or tending to prove an established royalty.***  I understand that Cordis has only licensed the

8   '594 patent once, and this was in the context of a cross-license.[23]  Thus, this one license for the '594

9   patent is not relevant to providing an established royalty applicable for this case because a licensing

10  arrangement between Cordis and BSC for the '594 patent would not involve any cross-licensing.

11  This *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis

12  of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable

13  royalty rate would fall.

14      48.   ***Factor 2.  The royalty rates paid by BSC for the use of other patents comparable to***

15  ***the patent in suit.***  I understand that BSC has produced in connection with this litigation a number of

16  licenses related to stents, restenosis reduction, or perfusion catheters.  Based on my analysis of 23

17  available licenses in this general area of medical technology in which BSC (including SciMed) was

18  the licensee, I found that the average "low" royalty rate to be paid by BSC (or SciMed) was 5.6

19  percent and the average "high" royalty rate to be paid by BSC was 6.9 percent.[24]  There is a low rate

20  and a high rate because many of these license agreements involved multiple royalty rates.[25]  These

21  licenses describe the royalty rates that BSC (or SciMed) has agreed to pay in prior licenses in this

22  general area of medical technology, and although each and every license may or may not be

---

[23] See trial transcript at 1219:3–:24 (Coletti).

[24] In total, there were 28 licenses.  Of these, 23 had royalty rates that were expressed in percentage terms.  There were 5 agreements for which royalty rates were either not listed in the agreement or given in terms other than percentages (e.g., fixed dollar amounts per unit).  In addition, BSC produced licenses that were negotiated in the context of a settlement.

[25] The low rate represents the lowest royalty rate listed in a given agreement and the high rate represents the highest such rate.  Where an agreement lists only a single royalty rate, that rate represents both the low rate and the high rate.

comparable to the '594 patent, the licenses overall provide perspective. As a result, the impact of this *Georgia-Pacific* factor on my analysis of the hypothetical negotiation would be to decrease the negotiated royalty rate below the mid-point.

49.     ***Factor 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*** Any post-verdict license by Cordis to BSC would be non-exclusive and restricted to the United States. In fact, Cordis has already licensed the '594 patent to another company.[26] In my analysis of the hypothetical negotiation, I considered the non-exclusive nature and geographic scope of the license that would have been negotiated. Thus, this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

50.     ***Factor 4. Cordis's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention; or by not licensing others to use the invention; or by granting licenses under special conditions designed to preserve that monopoly***. Cordis has no fixed policy or practice with respect to licensing patents to competitors, and the company has sometimes licensed patents to its competitors in the past.[27] Rather than having a hard and fast rule, Cordis weighs various business considerations in licensing competitors.[28] In my analysis of the hypothetical negotiation and the minimum royalty that Cordis would be willing to accept, I have considered the nature of the competition between Cordis and BSC with respect to balloon catheters, bare metal stents, and drug-eluting stents. Thus, this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

51.     ***Factor 5. The commercial relationship between Cordis and BSC, such as whether they are competitors in the same territory in the same line of business; or whether they are***

---

[26] See trial transcript at 1219:3-:5 (Coletti); and 561:2-:5 (Liang).

[27] See trial transcript at 1207:14–1208:7 (Coletti).

[28] See trial transcript at 1208:8–:21 (Coletti).

1    **inventor and promoter.** Cordis and BSC have been and remain competitors for the drug-eluting

2    stent products that use the technology claimed in the '594 patent.[29]  On October 31, 2007, BSC and

3    Cordis were the only two manufacturers of drug-eluting stents.  At the end of 2007, BSC's share of

4    total sales of drug-eluting stents in the U.S. was 54 percent, while Cordis's share was 46 percent.

5    This competition is likely to continue into the future.  For example, BSC's anticipated introduction

6    of its Promus catheter in 2008 is expected to reduce Cordis's sales and share of drug-eluting stents.[30]

7    In October 2007, both parties would have anticipated the entry of competing products (e.g.,

8    Medtronic's Endeavor and Abbott's Xience stents), but analysts still anticipate that BSC and Cordis

9    would remain the two largest sellers of drug-eluting stents at the end of 2008 and in 2009, which

10   spans the period of post-verdict infringement in my scenario of a failed negotiation.[31]  All else being

11   equal, a patent owner would require a higher royalty rate from a potential licensee that is a direct

12   competitor to account for the possibility that granting a license would lead to lost sales and profits.

13   My calculation of the minimum amount that Cordis would be willing to accept has accounted for

14   these potential lost sales and profits.

15        52.    However, as stated above, my analysis of the hypothetical negotiation and BSC's

16   willingness to pay for a license to the '594 patent assumes that, in November 2008, BSC could

17   immediately begin selling its FDA-approved, non-infringing catheters at a level that is consistent

18   with current forecasts of its revenues in November 2008 without any negative reputation or market

19   effects.  By making this assumption—which is likely to be an optimistic view regarding BSC's

20   competitiveness and sales after being out of the market for 12 months awaiting FDA approval—the

21   calculations that I have done to assess BSC's maximum willingness to pay for a license may well

22   underestimate BSC's true maximum willingness to pay.  This is because I may be attributing to BSC

---

[29] See trial transcript at 402:6–403:14 (Meyer); and 1219:25–1220:2 (Coletti).

[30] See, for example, "Johnson & Johnson Inc (JNJ), It May Be Unleaded, But There's Still Some Gas In The Tank," Citi Investment Research, April 16, 2008, pp. 7, 11 and "Medical Supplies & Devices, Industry Review:  The Current State of Coronary Stents," Cowen and Company, March 17, 2008, p. 5.

[31] "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

an overly optimistic forecast of sales and profits in November 2008 and in the months immediately after its re-entry into the market. There are at least two reasons why BSC's sales and profits when the company introduces its non-infringing catheter and stent delivery systems in November 2008 may not reach the levels of the current forecasts. First, current forecasts of BSC's sales do not account for any adverse sales impact that might result if BSC did not sell any bare metal stents or drug-eluting stents in the U.S. from November 1, 2007 to October 31, 2008. Second, current forecasts of BSC's sales are premised on the assumption that BSC would be selling catheters and stent delivery systems that have the benefits of the '594 technology. Whether BSC's non-infringing catheters and stent delivery systems will be as good as those that BSC currently sells with the '594 technology is not known. I understand, however, that the trial record contains evidence that the '594 technology has significant benefits. For example, the coextruded guidewire tube appears to be superior to a single layer guidewire tube, such as the design used in Ranger. In addition, the coextruded technology improves "deliverability,"[32] and BSC abandoned the non-infringing Ranger catheter for the Maverick catheter.[33] Thus, my calculations may understate the cost to BSC of not taking a license from Cordis by overstating BSC's competitiveness in a world in which it did not take a license from Cordis. As a result, the impact of this *Georgia-Pacific* factor on my analysis of the hypothetical negotiation would be to increase the negotiated royalty rate above the mid-point.

53.     ***Factor 6. The effect of selling the patented specialty in promoting sales of other products of BSC; the existing value of the invention to Cordis as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.*** BSC sells guidewires, insertion catheters, and other devices that are used with catheters that incorporate the technology in the '594 patent.[34] However, based on my review of the evidence at trial, it does not appear that BSC's sales of these products are related to BSC's sales of its catheters and stent delivery systems. Thus, this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my

---

[32] See trial transcript at 229:13-230:16 (Millhouse); 252:4-:21 (Millhouse); 230:17-231:8 (Millhouse); 214:19-215:6 (Millhouse); and 221:9-:24 (Millhouse).

[33] See Tr. 290:22–291:21 (LaViolette) and DX 601 at BSC 0168530.

[34] See trial transcript at 433:25–434:15 (Meyer).

analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

54.     **Factor 7.  The duration of the patent and the term of the license.**  The '594 patent does not expire until January 31, 2014.  Thus, the post-verdict life of the patent is over 6 years.  The remaining life of the '594 patent was considered in my analysis of the hypothetical negotiation, so this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

55.     **Factor 8.  The established profitability of the product made under the patent; its commercial success; and its current popularity.**  The products that have incorporated the technology claimed in the '594 patent include the balloon catheters, bare metal stents, and drug-eluting stents made by Cordis and BSC.  In 2005, US sales of BSC's and Cordis's balloon catheters were approximately $211 million.[35]  In 2006, sales of both companies' bare metal stents were $52 million, and sales of both companies' drug-eluting stents were almost $2.9 billion.[36]  The operating profit margin on these products (as a percent of revenues) has been estimated to be around 30 percent.[37]

56.     In addition, according to the expert report submitted by Felix Millhouse, M.D., a cardiologist, stents "have provided a relatively effective means of reducing the occurrence of restenosis, *i.e.*, re-narrowing of the artery following [an] interventional procedure."[38]  According to Dr. Millhouse, products using the technology of the '594 patent have increased stent deliverability, which leads to less patient discomfort and less potential for complications.[39]  However, the established success and profitability of the products that incorporate the technology claimed in the

---

[35] COR 00336503-78.

[36] "Johnson and Johnson Inc (JNJ):  Q3:07 – Bracing For The Storm," Citi Investment Research, October 16, 2007, p. 11.

[37] See trial transcript at 445:24–446:3 (Meyer).

[38] See Expert Report of Dr. Felix Millhouse, 33:12-:14.

[39] See Expert Report of Dr. Felix Millhouse, 48:13-:16.

'594 patent were considered in my analysis of the hypothetical negotiation, so this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

57.     **Factor 9.   The marginal utility of the patented invention over the old modes or devices, if any, that had been used for working out similar results.**   My discussion of *Georgia-Pacific* Factor 8 gives some of the reasons why physicians have found the technology of the '594 patent valuable.  The value of the patented '594 technology over older devices is also evident in the widespread adoption of the technology.  Cordis uses this technology in all of its catheter and stent products, and by October 2007, every balloon catheter and stent delivery system sold by BSC incorporated the technology claimed by the '594 patent.  BSC had two earlier products that were non-infringing—the BSC Ranger catheter and the Schneider Asuka catheter.  However, the Asuka catheter was last sold in the US in 2001, and in that year, U.S. sales of the Asuka were less than $5,000 while industry sales of balloon catheters were around $165 million.[40]  The Ranger catheter, which has a single-layer guidewire tube, was popular when it was first introduced, but its sales fell after BSC introduced the Maverick catheter, which infringes the '594 patent.[41]  Because I considered whether and how these older non-infringing alternatives could be used by BSC if it did not take a license from Cordis, this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

58.     **Factor 10.   The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**   As discussed above in the discussion of *Georgia-Pacific* Factor 8, the catheter and stent products that incorporate the patented '594 technology are commercially valuable to both Cordis and BSC.  In addition, as discussed above in the context of *Georgia-Pacific* Factor 9, the

---

[40] See PTX 0844 ("Balloon Catheters Market Shares Based on U.S. Revenues," 1996 to Q1 2007).

[41] See trial transcript at 290:22–291:21 (LaViolette).

1   products that incorporate the technology claimed in the '594 patent are valued by physicians.

2   Because I considered these aspects of the technology in my analysis of the hypothetical negotiation,

3   this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis

4   of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable

5   royalty rate would fall.

6       59.     **Factor 11.  The extent to which BSC has made use of the invention; and any**

7   **evidence probative of the value of that use.**  As discussed above under *Georgia-Pacific* Factor 8,

8   BSC has made extensive use of the patented '594 technology.  In October 2007, every balloon

9   catheter and stent delivery system sold by BSC incorporated the '594 technology.[42]  I considered

10  BSC's adoption of the patented '594 technology in my analysis of the hypothetical negotiation, so

11  this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis

12  of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable

13  royalty rate would fall.

14      60.     **Factor 12.  The portion of the profit or the selling price that may be customary in**

15  **the particular business or in comparable businesses to allow for the use of the invention or**

16  **analogous inventions.**  I am not aware of any customary practice or rule of thumb in this industry.

17  In addition, Paul Coletti, Associate Patent Counsel at Johnson & Johnson, testified at trial that he

18  also is not aware of any standard or established royalty for patents related to interventional

19  cardiology, or in the market in which BSC and Cordis compete.[43]  However, Cordis and BSC have

20  produced in connection with this litigation a number of licenses related to stents, restenosis

21  reduction, or perfusion catheters.[44]  Based on my review of 31 available licenses in this general area

22

23      [42] The jury concluded that the '594 technology was used in the entirety of BSC's U.S. product
24  line for angioplasty catheters and stent delivery systems (both bare metal stents and drug-eluting
    stents).  See trial transcript at 606:12–608:19 (Pruitt); and 1994:21–1995:1 (i.e., jury instructions).

        [43] See trial transcript at 1237:19–:25 (Coletti).
25
26      [44] In total, there were 40 licenses involving Cordis (or Johnson & Johnson) as the licensee or
    licensor and 7 licenses involving BSC as the licensor.  Of these, 37 had royalty rates that were
27  expressed in percentage terms.  There were 10 agreements for which royalty rates were either not
    listed in the agreement or given in terms other than percentages (e.g., fixed dollar amounts per unit).
28  In addition, BSC produced licenses that were negotiated in the context of a settlement.

of medical technology in which Cordis (or Johnson & Johnson) was either the licensor or the licensee and 6 licenses in which BSC (or SciMed) was the licensor, I found that the average "low" royalty rate was 3.9 percent and the average "high" royalty rate was 7.2 percent. These licenses describe the royalty rates that Cordis (or Johnson & Johnson) and BSC (or SciMed) have agreed to in prior licenses in this general area of medical technology, and although each and every license may or may not be comparable to the '594 patent, the licenses overall provide perspective. As a result, the impact of this *Georgia-Pacific* factor on my analysis of the hypothetical negotiation would be to decrease the negotiated royalty rate below the mid-point.

61.     **Factor 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements; the manufacturing process, business risks, or significant features or improvements added by BSC.** For the purpose of determining a post-verdict reasonable royalty, Cordis and BSC have entered into a stipulation that the royalty base should be the value of the catheter portion of the accused products sold.[45] In addition, as noted earlier in my discussion of *Georgia-Pacific* Factor 9, BSC uses the patented '594 technology in all of its current catheter and stent products, and it has never sold any of its current stents mounted on a non-infringing catheter. This means that without a license to this technology, BSC would not be able sell its bare metal stents and drug-eluting stents while it was designing, testing, and getting FDA approval for a non-infringing product. During this period, the profit that would be lost by not selling stents would include all of the profit associated with these products, and the loss of these profits should be "credited" to the invention. Because I have considered the value of the patented technology in my evaluation of the hypothetical negotiation, this *Georgia-Pacific* factor would not have an additional effect, negative or positive, on my analysis of the hypothetical negotiation and my assessment of where within the bargaining range a reasonable royalty rate would fall.

62.     **Factor 14. The opinion testimony of qualified experts.** In preparing this report, I have reviewed and considered the information in (a) the expert reports that were prepared by Cate Elsten, who was retained by Cordis to assess past damages in this matter, (b) the trial testimony and

---

[45] See *Joint Stipulation and Order About Accused Products*, October 12, 2007.

expert reports of Paul Meyer, who was BSC's damages expert at trial, and (c) the trial testimony and expert reports of Felix Millhouse, M.D., and David K. Roberts, M.D.

63.     ***Factor 15.  The royalty reached in a hypothetical negotiation between a willing licensor and a willing licensee.***  I have assessed the hypothetical negotiation that would have occurred between Cordis and BSC on October 31, 2007.  As described above, I analyzed the royalty that BSC would be willing to pay for the patented '594 technology to determine the maximum reasonable royalty.  I also analyzed the minimum royalty that Cordis would be willing to accept for the patented '594 technology.

64.     Based on my analysis of the hypothetical negotiation and the other *Georgia-Pacific* factors listed above, my conclusion is that the range of reasonable royalties for the '594 patent is 5.4 percent to 15.0 percent.  I also conclude that a 6 percent royalty rate is the royalty rate within this range that most closely reflects the cumulative impact of all of the *Georgia-Pacific* factors. Although my analysis of *Georgia-Pacific* Factor 5 (i.e., an analysis of the direct competition between BSC and Cordis, which includes conservative assumptions regarding BSC's re-entry into the market with a non-infringing product) indicates that a reasonable royalty rate above the mid-point may be appropriate, my analysis of *Georgia-Pacific* Factors 2 and 12, which focused on an assessment of the range of royalty rates that BSC (or SciMed) and Cordis (or Johnson & Johnson) have agreed to in the past for licenses in this general area of medical technology, suggests that a reasonable royalty is likely to be close to the low end of the range.  As discussed above, licenses involving BSC (or SciMed) as the licensee involved an average "low" royalty rate of 5.6 percent and an average "high" royalty rate of 6.9 percent.  The average low and high royalty rates in the licenses involving Cordis (or Johnson & Johnson) as either the licensor or the licensee and licenses in which BSC (or SciMed) was the licensor were 3.9 percent and 7.2 percent, respectively.  Based on my assessment of the *Georgia-Pacific* factors, including my analysis of the hypothetical negotiation, I conclude that a 6 percent royalty rate is reasonable.

65.     A 6 percent reasonable royalty rate on the catheter-related portion of BSC's sales of catheters and stent delivery systems implies that BSC would keep all of the profits on the stent portion of its stent delivery system sales and roughly 80 percent of the profits from the catheter

-26-

portion of these sales.  For example, if one of BSC's drug-eluting stents were to sell for $2,000, with $200 being the catheter portion of this price, BSC would pay a royalty of $12 on each unit sold (i.e., 6 percent of $200) or a royalty that is 20 percent of the catheter-related profit.[46]

### The Difference Between Pre-Verdict and Post-Verdict Royalties

66.     My analysis of the hypothetical negotiation and the *Georgia-Pacific* factors that would have determined the reasonable royalty for the '594 patent had there been a negotiation on October 31, 2007 (immediately after the jury returned its verdict of infringement) is described above. The analysis that I have performed differs from an analysis of a reasonable royalty rate in a hypothetical negotiation that would have taken place at the time of first infringement, which, in this case, was October 1998.  Two important differences between these hypothetical negotiations are discussed below.

67.     First, when infringement began in October 1998, the future importance of the patented '594 technology may not have been fully evident.  The best-selling cardiac catheter in the U.S. was BSC's Ranger catheter, which did not infringe.  However, by October 2007, all of BSC's and Cordis's catheters and stent delivery systems incorporated the patented '594 technology. Because the value of the patented '594 technology was known and largely undisputed by October 2007 (but uncertain in October 1998), BSC's willingness to pay for such technology would have been higher in 2007 than in 1998.

68.     Second, BSC's negotiating position was weaker in October 2007 than it would have been in October 1998.  This factor also suggests that the royalty rate that would have been negotiated in October 2007 would be higher than that which would have been negotiated in October 1998.  In October 2007, BSC was not selling an FDA-approved bare metal stent or drug-eluting stent that would not have infringed the '594 patent.  While BSC has sold non-infringing catheters in the past (e.g., the Ranger catheter and the Asuka catheter), I understand that none of these catheters has been approved nor has BSC ever obtained FDA approval for a non-infringing RX cardiac catheter.  Thus,

---

[46] A 30 percent profit margin on $200 implies a profit of $60.  A $12 royalty is 20 percent of the $60 in profit.

BSC cannot lawfully sell in the U.S. a non-infringing RX catheter, bare metal stent delivery system, or drug-eluting stent delivery system without first securing FDA approval for the combination. Such approval would require the filing of an FDA 180-Day Supplement, accompanied by preclinical testing data to demonstrate the safety and effectiveness of the modified device.[47]  Developing the modified device would take two to three months while testing and preparation of data to be filed with the 180-Day Supplement would take another 12 weeks. Finally, securing FDA approval would likely require an additional 6 to 12 months after an application was submitted.[48]  During this time, BSC would have to stop selling its current bare metal stents and drug-eluting stents in the U.S.

69.    In contrast, BSC's position was much stronger in October 1998 when BSC's Ranger was (a) the largest selling catheter in the U.S. and (b) and the catheter was used to deliver BSC's first bare metal stent, the NIR stent. This factor would have helped BSC negotiate a lower royalty rate.

70.    Based on the differences described above, my conclusion is that an October 2007 hypothetical negotiation would result in agreement to a higher royalty than what would have been negotiated in October 1998.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in San Francisco, California on May 9, 2008.

_Lawrence Wu_
Lawrence Wu

------

[47] See Valenti Declaration, p. 4.

[48] See Valenti Declaration, p. 6.

# Declaration of Lawrence Wu, Ph.D.

## Exhibits

EXHIBIT 1

**NERA**
Economic Consulting

**Lawrence Wu**
Senior Vice President

National Economic Research Associates, Inc.
1 Front St., Suite 2600
San Francisco, California 94111
+1 415 291 1000 Fax +1 415 291 1020
Direct dial: + 1 415 291 1007
lawrence.wu@nera.com
www.nera.com

# LAWRENCE WU
## SENIOR VICE PRESIDENT

Dr. Wu specializes in the economics of antitrust and competition policy. He has testified in US district courts and submitted analyses to the US Federal Trade Commission (FTC), US Department of Justice (DOJ), European Commission, Competition Tribunal of South Africa, and Brazil's competition authority (CADE).

Dr. Wu's antitrust practice focuses on the analysis of mergers, price fixing, and other competitive issues in a variety of retail, manufacturing, and service industries. He is particularly experienced in assessing competition in a wide range of health care markets, including hospital services, health insurance, physician services, and various medical technologies. His expertise includes the application of econometric and statistical methods, the design and economic analysis of consumer survey data, and merger simulation.

Dr. Wu's recent work includes the analysis of proposed mergers in a variety of industries from pipelay services to LED lighting systems. He has also been retained as an economic expert in antitrust litigation to assess issues related to liability and damages. For example, he has computed damages in alleged price fixing matters and has assessed the competitive implications of exclusive contracts, tying, bundling, and vertical integration.

In the area of intellectual property, he has written and consulted on issues involving patent pools. In addition, he has given a number of presentations on standard setting and on the use of benchmarks in a reasonable royalty analysis.

Dr. Wu has studied a wide range of industries, including ambulance services, bakeware, cookware, blood testing instruments and supplies, bronze memorials and other commemorative products, cardiac medical devices, carton sealing tape, clinical diagnostic tests and testing equipment, compact discs, diagnostic imaging equipment, dialysis services, DRAM (dynamic random access memory) chips and modules, ferrous scrap, glass beverageware, health insurance, hospital services, lamps and lighting, mattresses, outdoor advertising, patient monitoring equipment, orthopedic products, physician services, pipelay services, printers and printing supplies, ski resorts, and smokeless tobacco.

Lawrence Wu

He is frequently invited to speak at conferences and seminars, and his recent presentations have been on topics such as the competitive importance of products in the R&D pipeline, joint ventures, European merger enforcement, retrospective merger reviews, prescription drug reimportation, and new developments in health care antitrust. Dr. Wu is the editor of two books on the economics of antitrust and has published articles in *The Antitrust Bulletin*, *Antitrust Report*, *European Competition Law Review*, *Journal of Business Venturing*, and *Medical Care*. His research interests are in the areas of industrial organization, health economics, and antitrust.

Dr. Wu earned his PhD in economics from the University of Chicago Graduate School of Business and his BA in economics from Stanford University. Prior to joining NERA, he was a staff economist in the FTC's Bureau of Economics.

## Education

**University of Chicago, Graduate School of Business**
Ph.D., Economics, 1992

**Stanford University**
B.A., Economics, 1986

## Professional Experience

|  | |
|---|---|
| 1996- | **NERA Economic Consulting**<br>Senior Vice President (current position) |
| 1992-1996 | **Federal Trade Commission, Bureau of Economics, Division of Antitrust**<br>Economist |
| Spring 1997 | **New York University, Robert F. Wagner Graduate School of Public Service**<br>Adjunct Assistant Professor of Public Health Administration |
| Fall 1991 | **University of Chicago, Department of Economics**<br>Lecturer |
| 1990-1991 | **American Hospital Association, Division of Economic Analysis**<br>Research Analyst |
| 1986-1987 | **Federal Reserve Bank of New York, Banking Studies Department**<br>Research Assistant |

Lawrence Wu

## Honors and Professional Activities

    Section of Antitrust Law, American Bar Association:

        Member, Competitiveness Task Force, 2007

        Vice Chair, Economics Committee, 2003-2006

        Member, Exemptions and Immunities Task Force, 2003-2004

    Member, American Economic Association

    Member, Western Economic Association

    Member, Section of Antitrust Law, American Bar Association

    Member, The Antitrust and Unfair Competition Law Section, State Bar of California

    Federal Trade Commission Award for Meritorious Service, March 1996

    Great American Cookie Company Grant and Fellowship, International Franchise Association Educational Foundation, 1990

    University of Chicago Fellowship, 1987-1989

## Expert Reports and Testimony

Declaration and expert report on behalf of the defendants in *Kelley Woodruff, M.D. and Hawai`i Children's Blood and Cancer Group v. Hawai`i Pacific Health, et al.*, Circuit Court of the First Circuit, State of Hawaii, (Civil No. 02-1-0090-01 (BIA)).  Declaration: February 14, 2008.  Expert Report: February 22, 2008.

Declarations on behalf of the defendants in *The City of New York v. Group Health Incorporated, HIP Foundation, Inc., and Health Insurance Plan of Greater New York,* United States District Court for the Southern District of New York (Case No. 06 Civ. 13122 (KMK) (RME)).  Declarations:  March 6, 2007 and November 9, 2007.

Deposition on behalf of St. Joseph's Hospital in connection with *St. Joseph's Hospital, Inc., d/b/a St. Joseph's Hospital  v. Agency for Health Care Administration, et. al.,* Case No. 05-2754, State of Florida, Division of Administrative Hearings.  Deposition: September 25, 2007.

Deposition testimony and report on behalf of the plaintiff in *American Medical Response Inc. v. City of Stockton*, United States District Court in and for the Eastern District of California (Civil Action No. 2:05-CV-01316 DFL-EFB).  Deposition: January 19, 2007.  Report:  November 2, 2006.

Lawrence Wu

Deposition testimony and report on behalf of the defendants in connection with *Chemed Corporation v. PCI Holding Corporation, et al., v. Vitas Healthcare Corp.*, Superior Court of the Commonwealth of Massachusetts (Civil Action No. 04-2354-BLS2).  Deposition: June 30, 2006. Report:  November 30, 2005.

Expert report on behalf of Sharp Community Medical Group, Inc. in connection with *San Diego Physicians Medical Group, Inc. v. Sharp Community Medical Group Inc.,* Superior Court of the State of California for the County of San Diego Central (Case No. GIC 862275).  Report: April 14, 2006.

Deposition testimony and reports on behalf of the defendants in connection with *East Portland Imaging Center, P.C., and Body Imaging, P.C., v. Providence Health System-Oregon, Providence Health Plan, Portland Medical Imaging, LLP, Radiology Specialists of the Northwest, P.C., Center for Medical Imaging, LLP and Advanced Medical Imaging, LLC,* United States District Court for the District of Oregon (Case No. 05-CV-465-KI).  Reports: June 1 and November 1, 2005.  Deposition: November 22, 2005.

Testimony before the Provider Reimbursement Review Board, Centers for Medicare and Medicaid Services, in *St. David's Healthcare System v. Blue Cross Blue Shield Association/Trailblazer Health Enterprises, LLC*, Exception to Related Organization Principle, PRRB Case No. 95-0315G.  Testimony: September 29, 2005.

Expert report on behalf of Regence Blue Shield of Idaho, Inc. in connection with *Government Employees Medical Plan and Mutual Insurance Associates, Inc. v. Regence Blue Shield of Idaho, Inc. and Blue Cross of Idaho Health Services, Inc.*, United States District Court for the District of Idaho (Case No. CIV 04-284-E-BLW).  Report: May 16, 2005.

Expert reports on behalf of Johnson Controls, Inc.  Report was submitted in connection with *George Yardley Co. and Yardley-Zaretsky, Inc. v. Johnson Controls, Inc., et al.* (American Arbitration Association, Case No. 72 110 01086 02 HLT).  Reports: October 4 and December 1, 2004.

Expert report on behalf of Business Venture Investments No. 790 (PTY) Limited and Afrox Healthcare Limited.  Report was submitted to the Competition Tribunal of South Africa in connection with Case No. 76/LM/DEC 03.  Report: July 1, 2004.

Expert report on behalf of Nestlé in connection with Nestlé's proposed acquisition of Chocolates Garoto, S.A.  Report was submitted to Brazil's competition authority, CADE (Conselho Administrativo de Defesa Econômica), in connection with the agency's review of the proposed transaction.  Report: December 3, 2003.

Deposition testimony and expert report on behalf of the defendants in connection with *EasCare, LLC v. Cape Cod Healthcare, Inc. and Cape Cod Medical Enterprises, Inc. d/b/a Cape Cod Ambulance and Medical Services Ambulance,* United States District Court for the District of Massachusetts (Civil Action No. 02-11460-RWZ).  Report: July 25, 2003.  Deposition: September 11-12, 2003.

Lawrence Wu

Statement on the Analysis of Entry in Health Insurance Markets.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 24, 2003.

Statement on the Analysis of Competitive Effects in Health Insurance Markets.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 23, 2003.

Statement on the Analysis of Hospital Post-Merger Conduct.  Prepared for the Federal Trade Commission and the Department of Justice Hearings on Health Care and Competition Law and Policy, Washington, D.C., April 23, 2003.

Deposition and trial testimony on behalf of Naples Community Hospital in connection with *Collier HMA, Inc.'s Certificate of Need Application (CON #9551)*, State of Florida, Division of Administrative Hearings.  Deposition and trial testimony: February 11 and March 18, 2003.

Statement before the Federal Trade Commission on Health Insurance: Payor/Provider Issues.  Prepared for the Federal Trade Commission Workshop on Health Care and Competition Law and Policy, Washington, D.C., September 9, 2002.

Deposition testimony and expert report on behalf of three defendants (suppliers of biotin) in connection with *In re: Vitamins Antitrust Litigation*, United States District Court for the District of Columbia (M.D.L. Docket No. 1285).  Report: June 28, 2002.  Deposition: August 26, 2002.

Deposition and trial testimony on behalf of LifePath, Inc. in connection with *LifePath, Inc. v. Agency for Health Care Administration and Hernando-Pasco Hospice, Inc.,* Case Nos. 00-3203 *et seq.*, State of Florida, Division of Administrative Hearings.  Deposition and trial testimony: June 29 and August 7, 2002.

Deposition and trial testimony and expert report on behalf of the defendants in the matter of *Federal Trade Commission v. Swedish Match North America, Inc., et al.,* United States District Court for the District of Columbia (No. 1:00-CV-001501 TFH).  Reports: July 28 and August 15, 2000.  Deposition and trial testimony: August 16 and September 7-8, 2000.

Expert report on behalf of Aetna U.S. Healthcare in connection with Aetna U.S. Healthcare's proposed acquisition of Prudential Health Care Plan, Inc. before the Department of Insurance of the State of Georgia.  Report: May 19, 1999.

Oral testimony and expert report on behalf of Aetna U.S. Healthcare in connection with Aetna U.S. Healthcare's proposed acquisition of Prudential Health Care Plan, Inc. before the Department of Banking and Insurance and the Department of Health and Senior Services of the State of New Jersey.  Testimony: April 9, 1999.

Lawrence Wu

Deposition and trial testimony and expert report on behalf of the plaintiff in the matter of *Federal Trade Commission and State of Missouri v. Tenet Healthcare Corporation and Poplar Bluff Physician's Group, Inc.*, United States District Court for the Eastern District of Missouri (No. 4:98-CV-709 CDP). Report: May 20, 1998. Deposition: June 2, 3, and 5, 1998. Trial: June 23 and 26, 1998.

Deposition testimony and expert report on behalf of the defendants in connection with *William G. Marshall, Jr., M.D., v. Edward Planz, M.D. and Southeastern Cardiovascular Associates, P.C.*, United States District Court for the Middle District of Alabama (No. CV-97-T-793-S). Report: March 16, 1998. Deposition: May 22, 1998.

Deposition and trial testimony on behalf of the Federal Trade Commission *in the Matter of International Association of Conference Interpreters*. Docket Number 9270, Federal Trade Commission administrative proceeding. Deposition and trial testimony: January 1996.

## Publications

Gregory K. Leonard and Lawrence Wu, "Assessing the Competitive Effects of a Merger: Empirical Analysis of Price Differences Across Markets and Natural Experiments," *Antitrust*, Vol. 22, No. 1, Fall 2007, pp. 96-101.

Paul Lugard, John Taladay, and Lawrence Wu, "Comments on Draft EC Guidelines on the Assessment of Non-Horizontal Mergers Under the Council Regulation on the Control of Undertakings Between Undertakings," on behalf of the International Chamber of Commerce, Commission on Competition. Submitted to the European Commission, May 13, 2007 (at http://ec.europa.eu/comm/competition/mergers/legislation/files_non_horizontal_consultation/icc.pdf).

Paul Hofer, Mark Williams, and Lawrence Wu, "The Economics of Market Definition Analysis in Theory and in Practice," *The Asia Pacific Antitrust Review 2007*, Global Competition Review, May 2007, pp. 10-13.

*Economics of Antitrust: Complex Issues in a Dynamic Economy*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2007).

Paul Lugard, Lawrence Wu, Ilene Gotts, John Taladay, Eileen Reed, and Doris Hildebrand, "Comments on the Church Report and its Implications for Non-Horizontal Merger Guidelines," a report to the European Commission on behalf of the International Chamber of Commerce, September 13, 2006 (at http://www.iccwbo.org/uploadedFiles/ICC/policy/competition/Statements/CommentsChurchReport13Sept06.pdf).

Christian Dippon, Gregory Leonard, and Lawrence Wu, "Application of Empirical Methods in Merger Analysis," a chapter in a Japan Fair Trade Commission Competition Policy Research Center report titled *Merger Investigation and Economic Analysis*, November 2005, pp. 108-155.

Alan J. Daskin and Lawrence Wu, "Observations on the Multiple Dimensions of Market Power," *Antitrust*, Vol. 19, No. 3, Summer 2005, pp. 53-58. (Also see Chapter 11 in *Economics of Antitrust: Complex Issues in a Dynamic Economy*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2007), pp. 137-153.)

Lawrence Wu and Thomas R. McCarthy, "Essential Issues in the Competitive Analysis of Patent Pools," in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh (White Plains, NY: NERA Economic Consulting, 2005), pp. 233-249.

Robert Skitol and Lawrence Wu, "A Transatlantic Swim through Patent Pools: Keeping Antitrust Sharks at Bay," in *On the Merits: Current Issues in Competition Law and Policy, Liber Amicorum Peter Plompen*, ed. Paul Lugard and Leigh Hancher (Antwerpen-Oxford: Intersentia, 2005), pp. 103-116.

Lawrence Wu, "Innovation in the Coronary Stent Industry: A Note on the Competitive Importance of Products in the R&D Pipeline," prepared for the 2005 Antitrust in Healthcare Conference sponsored by the ABA Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, D.C., May 2005.

Paul Hofer, Patrick Smith, and Lawrence Wu, "Quantitative Techniques in Competition Policy Analysis," *The Asia Pacific Antitrust & Trade Review 2005*, Global Competition Review, April 2005, pp. 13-16.

Lawrence Wu and Rika Mortimer, "Competition Policy Challenges in Innovative Health Care Markets," prepared for the 6th Annual Conference on Emerging Issues in Healthcare Law sponsored by the ABA Health Law Section, Lake Buena Vista, Florida, February 2005.

Lawrence Wu and Rika Mortimer, "Competition and Innovation in Health Care Markets and their Implications for Antitrust Enforcement," *Antitrust Health Care Chronicle*, Vol. 18, No. 4, Winter 2005, p. 3, 12-16.

Paul Hofer, Mark Williams, and Lawrence Wu, "Principles of Competition Policy Economics," *The Asia Pacific Antitrust Review 2004*, Global Competition Review, April 2004, pp. 4-7.

*Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004).

Lawrence Wu, "Two Methods of Determining Elasticities of Demand and Their Use in Merger Simulation," in *Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004), pp. 21-33. (Previously published in *Antitrust Insights*, NERA Economic Consulting, January/February 2003.)

Lawrence Wu, Paul Hofer, and Mark Williams, "The Increasing Use of Empirical Methods in European Merger Enforcement: Lessons from the Past and a Look Ahead," in *Economics of Antitrust: New Issues, Questions, and Insights*, ed. Lawrence Wu (White Plains, NY: NERA Economic Consulting, 2004), pp. 71-83.  (Originally prepared for the UCLA Law First Annual Institute on U.S. and E.U. Antitrust Aspects of Mergers and Acquisitions, Los Angeles, California, February 28, 2004.)

Lawrence Wu, "Economic Aspects of an Analysis of Hospital Post-Merger Pricing and Conduct," prepared for the 2003 Antitrust in Healthcare Conference sponsored by the ABA Health Law Section and Section of Antitrust Law and the American Health Lawyers Association, Washington, D.C., May 15-16, 2003.

Lawrence Wu, "The Economic Analysis of Mergers After *Daubert*," *The Economics Committee Newsletter*, American Bar Association Section of Antitrust Law, Economics Committee, Vol. 1, No. 1, Spring, 2001, p. 16-20.

Robert E. Bloch, Scott P. Perlman, and Lawrence Wu, "A New and Uncertain Future for Managed Care Mergers: An Antitrust Analysis of the Aetna/Prudential Merger," *Antitrust Report*, October 1999, pp. 37-61.

Thomas R. McCarthy, Scott J. Thomas, and Lawrence Wu, "Efficiencies Analysis in Hospital Mergers," in *Antitrust and Healthcare Insights into Analysis and Enforcement*, American Bar Association, 1999, pp. 119-149. (A similar version appeared in the *Antitrust Health Care Chronicle*, Vol. 13, No. 1, Winter 1999, pp. 2-11.)

Lawrence Wu, "The Pricing of a Brand Name Product: Franchising in the Motel Services Industry," *Journal of Business Venturing*, Vol. 14, No. 1, January 1999, pp. 87-102.

Lawrence Wu, "The Evidence Is In: A Review of the Market Definition Debate in Hospital Merger Cases," *Antitrust Report*, November 1998, pp. 23-41.

Simon Baker and Lawrence Wu, "Applying the Market Definition Guidelines of the European Commission," *European Competition Law Review*, Vol. 19, No. 5, June 1998, pp. 273-280.

Lawrence Wu and De-Min Wu, "Measuring the Degree of Interindustry Competition in U.S. v. Continental Can," *The Antitrust Bulletin*, Vol. XLII, No. 1, Spring 1997, pp. 51-84.

David Dranove, William D. White, and Lawrence Wu, "Segmentation in Local Hospital Markets," *Medical Care*, Vol. 31, No. 1, January, 1993, pp. 52-64.

## Invited Presentations

"Mock Trial." Expert witness in a mock trial on the competitive impact of a resale price maintenance agreement at the 56th Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, March 27, 2008.

Lawrence Wu

"Fundamentals of Health Care Antitrust Economics."  Faculty presenter on the program, which was sponsored by the American Bar Association, Antitrust Section, Economics and Health Care and Pharmaceuticals Committees, Washington, DC, November 8, 2007.

"Mock Trial on Patent Damages."  Expert witness in a mock trial on reasonable royalty damages at an intellectual property seminar for Chinese judges sponsored by Stanford Law School, Stanford Program in Law, Science & Technology, August 16, 2007.

"Trial Preparation: Not Just for Outside Counsel." Speech presented at the 54th Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, March 29, 2006.

"Patent Pools and Standard Setting – an Economic Perspective." Speech presented before the Antitrust Law Section of the Minnesota State Bar Association, Minneapolis, Minnesota, October 25, 2005.

"Hot Topics in Healthcare Antitrust: Market Definition." Speech presented at the 2005 Antitrust in Healthcare conference, co-sponsored by the ABA Antitrust Law and Health Law Sections and the American Health Lawyers Association, Washington, DC, May 12, 2005.

"Protecting Competition or Protecting Competitors? Antitrust Issues for Plans and Providers." Speech presented at the 2005 Law Conference on Health Insurance Plans: Bridging the Gap between Providers and Insurers, co-sponsored by America's Health Insurance Plans and the American Health Lawyers Association, Colorado Springs, Colorado, May 3-4, 2005.

"Is Competition the Answer: Did DOJ and FTC Get it Right, or Does Regulation Still Serve its Purpose in Healthcare?" Participant on a panel discussion at the 6th Annual Conference on Emerging Issues in Healthcare Law sponsored by the ABA Health Law Section, Lake Buena Vista, Florida, February 24, 2005.

"The Ninth Circuit's Recent Decision in *Dagher v. Saudi Refining Inc.*" Participant on a panel discussion on joint ventures sponsored by the American Bar Association, Antitrust Section, Sherman Act Section 1 and Section 2 Committees, Washington, DC, October 26, 2004.

"Forces Shaping the Next Era in Health Care and their Economic Impact on Hospitals." Invited keynote speaker at the Mercer Human Resource Consulting and Marsh USA, Inc. Fifth Annual Hospital Management Seminar, Portland, Oregon, October 4, 2004.

"Antitrust and Health Care: Assessing Issues for California and the United States."  Invited speaker at a conference sponsored by the Nicholas C. Petris Center on Health Care Markets and Consumer Welfare at the University of California, Berkeley, California, April 30 – May 1, 2004.

"An Economic Perspective on Business Practices with 'Billion Dollar' Price Tags." Speech presented at the Antitrust Law Committee Forum, "Antitrust and Distribution: How to Avoid the Billion Dollar Judgment," at the Spring Meeting of the ABA Section of Business Law, Seattle, Washington, April 3, 2004.

Lawrence Wu

"The Increasing Use of Empirical Methods in European Merger Enforcement: Lessons from the Past and a Look Ahead." Speech presented at the UCLA Law First Annual Institute on U.S. and E.U. Antitrust Aspects of Mergers and Acquisitions, Los Angeles, California, February 28, 2004.

"Rx/OTC Switches and Prescription Drug Reimportation: Consequences for Consumers." Speech presented at the New York State Bar Association Annual Meeting, Food, Drug and Cosmetic Law Section, New York, New York, January 29, 2004.

"Forces Shaping the Next Big Idea in Health Care." Speech presented at the Marsh Healthcare Forum, Colorado Springs, Colorado, September 9, 2003.

"Economic Perspectives on Retrospective Reviews of Healthcare Mergers." Speech presented at the Antitrust in Healthcare Conference sponsored by the ABA Health Law Section and Section of Antitrust Law and the American Health Lawyers Association, Washington, D.C., May 15-16, 2003.

"The Sixth Circuit's Recent Decision in *Conwood Co., L.P. et al. v. United States Tobacco Co., et al.*" Participant on a panel discussion sponsored by the American Bar Association, Antitrust Section, Sherman Act Section 2 Committee, July 17, 2002.

"Getting a Fix on *FTC v. Libbey, Inc., et al.*" Speech presented at a seminar sponsored by the Antitrust Committee of the Boston Bar Association, March 8, 2002.

"The Brave New World for Managed Care Mergers: The *Aetna/Prudential* Merger." Speech presented at the 11th Annual Managed Care Law Conference, co-sponsored by the American Association of Health Plans and the American Bar Association, Kiawah Island, South Carolina, May 1, 2000.

"The Analysis of Product Market Definition and Entry in the *Aetna/Prudential* Transaction." Speech presented at a health care antitrust conference sponsored by the American Health Lawyers Association, Arlington, Virginia, February 17-18, 2000.

"The New Challenge for Mergers of Health Plans: What Does the *Aetna/Prudential* Decree Portend?" Speech presented at the Fifth Annual Health Care Antitrust Forum, Chicago, Illinois, October 22, 1999.

"Vertical Integration in Health Care." Speech presented at the 47th Annual Spring Meeting of the ABA Section of Antitrust Law, Washington, DC, April 14, 1999.

"Hospital Price Inflation: Will it Continue to Fall?" Speech presented at a conference presented by J&H Marsh & McLennan, Inc., St. Louis, Missouri, February 25, 1999.

"Using a Survey to Evaluate the Effect of Non-Infringing Alternatives on Patent Infringement Damages." Speech presented at NERA's Intellectual Property Seminar Series, Washington, DC, October 28, 1998, and New York, New York, June 3, 1998.

"An Introduction to the Economics of Hospital Merger Analysis." Speech presented at a health care antitrust conference sponsored by the Federal Trade Commission, the Missouri Attorney General, St. Louis University School of Law and the ABA Antitrust Section, St. Louis, Missouri, November 14, 1997.

"Using a Survey to Estimate the Price Sensitivity of Consumers." Speech presented at NERA's Second Annual Seminar on Merger Analysis, New York, New York, March 11, 1997.

"Hospital Merger Efficiencies: Passing on the Cost Savings to Consumers." Speech presented at a health care antitrust conference sponsored by the Federal Trade Commission, Denver, Colorado, October 25, 1996.

"The Role of Economics in a Bid-Rigging Investigation." Speech presented at the Antitrust Seminar, National Association of Attorneys General, Baltimore, Maryland, October 12, 1995.

## Selected Merger Experience

*Proctor & Gamble (P&G)*: reports and presentations to the Federal Trade Commission in connection with an acquisition involving over-the-counter heartburn products, 2006.

*Fresenius Medical Care and Renal Care Group*: reports and presentations to the Federal Trade Commission in connection with an acquisition of a national chain of kidney dialysis treatment centers in the US, 2005-2006.

*Evanston Northwestern Healthcare Corporation and Highland Park Hospital*: reports and presentations to the Federal Trade Commission in connection with a retrospective analysis of the competitive effects of a merger of two hospitals in the Chicago area, 2002-2004.

*General Electric Company and Instrumentarium Corporation*: reports and presentations to the Department of Justice and European Commission on behalf of a third party in connection with a proposed acquisition involving patient monitoring devices, 2003.

*Libbey, Inc. and Anchor Hocking Glass Company*: report and presentations to the Federal Trade Commission in connection with a proposed acquisition in the glass beverageware industry, 2001-2002.

*Cytyc Corporation and Digene Corporation*: presentations to the Federal Trade Commission in connection with a proposed acquisition involving the sale of diagnostic test kits for the human papillomavirus (HPV), 2002.

*Philips Medical Systems and Agilent Technologies, Inc.*: report and presentations to the Department of Justice in connection with the proposed acquisition of Agilent's Healthcare Solutions Group by Philips Medical Systems.  Both companies manufactured and sold cardiac ultrasound machines, 2000-2001.

Lawrence Wu

*Tyco International Ltd. and Pulmonetic Systems, Inc.*: report and presentations to the Federal Trade Commission in connection with a proposed acquisition involving home care respiratory ventilators, 2001.

*Aetna U.S. Healthcare and Prudential Health Care Plan, Inc.*: reports and presentations to the Department of Justice in connection with a proposed acquisition in the health insurance industry, 1998-1999.

*Newell Rubbermaid, Inc. and Regal Ware, Inc.*: report to the Federal Trade Commission in connection with a proposed acquisition in the cookware industry, 1999.

*Intertape Polymer Group and Central Products Company*: report and presentation to the Federal Trade Commission in connection with a proposed acquisition involving carton-sealing tape, 1999.

*Arrow International, Inc. and C.R. Bard*: presentation to the Federal Trade Commission in connection with the acquisition of C.R. Bard's cardiac assist unit. Both companies manufactured and sold intra-aortic balloon pumps and catheters, 1998.

*Pacificare Health Systems, Inc. and FHP International Corporation*: presentations to the Federal Trade Commission in connection with an acquisition in the health insurance industry. Both firms offered Medicare managed care plans to seniors, 1996-1997.

*Vail Resorts, Inc. and Ralston Resorts, Inc.*: report and presentation to the Department of Justice in connection with an acquisition of ski resorts in Colorado, 1996.

## Selected Litigation Consulting Experience

*In re: DRAM Antitrust Litigation*: retained by counsel for Nanya Technology Corporation and Nanya Techonology Corp. USA to assess issues related to antitrust liability in connection with a nationwide class action suit brought by purchasers of DRAM (dynamic random access memory) chips and modules, in the United States District Court for the Northern District of California, 2006.

*In re: Cotton Yarn Antitrust Litigation*: retained by counsel for Parkdale America,LLC and Parkdale Mills, Inc. to estimate antitrust damages to a class of direct purchasers of cotton yarn in the United States, in the United States District Court for the Middle District of North Carolina, Greensboro Division, 2004-2005.

*In re: Managed Care Litigation*: retained by counsel for the defendants to assess issues related to antitrust liability in connection with a nationwide class action suit brought by physicians and medical societies against ten commercial health insurance plans, in the United States District Court for the Southern District of Florida, Miami Division, 2003-2005.

Lawrence Wu

*In the Matter of Certain Recordable Compact Discs and Rewritable Compact Discs*: retained by counsel for Philips Electronics N.V. and U.S. Philips Corporation to assess the competitive issues surrounding the CD-R and CD-RW patent pools and allegations of patent misuse and injury to competition, in the US International Trade Commission, 2002-2003.

## Selected Industry Experience

Ambulance Services
Bakeware/Ovenware
Blood Testing Instruments and Supplies
Cardiac Medical Devices (e.g., Intra-Aortic Balloon Pumps and Catheters)
Cardiac Ultrasound Machines
Carton Sealing Tape
Chocolate Candies
Clinical Diagnostic Testing
Compact Discs
Cookware
Decorative Laminate Products (e.g., countertops)
Diagnostic Imaging Equipment
Dialysis Services
DRAM (dynamic random access memory) chips and modules
Ferrous Scrap
Fertilizer
Glass Beverageware
Health Insurance (e.g., HMOs and other managed care products)
Heating, Ventilation, and Air Conditioning Products
Hospice and Palliative Care
Hospital Beds
Hospital Services
Lamps and Lighting
Mattresses
Media Research
Methadone Maintenance Treatment
Microfiltration Products
Orthopedic Products
Outdoor Advertising
Over-the-Counter Prescription Drugs
Patient Monitoring Equipment and Anesthesia Machines
Physician Services (e.g., cardiovascular surgery, obstetrics, orthopedic)
Postage Meters
Pipelay Services
Printers and Printing Supplies (e.g., wide format printers)
Respiratory Ventilators
Ski Resorts

Lawrence Wu

Smokeless Tobacco (loose leaf chewing tobacco)
Urinary Catheters
Vitamins

4/1/08

EXHIBIT 2

# List of Materials Reviewed and Considered

## I. Publicly Available Documents

### A. Analyst Reports

#### 1. Abbott Laboratories

"ABT: SPIRIT II Two-Year Data Creates Opening For The Competition," Wachovia Capital Markets, LLC, 4/1/08.

"Abbott Update: Xience, Prevacid, and 2008," JPMorgan, 3/14/08.

#### 2. Boston Scientific Corporation

"Upgrading To Hold...Finding A Floor," Citi Investment Research, 2/6/08.

"Q1: Makes Weight With A Crash Diet," Citi Investment Research, 4/23/08.

"Less Climbers, But Still A Challenging Trail," Citi Investment Research, 10/21/07.

"4Q07 Post Conf Call: Lots of Moving Parts, No Upside to 2008 Guidance," Leerink Swann & Co., 2/6/08.

"1Q08 Preview: Expecting Weakness in DES, But Stability in ICDs," Leerink Swann & Co., 4/21/08.

"Episode 3Q07: A New Hope?," Leerink Swann & Co., 10/22/07.

"1Q08: Yes...Guidance Looks Conservative," Morgan Stanley, 4/22/08.

"A Bit More Clarity; Outlook Remains Neutral," Morgan Stanley, 10/29/07.

"DES Survey: erosion of incumbents more modest than expected," UBS, 2/25/08.

"BSX: Decent Qtr--Progress Cutting Costs Offsets Taxus Share Loss," Wachovia Capital Markets, LLC, 2/5/08.

"BSX: Q1 DES Results & Mgns Solid, But OUS ICD Mkt Slows--Adj Est," Wachovia Capital Markets, LLC, 4/23/08.

"BSX: Limited Upside Potential Given Growth and Risk," Wachovia Capital Markets, LLC, 10/22/07.

#### 3. Cordis (Johnson & Johnson, Inc.)

"It May Be Unleaded, But There's Still Some Gas In The Tank," Citi Investment Research, 4/16/08.

"Q3:07 – Bracing For The Storm," Citi Investment Research, 10/16/07.

"No major surprises...maintain Buy," Deutsche Bank Securities Inc., 10/16/07.

"Contracts Are an Underappreciated Barrier To Entry For New DES Entrants," Leerink Swann & Co., 3/27/08.

1

EXHIBIT 2

"Higher Sales Across All Businesses," Leerink Swann & Co., 10/16/07.

"Change in DES Mkt Share and EPS," Lehman Brothers, 10/29/07.

"1Q08: Devil in the Details; Outlook Remains Neutral," Morgan Stanley, 4/15/08.

"CNTO 1275 Data: Solid, but No Change to Numbers," Morgan Stanley, 10/3/07.

"3Q07: OK Quarter; Hard to Get Too Excited," Morgan Stanley, 10/16/07.

"JNJ: Sluggish Top-Line Growth Aided By Stocking And Currency," Wachovia Capital Markets, LLC, 4/15/08.

"JNJ: Decent Quarter, But The Story Remains The Same," Wachovia Capital Markets, LLC, 10/16/07.

**4. Industry Reports**

"SPIRIT III 2-Yr Data Sneak Preview," Wachovia Capital Markets, LLC, 4/3/08.

"TCT Update: DES Pricing Under Pressure," Wachovia Capital Markets, LLC, 10/22/07.

"The Current State of Coronary Stents," Cowen and Company, 3/17/08.

"Hosp. Supplies & Medical Technology: 4Q07 Statistical Handbook: Boring Can Be Beautiful," Morgan Stanley, 10/12/07.

"Hosp. Supplies & Medical Technology: 1Q08 Statistical Handbook: A Beggar's Banquet," Morgan Stanley, 10/12/07.

"Poised for Steady CRM Market Share Growth," Rodman & Renshaw, 2/28/08.

**B. Other Publicly Available Documents**

"Federal Panel Backs Abbott Heart Stent," New York Times (Reuters), 11/30/07.

"Cost of Capital Yearbook 2007," Morningstar, Inc., data through March 2007.

"Stocks, Bonds, Bills, and Inflation 2007 Valuation Edition Yearbook," Morningstar, Inc., 2007.

Boston Scientific Corporation, Form 10-K for the fiscal year ended December 31, 2006.

Boston Scientific Corporation, Form 10-K for the fiscal year ended December 31, 2007.

Boston Scientific Corporation, Form 10-Q for the quarterly period ended September 30, 2007.

Johnson & Johnson, Form 10-K for the fiscal year ended December 31, 2006.

Johnson & Johnson, Form 10-K for the fiscal year ended December 30, 2007.

Johnson & Johnson, Form 10-Q for the quarterly period ended September 30, 2007.

EXHIBIT 2

## II. Documents Received From Counsel

### A. Trial Transcripts and Other Documents Related to the Trial

"Joint Stipulation and Order about Accused Products," Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH vs. Johnson & Johnson and Cordis Corporation, Case No. C 02-790-SI, 10/12/07.

"Transcript of Proceedings," Case No. C 02-0790 SI, Volume 1 through 12, 10/9/07-10/31/07.

Defendants J&J/Cordis's Response to Boston Scientific's Eleventh Set of Interrogatories (Nos.91-95), No. C 02-790 SI, 5/29/07.

Transcript of Proceedings, Volume 1 through 12, NO. C 02-0790 SI, 10/9/07 through 10/31/07.

Transcript of Proceedings, Boston Scientific Corporation, et al. Johnson & Johnson and Cordis Corporation, No. C 02-0790 SI, Volumes 1 through 10 and Jury Verdict, 10/9/07.

Boston Scientific's Responses to J&J/Cordis's Ninth Request for the Production of Documents, No. C 02-790 SI, 5/18/07.

### B. Cordis's Trial Exhibits

Defendants J&J/Cordis's Video Clips Played at Trial (DX 4016-4019, DX 4023, AND DX 4025), Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, No. C 02-790 SI, 10/23/07.

DX0001, DX0006, DX0015, DX0016, DX0030, DX0039, DX0058, DX0059, DX0071, DX0090, DX0095, DX0105, DX0107, DX0111, DX0112, DX0168, DX0176A, DX0177, DX0358, DX0360, DX0413, DX0601, DX0819, DX0820, DX0821, DX0822, DX0840, DX0842, DX0844, DX0868, DX0951, DX1642, DX2107A, DX2112, DX2115, DX2116, DX2278, DX2336, DX2336A, DX2366, DX2367, DX4016, DX4017, DX4018, DX4019, DX4020, DX4022, DX4023, DX4024, DX4025, DX4026, DX4027, DX4028.

Cordis (Johnson & Johnson) demonstrative slides and video, DX3028 – DX3027, DX3034.

### C. BSC's Trial Exhibits

PTX0001, PTX0003, PTX0004, PTX0006, PTX0007, PTX0008, PTX0013, PTX0015, PTX0023, PTX0030, PTX0033, PTX0035, PTX0037, PTX0044, PTX0048, PTX0050, PTX0051, PTX0052, PTX0053, PTX0055, PTX0059, PTX0060, PTX0064, PTX0142, PTX0153, PTX0154, PTX0155, PTX0171, PTX0180, PTX0185, PTX0192, PTX0193, PTX0200, PTX0201, PTX0264, PTX0265, PTX0266, PTX0267, PTX0271, PTX0275, PTX0291, PTX0304, PTX0350, PTX0351, PTX0370, PTX0372, PTX0374, PTX0391, PTX0461, PTX0463, PTX0474, PTX0476, PTX0496, PTX0500, PTX0577, PTX0580, PTX0590, PTX0598, PTX0600, PTX0604, PTX0667, PTX0671, PTX0673, PTX0766, PTX0844, PTX0873, PTX0896, PTX0897, PTX0962, PTX0985, PTX0986, PTX0987, PTX0991, PTX1000, PTX1002, PTX1005, PTX1043, PTX1044, PTX 1045.

BSC demonstrative slides and videos, PDX A001-A065, D001- PDX D030, CABG, PTCA1, PTCA2.

### D. Documents Related to Cordis's Damages Motion

Order Re: Various Post-Trial Motions, Boston Scientific Corporation, et al. v. Johnson & Johnson, et al., No. C 02-00790 SI, 2/19/08.

3

EXHIBIT 2

Letter addressing the Court's request for supplemental briefing, Re: Boston Scientific Corp. v. Johnson & Johnson, No. 02-790 SI (N.D. Cal.), Sidley Austin LLP, 2/14/08.

Letter addressing the Court's request for supplemental briefing, Re: Boston Scientific Corp. v. Johnson & Johnson, No. 02-790 SI (N.D. Cal.), WilmerHale, 2/14/08.

Order Requesting Supplemental Briefing, Boston Scientific Corporation, et al., v. Johnson & Johnson, et al., No. C 02-00790 SI, 2/11/08.

Counterclaim-Plaintiff Cordis's Reply Brief in Support of its Motion for Damages and Equitable Relief, or in the Alternative, a New Jury Trial on Damages, Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, No. C 02-790 SI, 1/25/08.

Boston Scientific's Opposition to Cordis's Motion for a New Trial, or in the Alternative, for Damages and Equitable Relief, Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, Civil Action No. 02-0790 SI, 1/11/08.

Declaration of Dominic E. Massa in Support of Boston Scientific's Opposition to Cordis's Motion for a New Trial, or in the Alternative, for Damages and Equitable Relief, Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, Civil Action No. 02-0790 SI, 1/11/08.

Declaration of Cate Elsten in Support of Counterclaim-Plaintiff Cordis's Motion for Damages and Equitable Relief, or in the Alternative a New Jury Trial on Damages, No. C 02-790 SI, 12/14/07.

Declaration of Theodore W. Chandler in Support of Counterclaim-Plaintiff Cordis's Motion for Damages and Equitable Relief, or in the Alternative a New Jury Trial on Damages, Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, No. C 02-790 SI, 12/14/07.

[PROPOSED] ORDER GRANTING COUNTERCLAIM-PLAINTIFF CORDIS'S MOTION FOR DAMAGES AND EQUITABLE RELIEF, Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, No. C 02-790 SI, 12/14/07.

Counterclaim-Plaintiff Cordis's Motion for Damages and Equitable Relief, or in the Alternative a New Jury Trial on Damages, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GmbH, vs. Johnson & Johnson and Cordis Corporation, No. C 02-790 SI, 12/14/07.

**E. Expert Reports**

Expert Report of Dr. Felix Millhouse, 6/11/07.

Disclosure of Expert Testimony of David K. Roberts, M.D., Case No. C 02-790 SI, 6/11/07.

Rebuttal Expert Report of Dr. Felix Millhouse, C 02-790 SI, 7/2/07.

Rebuttal Expert Report of David K. Roberts, M.D., C 02-790 SI, 7/2/07.

Expert Report and Disclosure of Paul Meyer, C 02-790 SI, 6/11/07.

Expert Rebuttal Report of Paul Meyer, C 02-790 SI, 7/2/07.

EXHIBIT 2

Expert Supplemental Report of Paul Meyer, C 02-790 SI, 9/6/07.

Preliminary Expert Report of Cate Elsten, C 02-790 SI, 6/11/07.

Preliminary Expert Report of Cate Elsten, C 02-790 SI, 7/2/07.

Expert Report of Kevin M. Murphy, Ph.D., C 02-790 SI, 7/2/07.

Supplemental Expert Report of Cate Elsten, C 02-790 SI, 7/18/07.

Second Supplemental Report of Cate Elsten, C 02-790 SI, 10/5/07.


**F.  Cordis's Sales and Financial Documents**

"Level I PTCA Balloon Presentation," Cordis (Johnson & Johnson), August 2006, COR 00336503-78.

Cordis Cardiology Consolidated Statements of Income, COR00215438-45.

Cordis Corporation Sales by Region, COR00274579-COR00274670, COR00274671-COR00274769, COR00274770-COR00274896, COR00274897-COR00274979, COR00274980-COR00275059, COR00275060-COR00275218, COR00275219-COR00275281, COR00275282-COR00275347, COR00292911-COR00293034, COR00296409-COR00296473, COR00296474-COR00296537.

Sales data: COR 00354796, COR 00355147, COR 00355169, COR 00355170, COR 00355171, COR 00355172, COR 00355173, COR 00355174, COR 00355175, COR 00355176, COR 00355177, COR 00355178, COR 00355181, COR 00368068.

"Valuation Report Analysis of Acquired Intangible Assets as of September 10, 1998," Boston Scientific Corporation Acquisition of Schneider Worldwide, Valuation Report, Ernst & Young LLP, BSC0322474-786.


**G.  License Agreements**

"Transaction Agreement between Boston Scientific Corporation and Abbott Laboratories," 1/8/06.

Cordis License Agreements, COR00246180-58065, COR201818, COR 00354934, COR 00354935, COR 00354937.

Royalty Source Intellectual Property Database, COR 00371706-57, 2/20/07.

BSC license agreements: BSC0322787-322790, BSC0322791-322800, BSC0322989-322998, BSC0323012-323017, BSC0323357-323358, BSC0323359-323361, BSC0323600-323615, BSC0323670-323698, BSC0323707-323715, BSC0323867-323868, BSC0323922-323923, BSC0324046-324140, BSC0601155-601172, BSC0601173-601174, BSC0601175-601188, BSC0601189-601195, BSC0601196-601270, BSC0601290-601322, BSC0322801-322807, BSC0322808-322811, BSC0323470-323488, BSC05000000-500032, BSC0043463-0043477, BSC0043479-0043496, BSC0043497-0043507, BSC0043509-0043524, BSC0043526-0043538, BSC0043554-0043566, BSC0043568-0043580, BSC0043582-0043596, BSC0043598-0043607, BSC0043611-0043619, BSC0322999-323011, BSC0323018-323158, BSC0323212-323298, BSC0323466-323469, BSC0323491-323502, BSC0323516-323541, BSC0323542-323545, BSC0323699-323706, BSC0323716-323743, BSC0323847-323866, BSC0323881-323916, BSC0323924-323932, BSC0324032-324041, BSC0324042-324045, BSC0326289-326396, BSC0601508-601509, BSC0602135-602146, BSC0602147-602193, BSC0602194-602214, BSC0602215-602257.

**EXHIBIT 2**

**H.  Declarations**

    Declaration of Marlene W. Valenti, C 02-790 SI, 5/7/08.


**III.  Interviews**

Interview with Scott Oberman, Cordis Director of World Wide Cardiology Supply Chain, 5/9/08.

**Boston Scientific's Maximum Willingness to Pay Cordis for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval Process and Promus Is Not An Infringing Product**

**2007-2014**

| (A) BSC Profits: With License | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | |
| (1) Balloon Catheters | $ 57 | $ 345 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,293 |
| (2) Bare Metal Stents | 17 | 96 | 88 | 90 | 92 | 94 | 94 | 8 | 579 |
| (3) TAXUS Drug-Eluting Stents | 149 | 617 | 343 | 258 | 168 | 158 | 158 | 13 | 1,865 |
| Total | $ 224 | $ 1,058 | $ 783 | $ 711 | $ 634 | $ 637 | $ 637 | $ 53 | $ 4,737 |
| (4) **Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (5) BSC Profit | $ 67 | $ 317 | $ 235 | $ 213 | $ 190 | $ 191 | $ 191 | $ 16 | $ 1,421 |

| (B) BSC Profits: Without License | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | |
| (6) Balloon Catheters | $ 15 | $ 131 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,037 |
| (7) Bare Metal Stents | 0 | 15 | 88 | 90 | 92 | 94 | 94 | 8 | 481 |
| (8) TAXUS Drug-Eluting Stents | 0 | 70 | 343 | 258 | 168 | 158 | 158 | 13 | 1,168 |
| Total | $ 15 | $ 216 | $ 783 | $ 711 | $ 634 | $ 637 | $ 637 | $ 53 | $ 3,686 |
| (9) Cost of Design Around | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (10) **Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (11) BSC Profit | $ 4 | $ 65 | $ 235 | $ 213 | $ 190 | $ 191 | $ 191 | $ 16 | $ 1,106 |

| (C) Royalty Base Calculation | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Average Selling Price** | | | | | | | | | |
| (12) Balloon Catheters[3] | $ 200 | $ 192 | $ 176 | $ 162 | $ 149 | $ 137 | $ 137 | $ 137 | $ 156 |
| (13) Bare Metal Stents | 829 | 806 | 780 | 780 | 780 | 780 | 780 | 780 | 786 |
| (14) TAXUS Drug-Eluting Stents | 2,125 | 2,037 | 1,868 | 1,718 | 1,581 | 1,454 | 1,454 | 1,454 | 1,795 |
| **BSC Unit Sales With License** | | | | | | | | | |
| (15) Balloon Catheters | 0.285 | 1.798 | 2.002 | 2.245 | 2.513 | 2.813 | 2.813 | 0.234 | 14.705 |
| (16) Bare Metal Stents | 0.021 | 0.119 | 0.113 | 0.115 | 0.118 | 0.121 | 0.121 | 0.010 | 0.737 |
| (17) TAXUS Drug-Eluting Stents | 0.070 | 0.302 | 0.184 | 0.150 | 0.106 | 0.109 | 0.109 | 0.009 | 1.039 |
| Total | 0.376 | 2.220 | 2.299 | 2.511 | 2.738 | 3.043 | 3.043 | 0.254 | 16.481 |
| **BSC Catheter-Related Revenues** | | | | | | | | | |
| (18) Balloon Catheters | $ 57 | $ 345 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,293 |
| (19) Bare Metal Stents - Catheter Only | 4 | 23 | 20 | 19 | 18 | 16 | 16 | 1 | 117 |
| (20) TAXUS Drug-Eluting Stents - Catheter Only | 14 | 58 | 32 | 24 | 16 | 15 | 15 | 1 | 175 |
| Total | $ 75 | $ 426 | $ 404 | $ 406 | $ 407 | $ 416 | $ 416 | $ 35 | $ 2,586 |

| (C) Royalty Rate Calculation | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|
| (21) **Difference in Profit** | $ 63 | $ 253 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 315 |
| (22) **Discount Rate** | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % |
| (23) NPV of Difference in Profit | $ 63 | $ 233 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 295 |
| (24) NPV of BSC Catheter-Related Revenues (Royalty Base) | $ 75 | $ 392 | $ 343 | $ 317 | $ 293 | $ 276 | $ 254 | $ 20 | $ 1,970 |

| (25) **Maximum Willingness To Pay** | **14.99  %** |
|---|---|

**Exhibit 3A**
**Notes and Sources**

General Notes:

All figures are rounded, thus totals may not sum precisely.

All unit sales are in millions.  All revenues are in millions and represent sales in the United States.

To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts.  January 2008 revenues and shares reflect Q4 2007 forecasts.  February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts.  June 2008 revenues and shares reflect Q2 2008 forecasts.  Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

With the exception of the average selling price of balloon catheters, all data rely on projections available through 2012.  Projections for 2013 and 2014 are assumed to be the same as those in 2012.

In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market.  Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW to rapid exchange balloon catheter sales in 2006.

[1]  The total for 2007 consists of only November and December data. The total for 2014 consists only of January data.

[2]  Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3]  The average selling price of balloon catheters was $200 in 2007. The price is assumed to decline at the same rate as drug-eluting stent delivery systems.

Sources and Notes on the Calculations for Each Row in the Table:

(1)  "Boston Scientific, 1Q08: Yes…Guidance Looks Conservative," Morgan Stanley, April 22, 2008, p. 17.

(2)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(3)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(4)  Testimony of Paul Meyer (PDX D009).

(5)  $= [(1) * (4)] + [(2) * (4)] + [(3) * (4)]$

(6)  $= (1)$ - BSC lost revenues

(7)  $= (2)$ - BSC lost revenues

(8)  $= (3)$ - BSC lost revenues

(9)  Assumed to be zero.

(10)  Testimony of Paul Meyer (PDX D009).

(11)  $= [(6) * (10)] + [(7) * (10)] + [(8) * (10)]$

(12)  Testimony of Samuel Liang, Cordis VP of Worldwide Commercial Operations, October 11, 2007. (Tr. 535: 22-24).

(13)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(14)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(15)  $= (1) / (12)$

(16)  $= (2) / (13)$

(17)  $= (3) / (14)$

(18)  $= (15) * (12)$

(19)  $= (16) * (12)$

(20)  $= (17) * (12)$

(21)  $= (5) - (11)$

(22)  BSC's estimated weighted average cost of capital.  See Exhibit 8.

(23)  $= (21) / [1 + (22)]^T$

(24)  $= [(18) + (19) + (20)] / [1 + (22)]^T$

(25)  $= \sum(23) / \sum(24)$

Exhibit 3B

**Boston Scientific's Maximum Willingness to Pay Cordis for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval Process and Promus Is Not An Infringing Product**
**Month-by-Month Detail for 2007 and 2008**

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(A) BSC Profits: With License** | Nov | Dec | Total | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
| **BSC Total Revenues** | | | | | | | | | | | | | | | | |
| (1) Balloon Catheters | $ 29 | $ 29 | $ 57 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 345 |
| (2) Bare Metal Stents | 9 | 9 | 17 | 9 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 7 | 96 |
| (3) TAXUS Drug-Eluting Stents | 75 | 75 | 149 | 75 | 68 | 68 | 68 | 68 | 51 | 39 | 39 | 39 | 35 | 35 | 35 | 617 |
| **Total** | $ 112 | $ 112 | $ 224 | $ 112 | $ 105 | $ 105 | $ 105 | $ 105 | $ 87 | $ 75 | $ 75 | $ 75 | $ 71 | $ 71 | $ 71 | $ 1,058 |
| (4) Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (5) BSC Profit | $ 34 | $ 34 | $ 67 | $ 34 | $ 31 | $ 31 | $ 31 | $ 31 | $ 26 | $ 23 | $ 23 | $ 23 | $ 21 | $ 21 | $ 21 | $ 317 |

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(B) BSC Profits: Without License** | Nov | Dec | Total | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
| **BSC Total Revenues** | | | | | | | | | | | | | | | | |
| (6) Balloon Catheters | $ 7 | $ 7 | $ 15 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 29 | $ 29 | $ 131 |
| (7) Bare Metal Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 15 |
| (8) TAXUS Drug-Eluting Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 35 | 70 |
| **Total** | $ 7 | $ 7 | $ 15 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 71 | $ 71 | $ 216 |
| (9) Cost of Design Around | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (10) Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (11) BSC Profit | $ 2 | $ 2 | $ 4 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 21 | $ 21 | $ 65 |

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(C) Royalty Base Calculation** | Nov | Dec | Total | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
| **Average Selling Price** | | | | | | | | | | | | | | | | |
| (12) Balloon Catheters[3] | $ 200 | $ 200 | $ 200 | $ 200 | $ 192 | $ 192 | $ 192 | $ 192 | $ 192 | $ 191 | $ 191 | $ 191 | $ 190 | $ 190 | $ 190 | $ 192 |
| (13) Bare Metal Stents | 829 | 829 | 829 | 829 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 806 |
| (14) TAXUS Drug-Eluting Stents | 2,125 | 2,125 | 2,125 | 2,125 | 2,036 | 2,036 | 2,036 | 2,036 | 2,036 | 2,028 | 2,028 | 2,028 | 2,019 | 2,019 | 2,019 | 2,037 |
| **BSC Unit Sales With License** | | | | | | | | | | | | | | | | |
| (15) Balloon Catheters | 0.143 | 0.143 | 0.285 | 0.143 | 0.150 | 0.150 | 0.150 | 0.150 | 0.150 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 1.798 |
| (16) Bare Metal Stents | 0.010 | 0.010 | 0.021 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.009 | 0.009 | 0.119 |
| (17) TAXUS Drug-Eluting Stents | 0.035 | 0.035 | 0.070 | 0.035 | 0.033 | 0.033 | 0.033 | 0.033 | 0.025 | 0.019 | 0.019 | 0.019 | 0.017 | 0.017 | 0.017 | 0.302 |
| **Total** | 0.188 | 0.188 | 0.376 | 0.188 | 0.194 | 0.194 | 0.194 | 0.194 | 0.185 | 0.180 | 0.180 | 0.180 | 0.178 | 0.178 | 0.178 | 2.220 |
| **BSC Catheter-Related Revenues** | | | | | | | | | | | | | | | | |
| (18) Balloon Catheters | 29 | 29 | 57 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 345 |
| (19) Bare Metal Stents - Catheter Only | 2 | 2 | 4 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 23 |
| (20) TAXUS Drug-Eluting Stents - Catheter Only | 7 | 7 | 14 | 7 | 6 | 6 | 6 | 6 | 5 | 4 | 4 | 4 | 3 | 3 | 3 | 58 |
| Total | $ 38 | $ 38 | $ 75 | $ 38 | $ 37 | $ 37 | $ 37 | $ 37 | $ 35 | $ 34 | $ 34 | $ 34 | $ 34 | $ 34 | $ 34 | $ 426 |
| (21) **Difference in Profit** | $ 31 | $ 31 | $ 63 | $ 31 | $ 29 | $ 29 | $ 29 | $ 29 | $ 24 | $ 20 | $ 20 | $ 20 | $ 19 | $ 0 | $ 0 | $ 253 |

**Exhibit 3B**
**Notes and Sources**


General Notes:

  All figures are rounded, thus totals may not sum precisely.

  All unit sales are in millions.  All revenues are in millions and represent sales in the United States.

  To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts.  January 2008 revenues and shares reflect Q4 2007 forecasts.  February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts.  June 2008 revenues and shares reflect Q2 2008 forecasts.  Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

  With the exception of the average selling price of balloon catheters, all data rely on projections available through 2012.

  In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market.  Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW to rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data.

[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3] The average selling price of balloon catheters was $200 in 2007. The price is assumed to decline at the same rate as drug-eluting stent delivery systems.

Sources and Notes on the Calculations for Each Row in the Table:

 (1) "Boston Scientific, 1Q08: Yes…Guidance Looks Conservative," Morgan Stanley, April 22, 2008, p. 17.
 (2) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
 (3) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
 (4) Testimony of Paul Meyer (PDX D009).
 (5) = [(1) * (4)] + [(2) * (4)] + [(3) * (4)]
 (6) = (1) - BSC lost revenues
 (7) = (2) - BSC lost revenues
 (8) = (3) - BSC lost revenues
 (9) Assumed to be zero.
 (10) Testimony of Paul Meyer (PDX D009).
 (11) = [(6) * (10)] + [(7) * (10)] + [(8) * (10)]
 (12) Testimony of Samuel Liang, Cordis VP of Worldwide Commercial Operations, October 11, 2007. (Tr. 535: 22-24).
 (13) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
 (14) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
 (15) = (1) / (13)
 (16) = (2) / (13)
 (17) = (3) / (14)
 (18) = (15) * (12)
 (19) = (16) * (12)
 (20) = (17) * (12)
 (21) = (5) - (11)

Exhibit 4A

**Boston Scientific's Maximum Willingness to Pay Cordis for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval Process and Promus Is An Infringing Product**
**2007-2014**

| (A) BSC Profits: With License | | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | | |
| (1) | Balloon Catheters | $ 57 | $ 345 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,293 |
| (2) | Bare Metal Stents | 17 | 96 | 88 | 90 | 92 | 94 | 94 | 8 | 579 |
| (3) | TAXUS Drug-Eluting Stents | 149 | 617 | 343 | 258 | 168 | 158 | 158 | 13 | 1,865 |
| (4) | PROMUS Drug-Eluting Stents | -- | 94 | 167 | 171 | 161 | 151 | 151 | 13 | 907 |
| | Total | $ 224 | $ 1,151 | $ 950 | $ 882 | $ 795 | $ 788 | $ 788 | $ 66 | $ 5,644 |
| (5) | Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (6) | PROMUS Profit Margin | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % |
| (7) | BSC Profit | $ 67 | $ 334 | $ 265 | $ 244 | $ 219 | $ 218 | $ 218 | $ 18 | $ 1,584 |

| (B) BSC Profits: Without License | | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | | |
| (8) | Balloon Catheters | $ 15 | $ 131 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,037 |
| (9) | Bare Metal Stents | 0 | 15 | 88 | 90 | 92 | 94 | 94 | 8 | 481 |
| (10) | TAXUS Drug-Eluting Stents | 0 | 70 | 343 | 258 | 168 | 158 | 158 | 13 | 1,168 |
| (11) | PROMUS Drug-Eluting Stents | 0 | 27 | 167 | 171 | 161 | 151 | 151 | 13 | 841 |
| | Total | $ 15 | $ 243 | $ 950 | $ 882 | $ 795 | $ 788 | $ 788 | $ 66 | $ 4,527 |
| (12) | Cost of Design Around | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| (13) | Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (14) | PROMUS Profit Margin | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % |
| (15) | BSC Profit | $ 4 | $ 70 | $ 265 | $ 244 | $ 219 | $ 218 | $ 218 | $ 18 | $ 1,257 |

| (C) Royalty Base Calculation | | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Average Selling Price** | | | | | | | | | | |
| (16) | Balloon Catheters[3] | $ 200 | $ 192 | $ 176 | $ 162 | $ 149 | $ 137 | $ 137 | $ 137 | $ 156 |
| (17) | Bare Metal Stents | 829 | 806 | 780 | 780 | 780 | 780 | 780 | 780 | 786 |
| (18) | TAXUS Drug-Eluting Stents | 2,125 | 2,037 | 1,868 | 1,718 | 1,581 | 1,454 | 1,454 | 1,454 | 1,795 |
| (19) | PROMUS Drug-Eluting Stents | -- | 2,037 | 1,868 | 1,718 | 1,581 | 1,454 | 1,454 | 1,454 | 1,639 |
| **BSC Unit Sales With License** | | | | | | | | | | |
| (20) | Balloon Catheters | 0.285 | 1.798 | 2.002 | 2.245 | 2.513 | 2.813 | 2.813 | 0.234 | 14.705 |
| (21) | Bare Metal Stents | 0.021 | 0.119 | 0.113 | 0.115 | 0.118 | 0.121 | 0.121 | 0.010 | 0.737 |
| (22) | TAXUS Drug-Eluting Stents | 0.070 | 0.302 | 0.184 | 0.150 | 0.106 | 0.109 | 0.109 | 0.009 | 1.039 |
| (23) | PROMUS Drug-Eluting Stents | -- | 0.046 | 0.089 | 0.100 | 0.102 | 0.104 | 0.104 | 0.009 | 0.553 |
| | Total | 0.376 | 2.266 | 2.388 | 2.610 | 2.839 | 3.146 | 3.146 | 0.262 | 17.035 |
| **BSC Catheter-Related Revenues** | | | | | | | | | | |
| (24) | Balloon Catheters | $ 57 | $ 345 | $ 352 | $ 363 | $ 374 | $ 385 | $ 385 | $ 32 | $ 2,293 |
| (25) | Bare Metal Stents - Catheter Only | 4 | 23 | 20 | 19 | 18 | 16 | 16 | 1 | 117 |
| (26) | TAXUS Drug-Eluting Stents - Catheter Only | 14 | 58 | 32 | 24 | 16 | 15 | 15 | 1 | 175 |
| (27) | PROMUS Drug-Eluting Stents - Catheter Only | -- | 9 | 16 | 16 | 15 | 14 | 14 | 1 | 85 |
| | Total | $ 75 | $ 434 | $ 420 | $ 422 | $ 423 | $ 431 | $ 431 | $ 36 | $ 2,671 |

| (D) Royalty Rate Calculation | | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| (28) | **Difference in Profit** | $ 63 | $ 264 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 327 |
| (29) | Discount Rate | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % | 8.58 % |
| (30) | NPV of Difference in Profit | $ 63 | $ 244 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 306 |
| (31) | NPV of BSC Catheter-Related Revenues (Royalty Base) | $ 75 | $ 400 | $ 356 | $ 330 | $ 304 | $ 285 | $ 263 | $ 20 | $ 2,034 |
| (32) | **Maximum Willingness To Pay** | | | | | | | | | **15.06 %** |

**Exhibit 4A**
**Notes and Sources**

<u>General Notes:</u>

All figures are rounded, thus totals may not sum precisely.

All unit sales are in millions.  All revenues are in millions and represent sales in the United States.

To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts.  January 2008 revenues and shares reflect Q4 2007 forecasts.  February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts.  June 2008 revenues and shares reflect Q2 2008 forecasts.  Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

June 2008 revenues from BSC's sales of Promus are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter.

With the exception of the average selling price of balloon catheters, all data rely on projections available through 2012.  Projections for 2013 and 2014 are assumed to be the same as those in 2012.

In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market.  Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW to rapid exchange balloon catheter sales in 2006.

[1]  The total for 2007 consists of only November and December data. The total for 2014 consists only of January data.

[2]  Boston Scientific's may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3]  The average selling price of balloon catheters was $200 in 2007. The price is assumed to decline at the same rate as drug-eluting stent delivery systems.

<u>Sources and Notes on the Calculations for Each Row in the Table:</u>

(1)  "Boston Scientific, 1Q08: Yes…Guidance Looks Conservative," Morgan Stanley, April 22, 2008, p. 17.

(2)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(3)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(4)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(5)  Testimony of Paul Meyer (PDX D009).

(6)  = (5) * [1 - 0.4]

(7)  = [(1) * (5)] + [(2) * (5)] + [(3) * (5)] + [(4) * (6)]

(8)  = (1) - BSC lost revenues

(9)  = (2) - BSC lost revenues

(10)  = (3) - BSC lost revenues

(11)  = (4) - BSC lost revenues

(12)  Assumed to be zero.

(13)  Testimony of Paul Meyer (PDX D009).

(14)  = (13) * [1 - 0.4]

(15)  = [(8) * (13)] + [(9) * (13)] + [(10) * (13)] + [(11) * (14)]

(16)  Testimony of Samuel Liang, Cordis VP of Worldwide Commercial Operations, October 11, 2007. (Tr. 535: 22-24).

(17)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(18)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(19)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.

(20)  = (1) / (16)

(21)  = (2) / (17)

(22)  = (3) / (18)

(23)  = (4) / (19)

(24)  = (20) * (16)

(25)  = (21) * (16)

(26)  = (22) * (16)

(27)  = (23) * (16)

(28)  = (7) - (15)

(29)  BSC's estimated weighted average cost of capital.  See Exhibit 8.

(30)  $= [(24) + (25) + (26) + (27)] / [1 + (29)]^T$

(31)  $= (28) / [1 + (29)]^T$

(32)  $= \sum(30) / \sum(31)$

Exhibit 4B

**Boston Scientific's Maximum Willingness to Pay Cordis for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval Process and Promus Is An Infringing Product**

**Month-by-Month Detail for 2007 and 2008**

**(A) BSC Profits: With License**

| | Nov[1] | Dec | Total | Jan[2] | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | | | | | | | | |
| (1) Balloon Catheters | $ 29 | $ 29 | $ 57 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 345 |
| (2) Bare Metal Stents | 9 | 9 | 17 | 9 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 7 | 7 | 7 | 96 |
| (3) TAXUS Drug-Eluting Stents | 75 | 75 | 149 | 75 | 68 | 68 | 68 | 68 | 51 | 39 | 39 | 39 | 35 | 35 | 35 | 617 |
| (4) PROMUS Drug-Eluting Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 14 | 27 |
| Total | $ 112 | $ 112 | $ 224 | $ 112 | $ 105 | $ 105 | $ 105 | $ 105 | $ 100 | $ 89 | $ 89 | $ 89 | $ 85 | $ 85 | $ 85 | $ 1,151 |
| (5) Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (6) PROMUS Profit Margin | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % |
| (7) BSC Profit | $ 34 | $ 34 | $ 67 | $ 34 | $ 31 | $ 31 | $ 31 | $ 31 | $ 28 | $ 25 | $ 25 | $ 25 | $ 24 | $ 24 | $ 24 | $ 334 |

**(B) BSC Profits: Without License**

| | Nov[1] | Dec | Total | Jan[2] | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BSC Total Revenues** | | | | | | | | | | | | | | | | |
| (8) Balloon Catheters | $ 7 | $ 7 | $ 15 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 29 | $ 29 | $ 131 |
| (9) Bare Metal Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 15 |
| (10) TAXUS Drug-Eluting Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 35 | 70 |
| (11) PROMUS Drug-Eluting Stents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 14 | 27 |
| Total | $ 7 | $ 7 | $ 15 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 7 | $ 85 | $ 85 | $ 243 |
| (12) Cost of Design Around | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (13) Profit Margin | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| (14) PROMUS Profit Margin | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % | 18 % |
| (15) BSC Profit | $ 2 | $ 2 | $ 4 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 2 | $ 24 | $ 24 | $ 70 |

**(C) Royalty Base Calculation**

| | Nov[1] | Dec | Total | Jan[2] | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Average Selling Price** | | | | | | | | | | | | | | | | |
| (16) Balloon Catheters[3] | $ 200 | $ 200 | $ 200 | $ 200 | $ 192 | $ 192 | $ 192 | $ 192 | $ 192 | $ 191 | $ 191 | $ 191 | $ 190 | $ 190 | $ 190 | $ 192 |
| (17) Bare Metal Stents | 829 | 829 | 829 | 829 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 806 |
| (18) TAXUS Drug-Eluting Stents | 2,125 | 2,125 | 2,125 | 2,125 | 2,036 | 2,036 | 2,036 | 2,036 | 2,036 | 2,028 | 2,028 | 2,028 | 2,019 | 2,019 | 2,019 | 2,037 |
| (19) PROMUS Drug-Eluting Stents | 2,125 | 2,125 | 2,125 | 2,125 | 2,036 | 2,036 | 2,036 | 2,036 | 2,036 | 2,028 | 2,028 | 2,028 | 2,019 | 2,019 | 2,019 | 2,037 |
| **BSC Unit Sales With License** | | | | | | | | | | | | | | | | |
| (20) Balloon Catheters | 0.143 | 0.143 | 0.285 | 0.143 | 0.150 | 0.150 | 0.150 | 0.150 | 0.150 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 0.151 | 1.798 |
| (21) Bare Metal Stents | 0.010 | 0.010 | 0.021 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.009 | 0.009 | 0.009 | 0.119 |
| (22) TAXUS Drug-Eluting Stents | 0.035 | 0.035 | 0.070 | 0.035 | 0.033 | 0.033 | 0.033 | 0.033 | 0.025 | 0.019 | 0.019 | 0.019 | 0.017 | 0.017 | 0.017 | 0.302 |
| (23) PROMUS Drug-Eluting Stents | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.006 | 0.007 | 0.007 | 0.007 | 0.007 | 0.007 | 0.046 |
| Total | 0.188 | 0.188 | 0.376 | 0.188 | 0.194 | 0.194 | 0.194 | 0.194 | 0.191 | 0.186 | 0.186 | 0.186 | 0.185 | 0.185 | 0.185 | 2.266 |
| **BSC Catheter-Related Revenues** | | | | | | | | | | | | | | | | |
| (24) Balloon Catheters | $ 29 | $ 29 | $ 57 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 29 | $ 345 |
| (25) Bare Metal Stents - Catheter Only | 2 | 2 | 4 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 23 |
| (26) TAXUS Drug-Eluting Stents - Catheter Only | 7 | 7 | 14 | 7 | 6 | 6 | 6 | 6 | 5 | 4 | 4 | 4 | 3 | 3 | 3 | 58 |
| (27) PROMUS Drug-Eluting Stents - Catheter Only | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 9 |
| Total | $ 38 | $ 38 | $ 75 | $ 38 | $ 37 | $ 37 | $ 37 | $ 37 | $ 37 | $ 36 | $ 36 | $ 36 | $ 35 | $ 35 | $ 35 | $ 434 |
| (28) **Difference in Profit** | $ 31 | $ 31 | $ 63 | $ 31 | $ 29 | $ 29 | $ 29 | $ 29 | $ 26 | $ 23 | $ 23 | $ 23 | $ 22 | $ 0 | $ 0 | $ 264 |

**Exhibit 4B**
**Notes and Sources**

General Notes:

All figures are rounded, thus totals may not sum precisely.

All unit sales are in millions.  All revenues are in millions and represent sales in the United States.

To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts.  January 2008 revenues and shares reflect Q4 2007 forecasts.  February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts.  June 2008 revenues and shares reflect Q2 2008 forecasts.  Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

June 2008 revenues from BSC's sales of Promus are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter.

With the exception of the average selling price of balloon catheters, all data rely on projections available through 2012.

In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market.  Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW to rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data.

[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3] The average selling price of balloon catheters was $200 in 2007. The price is assumed to decline at the same rate as drug-eluting stent delivery systems.

Sources and Notes on the Calculations for Each Row in the Table:

(1)  "Boston Scientific, 1Q08: Yes…Guidance Looks Conservative," Morgan Stanley, April 22, 2008, p. 17.
(2)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(3)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(4)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(5)  Testimony of Paul Meyer (PDX D009).
(6)  = (5) * [1 - 0.4]
(7)  = [(1) * (5)] + [(2) * (5)] + [(3) * (5)] + [(4) * (6)]
(8)  = (1) - BSC lost revenues
(9)  = (2) - BSC lost revenues
(10)  = (3) - BSC lost revenues
(11)  = (4) - BSC lost revenues
(12)  Assumed to be zero.
(13)  Testimony of Paul Meyer (PDX D009).
(14)  = (13) * [1 - 0.4]
(15)  = [(8) * (13)] + [(9) * (13)] + [(10) * (13)] + [(11) * (14)]
(16)  Testimony of Samuel Liang, Cordis VP of Worldwide Commercial Operations, October 11, 2007. (Tr. 535: 22-24).
(17)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(18)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(19)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(20)  = (1) / (16)
(21)  = (2) / (17)
(22)  = (3) / (18)
(23)  = (4) / (19)
(24)  = (20) * (16)
(25)  = (21) * (16)
(26)  = (22) * (16)
(27)  = (23) * (16)
(28)  = (7) - (15)

EXHIBIT 5A

**Cordis's Minimum Willingness to Accept from Boston Scientific for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval and PROMUS Is Not An Infringing Product**
**2007-2014**

| | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[1] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **(1) Industry Revenues for Drug-Eluting Stents** | $ 276 | $ 1,628 | $ 1,520 | $ 1,426 | $ 1,338 | $ 1,256 | $ 1,256 | $ 105 | **$ 8,805** |
| **(A) Cordis Profits: With License** | | | | | | | | | |
| **(2) Cordis Drug-Eluting Stent Shares** | 45.9 % | 32.5 % | 23.8 % | 21.0 % | 20.7 % | 20.7 % | 20.7 % | 20.7 % | **25.7 %** |
| **(3) Cordis Drug-Eluting Stent Revenues** | $ 127 | $ 529 | $ 361 | $ 300 | $ 277 | $ 260 | $ 260 | $ 22 | **$ 2,135** |
| **(4) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | **30 %** |
| **(5) Cordis Profits** | $ 38 | $ 159 | $ 108 | $ 90 | $ 83 | $ 78 | $ 78 | $ 7 | **$ 641** |
| **(B) Cordis Profits: Without License** | **2007[1]** | **2008[2]** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014[1]** | **Total** |
| **(6) Cordis Drug-Eluting Stent Shares (No Capacity Constraint)** | 100.0 % | 54.8 % | 23.8 % | 21.0 % | 20.7 % | 20.7 % | 20.7 % | 20.7 % | **35.3 %** |
| **(7) Cordis Drug-Eluting Stent Revenues** | $ 127 | $ 893 | $ 361 | $ 300 | $ 277 | $ 260 | $ 260 | $ 22 | **$ 2,499** |
| **(8) Average Selling Price of Drug-Eluting Stents** | $ 2,125 | $ 2,037 | $ 1,868 | $ 1,718 | $ 1,581 | $ 1,454 | $ 1,454 | $ 1,454 | **$ 1,711** |
| **(9) Cordis Drug-Eluting Stent Unit Sales (No Capacity Constraint)[3]** | 0.130 | 0.442 | 0.193 | 0.175 | 0.175 | 0.179 | 0.179 | 0.015 | **0.186** |
| **(10) Cordis Drug-Eluting Stent Unit Sales (With Capacity Constraint)[3]** | 0.060 | 0.437 | 0.193 | 0.175 | 0.175 | 0.179 | 0.179 | 0.015 | **0.176** |
| **(11) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | **30 %** |
| **(12) Cordis Profits** | $ 38 | $ 268 | $ 108 | $ 90 | $ 83 | $ 78 | $ 78 | $ 7 | **$ 750** |
| **(C) Royalty Rate Calculation** | | | | | | | | | |
| **(13) Difference in Profits** | $ 0 | $ 109 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | **$ 109** |
| **(14) Discount Rate** | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | **6.87 %** |
| **(15) NPV of the Difference in Profits** | 0 | 102 | 0 | 0 | 0 | 0 | 0 | 0 | **102** |
| **(16) NPV of BSC Catheter-Related Revenues (Royalty Base)** | | | | | | | | | **1,970** |
| **(17) Minimum Willingness To Accept** | | | | | | | | | **5.19 %** |

General Notes:

All figures are rounded, thus totals may not sum precisely.

All unit sales are in millions. All revenues are in millions and represent sales in the United States.

To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts. January 2008 revenues and shares reflect Q4 2007 forecasts. February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts. June 2008 revenues and shares reflect Q2 2008 forecasts. Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

June 2008 revenues from BSC's sales of Promus and Abbott's sales of Xience are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter. Shares of all drug-eluting stent manufacturers have been adjusted accordingly in this time period.

All data rely on projections available through 2012. Projections for 2013 and 2014 are assumed to be the same as those in 2012.

In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market. Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW or rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data. The total for 2014 consists only of January data.

[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3] For the first three months of the "Without License" scenario, Cordis' drug-eluting stent revenues is calculated using the minimum of the unit sales with capacity constraint and unit sales without capacity constraint.

Sources and Notes on the Calculations for Each Row in the Table:

(1) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(2) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(3) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(4) Testimony of Paul Meyer (PDX D009).
(5) = (3) * (4)
(6) = (2) + Cordis's gained shares
(7) = (1) * (6). In the first three months of the hypothetical negotiation, it is the lower of the first formula or the following formula: (8) * (10)
(8) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(9) = (7) / (8)
(10) = (7) / (8). In the first two months following the hypothetical negotiation, production is constrained to pre-negotiation levels before doubling in the third month. After that, production levels are unconstrained.
(11) Testimony of Paul Meyer (PDX D009).
(12) = (7) * (11)
(13) = (12) - (5)
(14) Johnson and Johnson's estimated weighted average cost of capital. See Exhibit 9.
(15) = (13) / [1 + (14)]$^T$
(16) = (BSC Catheter-Related Revenues) / [1 + (14)]$^T$
(17) = Σ(15) / Σ(16)

EXHIBIT 5B

**Cordis's Minimum Willingness to Accept from Boston Scientific for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval and PROMUS Is Not An Infringing Product**
**Month-by-Month Detail for 2007 and 2008**

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
| | November | December | Total | January | February | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(1) Industry Revenues for Drug-Eluting Stents** | $ 138 | $ 138 | $ 276 | $ 138 | $ 141 | $ 141 | $ 141 | $ 141 | $ 137 | $ 134 | $ 134 | $ 134 | $ 130 | $ 130 | $ 130 | $ 1,628 |
| **(A) Cordis Profits: With License** | | | | | | | | | | | | | | | | |
| **(2) Cordis Drug-Eluting Stent Shares** | 45.9 % | 45.9 % | 45.9 % | 45.9 % | 40.0 % | 40.0 % | 40.0 % | 40.0 % | 36.2 % | 25.9 % | 25.9 % | 25.9 % | 23.4 % | 23.4 % | 23.4 % | 32.5 % |
| **(3) Cordis Drug-Eluting Stent Revenues** | $ 63 | $ 63 | $ 127 | $ 63 | $ 56 | $ 56 | $ 56 | $ 56 | $ 45 | $ 35 | $ 35 | $ 35 | $ 30 | $ 30 | $ 30 | $ 529 |
| **(4) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(5) Cordis Profits** | $ 19 | $ 19 | $ 38 | $ 19 | $ 17 | $ 17 | $ 17 | $ 17 | $ 14 | $ 10 | $ 10 | $ 10 | $ 9 | $ 9 | $ 9 | $ 159 |

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
| | November | December | Total | January | February | March | April | May | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **(B) Cordis Profits: Without License** | | | | | | | | | | | | | | | | |
| **(6) Cordis Drug-Eluting Stent Shares (No Capacity Constraint)** | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 77.2 % | 77.2 % | 77.2 % | 77.2 % | 61.1 % | 36.4 % | 36.4 % | 36.4 % | 32.0 % | 23.4 % | 23.4 % | 54.8 % |
| **(7) Cordis Drug-Eluting Stent Revenues** | $ 63 | $ 63 | $ 127 | $ 127 | $ 109 | $ 109 | $ 109 | $ 109 | $ 83 | $ 49 | $ 49 | $ 49 | $ 42 | $ 30 | $ 30 | $ 893 |
| **(8) Average Selling Price of Drug-Eluting Stents** | $ 2,125 | $ 2,125 | $ 2,125 | $ 2,125 | $ 2,036 | $ 2,036 | $ 2,036 | $ 2,036 | $ 2,036 | $ 2,028 | $ 2,028 | $ 2,028 | $ 2,019 | $ 2,019 | $ 2,019 | $ 2,037 |
| **(9) Cordis Drug-Eluting Stent Unit Sales (No Capacity Constraint)[3]** | 0.065 | 0.065 | 0.130 | 0.065 | 0.053 | 0.053 | 0.053 | 0.053 | 0.041 | 0.024 | 0.024 | 0.024 | 0.021 | 0.015 | 0.015 | 0.442 |
| **(10) Cordis Drug-Eluting Stent Unit Sales (With Capacity Constraint)[3]** | 0.030 | 0.030 | 0.060 | 0.060 | 0.053 | 0.053 | 0.053 | 0.053 | 0.041 | 0.024 | 0.024 | 0.024 | 0.021 | 0.015 | 0.015 | 0.437 |
| **(11) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(12) Cordis Profits** | $ 19 | $ 19 | $ 38 | $ 38 | $ 33 | $ 33 | $ 33 | $ 33 | $ 25 | $ 15 | $ 15 | $ 15 | $ 12 | $ 9 | $ 9 | $ 268 |
| **(13) Difference in Profits** | $ 0 | $ 0 | $ 0 | $ 19 | $ 16 | $ 16 | $ 16 | $ 16 | $ 12 | $ 4 | $ 4 | $ 4 | $ 3 | $ 0 | $ 0 | $ 109 |

General Notes:

All figures are rounded, thus totals may not sum precisely.
All unit sales are in millions. All revenues are in millions and represent sales in the United States.
To account for the entry of Medtronic's Endeavor on February 1, 2008, and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts. January 2008 revenues and shares reflect Q4 2007 forecasts. February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts. June 2008 revenues and shares correspond to their respective quarterly forecasts. Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.
June 2008 revenues from BSC's sales of Promus and Abbott's sales of Xience are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter. Shares of all drug-eluting stent manufacturers have been adjusted accordingly in this time period.
All data rely on projections available through 2012.
In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market. Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW to rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data.
[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.
[3] For the first three months of the "Without License" scenario, Cordis' drug-eluting stent revenues is calculated using the minimum of the unit sales with capacity constraint and unit sales without capacity constraint.

Sources and Notes on the Calculations for Each Row in the Table:

(1) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(2) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(3) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(4) Testimony of Paul Meyer (PDX D009).
(5) = (3) * (4)
(6) = (2) + Cordis's gained shares
(7) = (1) * (6). In the first three months of the hypothetical negotiation, it is the lower of the first formula or the following formula: (8) * (10)
(8) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(9) = (7) / (8)
(10) = (7) / (8). In the first two months following the hypothetical negotiation, production is constrained to pre-negotiation levels before doubling in the third month. After that, production levels are unconstrained.
(11) Testimony of Paul Meyer (PDX D009).
(12) = (7) * (11)
(13) = (12) - (5)

EXHIBIT 6A

**Cordis's Minimum Willingness to Accept from Boston Scientific for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval and PROMUS Is An Infringing Product**
**2007-2014**

| | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[3] | Total |
|---|---|---|---|---|---|---|---|---|---|
| **(1) Industry Revenues for Drug-Eluting Stents** | $ 276 | $ 1,628 | $ 1,520 | $ 1,426 | $ 1,338 | $ 1,256 | $ 1,256 | $ 105 | $ 8,805 |
| **(A) Cordis Profits: With License** | | | | | | | | | |
| **(2) Cordis Drug-Eluting Stent Shares** | 45.9 % | 32.5 % | 23.8 % | 21.0 % | 20.7 % | 20.7 % | 20.7 % | 20.7 % | 25.7 % |
| **(3) Cordis Drug-Eluting Stent Revenues** | $ 127 | $ 529 | $ 361 | $ 300 | $ 277 | $ 260 | $ 260 | $ 22 | $ 2,135 |
| **(4) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(5) Cordis Profits** | $ 38 | $ 159 | $ 108 | $ 90 | $ 83 | $ 78 | $ 78 | $ 7 | $ 641 |
| **(B) Cordis Profits: Without License** | 2007[1] | 2008[2] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014[3] | Total |
| **(6) Cordis Drug-Eluting Stent Shares (No Capacity Constraint)** | 100.0 % | 57.1 % | 23.8 % | 21.0 % | 20.7 % | 20.7 % | 20.7 % | 20.7 % | 35.6 % |
| **(7) Cordis Drug-Eluting Stent Revenues** | $ 127 | $ 930 | $ 361 | $ 300 | $ 277 | $ 260 | $ 260 | $ 22 | $ 2,536 |
| **(8) Average Selling Price of Drug-Eluting Stents** | $ 2,125 | $ 2,037 | $ 1,868 | $ 1,718 | $ 1,581 | $ 1,454 | $ 1,454 | $ 1,454 | $ 1,711 |
| **(9) Cordis Drug-Eluting Stent Unit Sales (No Capacity Constraint)[5]** | 0.130 | 0.460 | 0.193 | 0.175 | 0.175 | 0.179 | 0.179 | 0.015 | 0.188 |
| **(10) Cordis Drug-Eluting Stent Unit Sales (With Capacity Constraint)[5]** | 0.060 | 0.455 | 0.193 | 0.175 | 0.175 | 0.179 | 0.179 | 0.015 | 0.179 |
| **(11) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(12) Cordis Profits** | $ 38 | $ 279 | $ 108 | $ 90 | $ 83 | $ 78 | $ 78 | $ 7 | $ 761 |
| **(C) Royalty Rate Calculation** | | | | | | | | | |
| **(13) Difference in Profits** | $ 0 | $ 120 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 120 |
| **(14) Discount Rate** | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % | 6.87 % |
| **(15) NPV of the Difference in Profits** | 0 | 113 | 0 | 0 | 0 | 0 | 0 | 0 | 113 |
| **(16) NPV of BSC Catheter-Related Revenues (Royalty Base)** | | | | | | | | | 2,034 |
| **(17) Minimum Willingness To Accept** | | | | | | | | | 5.53 % |

General Notes:

All figures are rounded, thus totals may not sum precisely.

All unit sales are in millions. All revenues are in millions and represent sales in the United States.

To account for the entry of Medtronic's Endeavor on February 1, 2008 and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly forecasts. January 2008 revenues and shares reflect Q4 2007 forecasts. February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts. June 2008 revenues and shares reflect Q2 2008 forecasts. Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.

June 2008 revenues from BSC's sales of Promus and Abbott's sales of Xience are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter. Shares of all drug-eluting stent manufacturers have been adjusted accordingly in this time period.

All data rely on projections available through 2012. Projections for 2013 and 2014 are assumed to be the same as those in 2012.

In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market. Revenues from sales of over-the-wire balloon catheters have been projected using the proportion of OTW or rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data. The total for 2014 consists only of January data.

[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.

[3] For the first three months of the "Without License" scenario, Cordis' drug-eluting stent revenues is calculated using the minimum of the unit sales with capacity constraint and unit sales without capacity constraint.

Sources and Notes on the Calculations for Each Row in the Table:

(1) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(2) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(3) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(4) Testimony of Paul Meyer (PDX D009).
(5) = (3) * (4)
(6) = (2) + Cordis's gained shares
(7) = (1) * (6). In the first three months of the hypothetical negotiation, it is the lower of the first formula or the following formula: (8) * (10)
(8) "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(9) = (7) / (8)
(10) = (7) / (8). In the first two months following the hypothetical negotiation, production is constrained to pre-negotiation levels before doubling in the third month. After that, production levels are unconstrained.
(11) Testimony of Paul Meyer (PDX D009).
(12) = (7) * (11)
(13) = (12) - (5)
(14) Johnson and Johnson's estimated weighted average cost of capital. See Exhibit 9.
(15) = (13) / [1 + (14)]$^T$
(16) = (BSC Catheter-Related Revenues) / [1 + (14)]$^T$
(17) = Σ(15) / Σ(16)

EXHIBIT 6B

**Cordis's Minimum Willingness to Accept from Boston Scientific for a License to the Fontirroche Patent**
**Assuming 12 Month FDA Approval and PROMUS Is An Infringing Product**
**Month-by-Month Detail for 2007 and 2008**

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | November | December | Total | January | February | March | April | May | June | July | August | September | October | November | December | Total |
| **(1) Industry Revenues for Drug-Eluting Stents** | $ 138 | $ 138 | $ 276 | $ 138 | $ 141 | $ 141 | $ 141 | $ 141 | $ 137 | $ 134 | $ 134 | $ 134 | $ 130 | $ 130 | $ 130 | $ 1,628 |
| **(A) Cordis Profits: With License** | | | | | | | | | | | | | | | | |
| **(2) Cordis Drug-Eluting Stent Shares** | 45.9 % | 45.9 % | 45.9 % | 45.9 % | 40.0 % | 40.0 % | 40.0 % | 40.0 % | 36.2 % | 25.9 % | 25.9 % | 25.9 % | 23.4 % | 23.4 % | 23.4 % | 32.5 % |
| **(3) Cordis Drug-Eluting Stent Revenues** | $ 63 | $ 63 | $ 127 | $ 63 | $ 56 | $ 56 | $ 56 | $ 56 | $ 45 | $ 35 | $ 35 | $ 35 | $ 30 | $ 30 | $ 30 | $ 529 |
| **(4) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(5) Cordis Profits** | $ 19 | $ 19 | $ 38 | $ 19 | $ 17 | $ 17 | $ 17 | $ 17 | $ 14 | $ 10 | $ 10 | $ 10 | $ 9 | $ 9 | $ 9 | $ 159 |

| | 2007[1] | | | 2008[2] | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | November | December | Total | January | February | March | April | May | June | July | August | September | October | November | December | Total |
| **(B) Cordis Profits: Without License** | | | | | | | | | | | | | | | | |
| **(6) Cordis Drug-Eluting Stent Shares (No Capacity Constraint)** | 100.0 % | 100.0 % | 100.0 % | 100.0 % | 77.2 % | 77.2 % | 77.2 % | 77.2 % | 64.7 % | 42.5 % | 42.5 % | 42.5 % | 37.4 % | 23.4 % | 23.4 % | 57.1 % |
| **(7) Cordis Drug-Eluting Stent Revenues** | $ 63 | $ 63 | $ 127 | $ 127 | $ 109 | $ 109 | $ 109 | $ 109 | $ 88 | $ 57 | $ 57 | $ 57 | $ 49 | $ 30 | $ 30 | $ 930 |
| **(8) Average Selling Price of Drug-Eluting Stents** | $ 2,125 | $ 2,125 | $ 2,125 | $ 2,125 | $ 2,036 | $ 2,036 | $ 2,036 | $ 2,036 | $ 2,028 | $ 2,028 | $ 2,028 | $ 2,028 | $ 2,019 | $ 2,019 | $ 2,019 | $ 2,037 |
| **(9) Cordis Drug-Eluting Stent Unit Sales (No Capacity Constraint)[3]** | 0.065 | 0.065 | 0.130 | 0.065 | 0.053 | 0.053 | 0.053 | 0.053 | 0.043 | 0.028 | 0.028 | 0.028 | 0.024 | 0.015 | 0.015 | 0.460 |
| **(10) Cordis Drug-Eluting Stent Unit Sales (With Capacity Constraint)[3]** | 0.030 | 0.030 | 0.060 | 0.060 | 0.053 | 0.053 | 0.053 | 0.053 | 0.043 | 0.028 | 0.028 | 0.028 | 0.024 | 0.015 | 0.015 | 0.455 |
| **(11) Profit Margin** | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % | 30 % |
| **(12) Cordis Profits** | $ 19 | $ 19 | $ 38 | $ 38 | $ 33 | $ 33 | $ 33 | $ 33 | $ 27 | $ 17 | $ 17 | $ 17 | $ 15 | $ 9 | $ 9 | $ 279 |
| **(13) Difference in Profits** | $ 0 | $ 0 | $ 0 | $ 19 | $ 16 | $ 16 | $ 16 | $ 16 | $ 13 | $ 7 | $ 7 | $ 7 | $ 5 | $ 0 | $ 0 | $ 120 |

General Notes:

All figures are rounded, thus totals may not sum precisely.
All unit sales are in millions.  All revenues are in millions and represent sales in the United States.
To account for the entry of Medtronic's Endeavor on February 1, 2008, and the presumed entry of Abbott's Xience and BSC's Promus on June 1, 2008, monthly revenues and shares were projected using quarterly
    forecasts.  January 2008 revenues and shares reflect Q4 2007 forecasts.  February 2008 - May 2008 revenues and shares reflect Q1 2008 forecasts.  June 2008 revenues and shares reflect Q2 2008 forecasts.
    Subsequent monthly revenues and shares correspond to their respective quarterly forecasts.
June 2008 revenues from BSC's sales of Promus and Abbott's sales of Xience are estimated to be one-half of Q2 2008 forecasts because projected revenues are earned only in the last two months of the quarter.
    Shares of all drug-eluting stent manufacturers have been adjusted accordingly in this time period.
All data rely on projections available through 2012.
In the but-for world, BSC would be able to sell over-the-wire balloon catheters during the period when they are out of the market.  Revenues from sales of over-the-wire balloon catheters have been projected using the proportion
    of OTW to rapid exchange balloon catheter sales in 2006.

[1] The total for 2007 consists of only November and December data.
[2] Boston Scientific may have manufactured some products to be sold outside the U.S. in 2008, but for the purposes of this analysis, only domestic U.S. sales are included.
[3] For the first three months of the "Without License" scenario, Cordis' drug-eluting stent revenues is calculated using the minimum of the unit sales with capacity constraint and unit sales without capacity constraint.

Sources and Notes on the Calculations for Each Row in the Table:

(1)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(2)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(3)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(4)  Testimony of Paul Meyer (PDX D009).
(5)  = (3) * (4)
(6)  = (2) + Cordis's gained shares
(7)  = (1) * (6). In the first three months of the hypothetical negotiation, it is the lower of the first formula or the following formula: (8) * (10)
(8)  "Johnson & Johnson Inc (JNJ): It May Be Unleaded, But There's Still Some Gas Left In The Tank," Citi Investment Research, April 16, 2008, p. 11.
(9)  = (7) / (8)
(10) = (7) / (8). In the first two months following the hypothetical negotiation, production is constrained to pre-negotiation levels before doubling in the third month.  After that, production levels are unconstrained.
(11) Testimony of Paul Meyer (PDX D009).
(12) = (7) * (11)
(13) = (12) - (5)

Exhibit 7

**US Revenue Attributed to Catheter Portion of BSC Products
Alleged to Infringe the Fontirroche '594 Patent**

**2006**

| Balloon Catheters | Catheter Portion of Revenue |
|---|---|
| Maverick OTW | $ 41,712,310 |
| Maverick Rx | -- |
| Maverick2 Rx | 97,943,524 |
| Maverick LX | 1,404,261 |
| Quantum Maverick OTW | 10,720,914 |
| Quantum Maverick Rx | 49,723,304 |
| UltraSoft SV | 2,717,073 |
| **Total** | $ **204,221,386** |
| | |
| **Total Rx Revenue** | $ **151,788,162** |
| **Total OTW Revenue** | $ **52,433,224** |
| | |
| **Rx Portion of Revenue** | **74.3 %** |
| **OTW Portion of Revenue** | **25.7 %** |

Note:  Maverick LX and UltraSoft SV are Rapid Exchange products.

Source:  Chandler Declaration, Exhibit C.

# Boston Scientific Corporation
## Estimated Weighted Average Cost of Capital
## As of October 31, 2007

Weighted Average Cost of Capital = $[(R_d)*(1-T_c)*(D/V)] + \{[R_f + \beta*(R_e)]*(E/V)\}$

$R_d$ = Weighted Average Cost of Debt

$T_c$ = Corporate Tax Rate

$D$ = Total Debt

$E$ = Total Equity

$V$ = D + E = Total Capitalization

$\beta$ = Beta

$R_m$ = Market Rate of Return

$R_f$ = Risk Free Rate

$R_e = (R_m - R_f)$ = Equity Risk Premium

| | |
|---|---|
| Weighted Average Cost of Debt[1] | 6.36% |
| Corporate Tax Rate[2] | 35.00% |
| Debt ($ Millions)[3] | 8,189 |
| Equity ($ Millions)[4] | 20,677 |
| Total Capitalization ($ Millions)[5] | 28,866 |
| Risk Free Rate[6] | 4.16% |
| Beta[7] | 0.87 |
| Equity Risk Premium[8] | 7.10% |
| **Weighted Average Cost of Capital** | **8.58%** |

**Notes and Sources:**

[1] BSX's Form 10-K for the period ending December 31, 2007, p. 58.

[2] BSX's Form 10-K for the period ending December 31, 2007, p. 108.

[3] BSX's Form 10-K for the period ending December 31, 2007, p. 57.

[4] Equals number of shares outstanding as of October 31, 2007 (1,490,785,766) times the closing stock price of Boston Scientific Corp. (BSX) stock on October 31, 2007 ($13.87). Shares outstanding as reported in Boston Scientific Corp. Form 10-Q filing with the SEC, September 30, 2007., p. 1.  Stock prices are obtained from Google Finance.

[5] Total Capitalization is equal to Debt plus Equity.

[6] U.S. Treasury Securities, Nominal 5-year Constant Maturity for October 31, 2007 (http://www.federalreserve.gov/releases/h15/data/Business_day/H15_TCMNOM_Y5.txt).

[7] 3-Year Beta versus the S&P500 obtained from Yahoo Finance.

[8] Long-horizon expected equity risk premium.  Obtained from Morningstar, Inc.'s *Stocks, Bonds, Bills and Inflation (SBBI): Valuation Edition 2007 Yearbook.*

**Johnson and Johnson**
**Estimated Weighted Average Cost of Capital**
**As of October 31, 2007**

Weighted Average Cost of Capital = $[(R_d)*(1-T_c)*(D/V)] + \{[R_f + \beta*(R_e)]*(E/V)\}$

$$R_d = \text{Weighted Average Cost of Debt}$$
$$T_c = \text{Corporate Tax Rate}$$
$$D = \text{Total Debt}$$
$$E = \text{Total Equity}$$
$$V = D + E = \text{Total Capitalization}$$
$$\beta = \text{Beta}$$
$$R_m = \text{Market Rate of Return}$$
$$R_f = \text{Risk Free Rate}$$
$$R_e = (R_m - R_f) = \text{Equity Risk Premium}$$

| | |
|---|---:|
| Weighted Average Cost of Debt[1] | 5.47% |
| Corporate Tax Rate[2] | 35.00% |
| Debt ($ Millions)[3] | 7,074 |
| Equity ($ Millions)[4] | 186,500 |
| Total Capitalization ($ Millions)[5] | 193,574 |
| Risk Free Rate[6] | 4.16% |
| Beta[7] | 0.4 |
| Equity Risk Premium[8] | 7.10% |
| **Weighted Average Cost of Capital** | **6.87%** |

**Notes and Sources:**

[1] JNJ's 2007 Annual Report for the period ending December 30, 2007, p. 55.

[2] JNJ's 2007 Annual Report for the period ending December 30, 2007, p. 56.

[3] JNJ's 2007 Annual Report for the period ending December 30, 2007, p. 55.

[4] Equals number of shares outstanding as of October 28, 2007 (2,861,749,911) times the closing stock price of Johnson and Johnson. (JNJ) stock on October 31, 2007 ($65.17). Shares outstanding as reported in Johnson and Johnson Form 10-Q filing with the SEC, September 30, 2007, p. 1.  Stock prices are obtained from Google Finance.

[5] Total Capitalization is equal to Debt plus Equity.

[6] U.S. Treasury Securities, Nominal 5-year Constant Maturity for October 31, 2007 (http://www.federalreserve.gov/releases/h15/data/Business_day/H15_TCMNOM_Y5.txt).

[7] 3-Year Beta versus the S&P500 obtained from Yahoo Finance.

[8] Long-horizon expected equity risk premium.  Obtained from Morningstar, Inc.'s *Stocks, Bonds, Bills and Inflation (SBBI): Valuation Edition 2007 Yearbook.*